J941mcc1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  CHANCE McCURDY,

4                 Plaintiff,

5          v.                           17 Civ. 5168 (GHW)

6  CORRECTION OFFICER J. MITCHELL
   and CAPTAIN OF CORRECTIONS
7  BELL,

8                 Defendants.          Jury Trial

9  ------------------------------x
                                       New York, N.Y.
10                                     September 4, 2019
                                       9:04 a.m.
11
   Before:
12
                     HON. GREGORY H. WOODS,
13
                                       District Judge
14
                          APPEARANCES
15
   THE LAW OFFICE OF FRED LICHTMACHER, P.C.
16      Attorneys for Plaintiff
   BY:  FRED LICHTMACHER, ESQ.
17
   NEW YORK CITY LAW DEPARTMENT
18 OFFICE OF THE CORPORATION COUNSEL
        For Defendants
19 BY:  BRACHAH GOYKADOSH, ACC
        OMAR J. SIDDIQI, ACC
20

21

22

23

24

25

J941mcc1

1             (In open court; jury not present)

2             THE COURT:  Thank you very much, counsel.  Good

3    morning.  Let's begin.

4             I have a number of things on the agenda.

5             First, all of our jurors are not yet here.  My

6    expectation is to begin promptly at 9:15, assuming that all the

7    jurors are present.

8             The second thing that I should inform you of is the

9    information that I have about Mr. McCurdy and his presentation.

10   So my clerk called the GVRC earlier this morning.  She was

11   informed earlier this morning -- I'm not sure exactly when,

12   shortly after 8 or 8:15 -- that he had not yet left the

13   facility, that he is in outtake at GVRC.  So I do not know when

14   he will be here.  I just got off of the phone with the Marshals

15   to let them know that we are waiting for him and that we want

16   him to be here promptly, and they know that as soon as he's

17   produced to MCC that they're to bring him to the courtroom, and

18   I worked out a protocol with them that I hope, if implemented

19   properly, will have us know as soon as he's here so that we can

20   take a break and so that we do not need to let the jury know

21   that he's coming in through the side door, which is the cells.

22   I expect he won't come into the courtroom from that cell in the

23   presence of the jury.

24             MR. LICHTMACHER:  Thank you, your Honor.

25             THE COURT:  Thank you.

J941mcc1

1          So the other things I have to discuss are what I'm

2     going to describe as a judicial notice issue, and I also

3     received the series of redactions from Exhibit 8.  I understand

4     there are no proposed redactions to Exhibit 14.

5          Counsel, is this set of redactions comprehensive or is

6     there anything that remains to be discussed during our brief

7     window prior to the arrival of our jurors?

8          MS. GOYKADOSH:  May I respond, your Honor?

9          THE COURT:  Yes.

10          MS. GOYKADOSH:  So two things.

11          The first is, with regards to Exhibit 14,

12     Mr. Lichtmacher informed me yesterday that he will not be using

13     that exhibit in part of the trial, so that is why there are no

14     redactions to that exhibit.

15          With regards to Exhibit 8, the parties conferred

16     yesterday and were able to reach resolution on almost

17     everything.  Defendants have two areas of dispute that we just

18     wanted to raise for the Court, but besides that, we are there,

19     I think.

20          THE COURT:  Good.  Thank you.

21          So let's take each of those up, unless there's

22     something else that the parties would like to raise with the

23     Court before the jury arrives.

24          Counsel, anything else that we should add to the

25     agenda before we begin our discussion of Exhibit 8?

J941mcc1

1          MR. SIDDIQI:  Your Honor, I have a very quick,

2     slightly strange question.  In the opening, I plan to use

3     quotations from certain records that have curse words in them.

4     I was wondering if your Honor has a preference of whether I can

5     say the curse word or I should say "F word."

6          THE COURT:  Thank you.  That's a fair question.

7          MR. LICHTMACHER:  May I be heard on this, your Honor.

8          THE COURT:  Yes.

9          MR. LICHTMACHER:  To the extent that we're going to be

10    told that that appears on documents, and no documents like that

11    have been offered in the JPTO, I would object to them being

12    referred to as being from a document, so if there's a document

13    where that has it and it's been stipped into evidence, I

14    wouldn't object, but since nothing's been stipped into

15    evidence, you know, referring to such a document would be

16    inappropriate.

17         THE COURT:  Thank you.

18         MR. SIDDIQI:  And I apologize, your Honor.  What I

19    meant to say, it's something that's going to come out in

20    Officer Mitchell's testimony from his memory.

21         THE COURT:  Thank you.

22         A few things.  First, obviously opening statements are

23    not themselves evidence.  Counsel is well warned and well

24    advised not to misstate the anticipated facts.  Jurors remember

25    it, and opposing counsel have a way to remind the jury when

J941mcc1

1    counsel states facts in their openings that do not prove

2    themselves during the course of trial.  So I make that comment

3    at the outset.

4           With respect to the use of curse words, my personal

5    preference is that they not be used because this is a

6    courtroom.  That's my preference, but it's far from my mandate.

7    I will not prohibit you from using curse words.  You should

8    make your own decisions about how best to choose your language.

9    If the language that you're going to use will come into

10   evidence, I will permit you to use it.  Frequently counsel

11   choose not to use such language in part out of respect for the

12   sensitivity of the jurors and for concern about whether

13   particular jurors may find the association with such language

14   to be adverse.  That kind of consideration is something I will

15   leave to the good judgment of counsel.

16          In sum, you should feel free to use whatever language

17   that you believe is appropriate in order to make your point.

18   You're aware of the potential concerns.  I will let you make

19   that call, ultimately, yourself.

20          MR. SIDDIQI:  Thank you for your guidance, your Honor.

21          THE COURT:  Thank you.

22          Good.  So thank you very much for raising the

23   question.  I appreciate it.

24          Counsel for plaintiff, any additional issues that

25   you'd like to raise before we begin a discussion of the

J941mcc1

1    Exhibit 8?

2              MR. LICHTMACHER:  Well, the same issue.  I'm just

3    concerned that anything that is not in evidence yet will be

4    discussed as if it is in evidence.  It goes for more than just

5    the one thing.  It's a little hard to put that cat back in the

6    bag if in fact your Honor does not admit into evidence in court

7    whatever they're going to say.  So that is my lone request.

8              Actually, one other thing.  The language, in terms of

9    referring to him as a rapist, I think the Court was kind of

10   clear about it, but I'd love to go over what kind of language

11   they're going to be allowed to use.

12             THE COURT:  Thank you.  Please proceed.

13             MR. LICHTMACHER:  Not a juror.  Okay.

14             THE COURT:  I just wanted to make sure the door was

15   not open as you were using that word.

16             MR. LICHTMACHER:  So I would just like to go over, you

17   know, specifically what your instruction is to that type of

18   language being used.  I think you mentioned the frequency of

19   it, I believe, in our last meeting.  I believe that's what you

20   said.

21             THE COURT:  Thank you.

22             MR. LICHTMACHER:  Or if we could have some clarity,

23   I'd appreciate it.

24             THE COURT:  Thank you.  Yes, I'd be happy to reprise

25   our discussion from before.

J941mcc1

1         In sum, I permitted the defense to introduce what I

2     described as the pedigree of the criminal offenses with which

3     he was convicted.  Those convictions in their basic pedigree

4     include the word "rape."  However, I directed that they not use

5     the word "rapist" throughout the course of the discussion of

6     the rationale, why it was that the officer and Captain Bell did

7     not believe that he'd be an effective interlocutor with the

8     remaining jail population.  Instead, I directed that they use

9     the less inflammatory term "sex offender."

10         MR. LICHTMACHER:  Thank you, your Honor.

11         THE COURT:  Thank you.  Good.

12         MR. LICHTMACHER:  Just so you know, that was

13    Mr. McCurdy's mother with his clothing.  I didn't mean to get

14    up.  I don't want to be rude.  But I know she has to run to

15    work.

16         THE COURT:  That's fine.  That's not a problem.  Thank

17    you very much.  The Marshals may want to look at the clothing

18    before he uses it, before it's handed back to them.  We'll set

19    up a process to allow them to do whatever they think is

20    appropriate from a security perspective before the clothing is

21    handed back to him.

22         MR. LICHTMACHER:  I'm aware of the procedure, your

23    Honor, of course.

24         THE COURT:  Thank you.

25         So give me one moment, please, counsel.

J941mcc1

1        Good.  So counsel for defendants, please let me know

2    what the issues are that you'd like to discuss with respect to

3    the proposed redactions to Exhibit 8.  Counsel.

4        MS. GOYKADOSH:  Yes, your Honor.

5        So the first issue, it appears globally throughout,

6    but the best page to look at is page D000775, and that's the

7    page with the radiology results for the wrist, and we agreed

8    that the words "cortical step-off" should be taken out.

9    Defendants also proposed that the words "which may suggest a

10   fracture" should also be taken out because it links back to the

11   "cortical step-off," and it's misleading to the jury.  So the

12   parties were unable to come to a resolution as to that.

13       Would your Honor like me to state the second issue as

14   well now?

15       THE COURT:  Thank you.  Please do.

16       MS. GOYKADOSH:  And the second issue, again, this

17   appears globally throughout, but the best page to look at is

18   D000783.  This is a page that is the radiology results for the

19   head CT, and there are two paragraphs on that page that say

20   "Finding."  The second paragraph on that page that says

21   "Finding" says, "There may be a slight buckling of the lateral

22   wall of the right maxillary sinus."  We proposed that that

23   sentence be taken out.  We do not believe that the concept, or

24   the term, actually, the medical terminology "buckling" is

25   within the province of the jury.  Plaintiff's counsel

J941mcc1

1    disagrees, so that's the second area of dispute.

2              THE COURT:  Thank you.

3              The question is the word "buckling" in this context,

4    is that correct?

5              MS. GOYKADOSH:  Correct, your Honor.

6              THE COURT:  Thank you.  Good.

7              So the jurors are all here.  Counsel for plaintiff,

8    any argument with respect to each of these issues?  And then I

9    will invite us to begin.  Counsel, any arguments on this?  I'll

10   consider it while you're opening.

11             MR. LICHTMACHER:  Sure.

12             First of all, for the "buckling," it's plain English,

13   "buckling."

14             THE COURT:  Thank you.

15             MR. LICHTMACHER:  It is simple.

16             Secondly, I understand the "step-off" argument, but

17   the other part, you know, he may have a fracture, that's plain

18   English that I don't need a doctor to bring in.

19             And by the way, this is why I didn't bring a doctor

20   in.  I consulted one.  You know, this is plain English.  These

21   are easy to read.  There are some things that are medical terms

22   that we did agree to redact, and a substantial number of

23   redactions, as you saw from the submission.  But, you know,

24   indicating that something may be fractured, we talked about

25   yesterday.  That goes to his emotional harm, oh, my god, I may

J941mcc1

 1    have a fracture, you know; and the buckling of the wall, he

 2    thinks he has a fracture in part of his head, and he does

 3    indicate that those parts of his body were parts where he was

 4    beaten.  So I think they're plain English, they don't need an

 5    expert, and they should come in.

 6              THE COURT:  Thank you.  Good.  I'll consider this.

 7              Counsel, before we bring in the jury, let me -- and

 8    I'll come back and give you a ruling on it promptly.  I don't

 9    understand these exhibits will come in during the first two

10    witnesses' testimony.

11              Counsel for plaintiff, first, would you like for me to

12    give the same kind of instruction that I gave during the voir

13    dire process yesterday -- namely, that Mr. McCurdy is not here

14    through no fault of his own, that they are not to hold the fact

15    that he is not present against him in any way, and that they're

16    not to speculate as to the reasons why he's not here?  Is that

17    helpful, from your perspective?  I'd be happy to repeat it if

18    you believe it would be beneficial.

19              MR. LICHTMACHER:  I think it's helpful.  I think it's

20    generous of the Court, particularly in light of the fact that

21    this was my fault, so I appreciate it greatly.

22              THE COURT:  Thank you.  I'd be happy to do that.

23              MR. LICHTMACHER:  Thank you.

24              THE COURT:  Counsel, do you need a ruling with respect

25    to the judicial notice issue before you open?  I can provide

J941mcc1

```
 1      you one if you like, but I'd also like to begin promptly if it
 2      turns on whether or not it's included in your opening.
 3             MR. LICHTMACHER:  It will be included in my opening
 4      depending on the ruling.  But I would certainly also hope we
 5      get a very short nature break before we start, your Honor.
 6      Very short.
 7             THE COURT:  Fine.  If it's very short, that's fine.
 8             So let me take up the issue first regarding the
 9      request that I take judicial notice of NYC Penal Law
10      Section 120.08.  I'm going to refer to this as the request that
11      I take judicial notice of the statute, but I use that largely
12      as a term to refer to the issue that it provokes.  That
13      request, like Helen, launches a thousand ships.  The purpose of
14      the request that I take judicial notice of the statute is to
15      facilitate an argument that, as I understand it, if the
16      incident occurred as the officers stated, then there would have
17      been a prosecution or a referral for prosecution and that the
18      investigation process that ensued would have resulted in the
19      acquisition of sworn statements and that, therefore, presumably
20      the officers may not have referred the incident for prosecution
21      because they did not want to provide such sworn statements; and
22      also to show that perhaps the incident itself did not occur
23      because the plaintiff was not prosecuted for it.  So I agree
24      with the defendants that I should not take judicial notice of
25      the statute.  And I use that, again, as a heading for
```

J941mcc1

commentary regarding what I understand to be the broader set of

arguments that the plaintiff would like to introduce that are

prompted by the request.

First, the fact of nonprosecution of the plaintiff

with respect to this incident has very little probative value,

if any.  There are many reasons why criminal acts are not

prosecuted.  Counsel for defendants proffered yesterday that

the officers are not the people who make the prosecution

decision.  Extrapolating from the fact of nonprosecution that

the reason for the nonprosecution was that the incident did not

occur is very tenuous and calls for the jury to speculate.  To

the extent that the proposed evidence of the nature of this

offense has any probative value, it's substantially outweighed

by the risk of juror confusion and the risk of wasting time --

the risk of juror confusion and wasting time in part because it

would require, as counsel for the defendants described

yesterday, a mini trial about the nature and circumstances of

DA referrals generally, the process that they use, the

inferences that they, the jury, can draw from that, all of

which I am concerned would be time-consuming.  And I also am

somewhat concerned we do not have witnesses who can testify to

it in depth, leaving the jury in a position to be required to

speculate in order to reach the kind of inferences that

plaintiff suggests.

I believe that the introduction of this line is also

J941mcc1                    Opening - Mr. Lichtmacher

1   prejudicial for substantially the reasons that I've just

2   described and that those prejudicial risks, together with the

3   risk of juror confusion and the risk of wasting time,

4   substantially outweigh what I view is the very minor probative

5   value of the evidence.

6          So counsel, let's take a very short rest break.  My

7   clerk will let the jury know that we'll be starting

8   momentarily, so please be back here as promptly as you can.

9   I'm going to step down during this short break.  Thank you.

10          MR. LICHTMACHER:  Thank you, your Honor.

11          (Recess)

12          (In open court)

13          THE COURT:  Thank you.  You can be seated.

14          Thank you.  Ms. Nelson, you can bring in the jury.

15          (Jury present)

16          THE COURT:  Thank you.  You can be seated.

17          So welcome back, ladies and gentlemen of the jury.

18   Thank you very much for all being here on time.  I appreciate

19   it.

20          So we're about to begin the trial.  One thing that

21   you'll note is that Mr. McCurdy is not here.  He's not here

22   through no fault of his own.  So again, I'm going to instruct

23   you not to hold the fact that he's not currently present in the

24   courtroom against him in any way in your deliberations and also

25   that you're not to speculate as to the reasons why he is not

J941mcc1                    Opening - Mr. Lichtmacher

1   currently present.

2          So the first step in the trial, as I told you all

3   yesterday, is opening statements.  First we're going to hear

4   from plaintiff's counsel, and then we will hear from counsel

5   for defendants.

6          With that, let me ask you all to pay close attention

7   to each of the lawyers as they give their opening statements.

8          Counsel for plaintiff.

9          MR. LICHTMACHER:  Thank you, your Honor.

10         Good morning, ladies and gentlemen.

11         Now the evidence here will show the following:  That

12   on February 19, 2015, Chance McCurdy was subjected to the use

13   of excessive force by the defendants, Corrections Officer

14   Mitchell and Captain Bell.  "Excessive force" will be defined

15   for you by the Court, and I will not usurp the role of the

16   Court.  What we're talking about here is a beating, plain and

17   simple; what we use in plain English, that he was beaten up and

18   that a substantial part of that beating happened while he was

19   in handcuffs, and as a result, he had injuries.

20         Now the evidence will show to you that the defendants

21   were less than forthright after the incident, even to the

22   extent of not acknowledging who was actually there when the

23   incident took place.  Mr. McCurdy was hit over several parts of

24   his body.  He's a big, strong guy, and he was in prison, no

25   doubt, but he was hit in several places and he has several

1    injuries, which you will hear about.

2            Now he was brought to the clinic on Rikers Island,

3    where they created a diagram of where his injuries are located,

4    and I hope to be able to show that to you during the trial.

5    The clinic referred him to Elmhurst Hospital, where he was

6    treated further.  When he was released, he was given oxycodone,

7    Percocet, ibuprofen, and something else for pain.  I don't

8    remember.  Another lesser one.

9            Now inmates do not get to just ask to go to the

10   hospital.  Unlike all of us here, if we decide we don't feel

11   well, we can get in an Uber, get in a cab, get in a subway, or

12   get our kids, our parents to drive us.  Inmates can't do that.

13   They're brought because the correctional facility deems it

14   appropriate to have them brought, and I'd like you to keep that

15   in mind.  We're not contesting that an inmate should be able to

16   go when he wants to a doctor, should be able to define when he

17   needs to be treated.  We're not contesting that.  That is the

18   way it is.  We accept it.  It's true.

19           Nor is anyone contesting the fact of his

20   incarceration.  It's not a false arrest case.  We're not saying

21   that he's pristine, that he shouldn't have been in a jail.

22   None of that is being argued here.  I want to be clear about

23   that.

24           I want to be clear about something else.  He has a

25   criminal record, and it includes sex offenses.  So Mr. McCurdy

J941mcc1                    Opening - Mr. Lichtmacher

1    is not what we would think of as maybe the most pristine human

2    being.  He's not somebody you'd want to live next to; he's not

3    somebody you want your kids to be friends with; he's not the

4    most wonderful human being, but that should make no difference

5    to you when ruling on this.  All of us here are special.

6    Whether or not we're perfect or the greatest country in the

7    world, we'll leave that argument to another day.  That is not

8    the point.  We are all subject to the same laws.  The least of

9    us and the best of us are all subject to the same laws.  And

10   because a person is in law enforcement, doesn't automatically

11   put him on the good guy side where they're allowed to break the

12   law.  In fact, it may do the exact opposite.  It may give them

13   an obligation, almost, to demonstrate through their behavior

14   what lawful conduct is like.

15            Mr. McCurdy, we acknowledge, is not a lawful person.

16   He's a person who's had problems, and you'll hear about them,

17   but it does not mean that he should be beaten up.  If

18   Mr. McCurdy doesn't have the same rights as the rest of us,

19   what's to stop the rest of our rights from being taken away

20   from us?  Nothing.  The law either applies to all of us or it

21   applies to none of us.

22            MR. SIDDIQI:  Objection.

23            THE COURT:  Thank you.  Sustained.

24            Please continue.

25            MR. LICHTMACHER:  Now we're not here to hear about

1    who's the good guys and who's the bad guys.  Mr. McCurdy is

2    clearly, what I said, by all civilized standards, not one of

3    the best of us, but in this particular instance, the defendants

4    will be shown to have acted far worse than Mr. McCurdy did.

5           Now I have no doubt the defendants will say:  It's all

6    about the money, it's all about the money.  No, it's not.  Not

7    for you it's not.  For you it's about the difference between

8    right and wrong, distinguishing good people and bad people.

9           MR. SIDDIQI:  Objection.

10          THE COURT:  Thank you.  Sustained.

11          Please refrain from argument during opening

12   statements, counsel.

13          MR. LICHTMACHER:  Now one day, almost every person in

14   jail will walk the streets among us.  We would hope at that

15   point they know more about what good behavior is and bad

16   behavior.  We would hope so.  We would hope they understand

17   there's a difference between good guys and bad guys.  If the

18   lesson in jail is beating and lying is --

19          MR. SIDDIQI:  Objection.

20          THE COURT:  Thank you.  Proceed, counsel.

21          MR. LICHTMACHER:  If the lesson in jail is beating and

22   lying is acceptable, what do we get when inmates get out?

23          Now you're in a position here to determine whose

24   behavior was more appropriate.  I'm probably asking you to go

25   against every instinct you have.  I'm probably asking you to

J941mcc1                    Opening - Mr. Lichtmacher

1   find for somebody that you may not like, and I'm probably

2   asking you to find against people that you may see as

3   protecting you.  But that is exactly what I'm asking you to do.

4   And the reason is, what matters is what happened during this

5   incident, and nothing else.

6          Now they say that getting a summons to appear for jury

7   duty is sort of like being told you have to go to a job

8   interview for a job you don't want.  We understand that.

9   Believe it or not, the lawyers get these same things that you

10  got.  We appreciate you showing up and doing your civic duty.

11  It's an important responsibility.

12         And this is an important case.  It's important because

13  of the principles we're talking about, that our rights belong

14  to everybody.  Now I urge you, in all our best interests, after

15  you've heard the evidence, to act not on who you like more but

16  of what you think actually happened, because that's what's

17  important.

18         Now being a member of law enforcement is a noble

19  undertaking.  I will not try to undermine that; I will not try

20  to berate that.  But nevertheless, they have the same

21  responsibility to be lawful as the rest of us have.  And when

22  they are not, we are in the unique position -- and most

23  countries do not allow this.  We're in a unique position of

24  bringing them into court and telling them that they did wrong,

25  if in fact you find that they did wrong.

1          Now I'm not going to demean law enforcement generally,

2    and I mean that.  We're going to distinguish what these people

3    have done to what good members of law enforcement hopefully act

4    like.

5          MR. SIDDIQI:  Objection.

6          THE COURT:  Thank you.  Sustained.

7          MR. LICHTMACHER:  Now you will only hear from

8    Mr. McCurdy on Mr. McCurdy's behalf, nobody else.  He's the

9    only one you're going to hear from.  He's in a jail.  There

10   aren't witnesses walking the street.  There were no video

11   cameras that took pictures of what was happening.

12         MR. SIDDIQI:  Objection.

13         THE COURT:  Thank you.  You can proceed, counsel.

14         MR. LICHTMACHER:  There were no video cameras of what

15   was happening.  There was Mr. McCurdy and a group of correction

16   personnel, and that's all.  So you will hear only from

17   Mr. McCurdy, and I'm sure that what you will hear from the

18   correction officers will be completely different from what you

19   hear from Mr. McCurdy.  They're completely distinguishable.

20   And we're counting on you to be able to do something very

21   difficult -- to see the truth even if it doesn't come from a

22   source that you admire, but see the truth based on what the

23   evidence shows.  Do not listen to maybe four or five people who

24   walk in and say, he did all these bad things and have one guy

25   that you may look at as a very bad guy come in --

1          MR. SIDDIQI:  Objection.

2          THE COURT:  Thank you.  Sustained.

3          MR. LICHTMACHER:  We are hoping you can listen to what

4   Mr. McCurdy says and listen to what all these correction

5   officers probably will say and determine who's telling the

6   truth -- not who you like more, but who is telling the truth,

7   because that's what really matters here.  That's what makes us

8   who we are as a people.

9          MR. SIDDIQI:  Objection.

10          MR. LICHTMACHER:  Thank you.

11          THE COURT:  Thank you.

12          Counsel, you can proceed.

13          MR. SIDDIQI:  Thank you, your Honor.

14          Good morning, ladies and gentlemen of the jury.  May

15   it please the Court.

16          On February 19, 2015, at Rikers Island, correction

17   officers were looking for a scalpel that had been used in a

18   violent slashing.  Slashing.  Officers were going cell by cell

19   searching for that weapon.  Officer Mitchell came to the cell

20   of the plaintiff, Chance McCurdy, to search him.  Instead of

21   being searched, plaintiff yelled "F you.  I'm going to cut one

22   of you."  He then threw his T-shirt at Officer Mitchell's face

23   to blind him and then sucker-punched Officer Mitchell in the

24   face.  And now we're here for a federal civil rights trial

25   because plaintiff wants you to pay him for refusing orders and

1    punching Officer Mitchell in the face.

2            Ladies and gentlemen of the jury, to understand this

3    case, you have to understand Rikers Island.  Rikers Island is a

4    jail; it's a correctional facility.  It is not a school; it's

5    not an office; it's not a hotel.  Some people at Rikers are

6    awaiting trial; some people at Rikers are awaiting sentencing;

7    some people at Rikers, like plaintiff, have already been

8    convicted of violent crimes.  Plaintiff is a convicted violent

9    sexual offender.

10           At Rikers, there are gangs.  There are gang members --

11           MR. LICHTMACHER:  Objection, your Honor.

12           THE COURT:  Thank you.  Sustained.

13           Please proceed.

14           MR. SIDDIQI:  Plaintiff is one of those gang members.

15           MR. LICHTMACHER:  Objection, your Honor.

16           THE COURT:  Thank you.  Counsel, you can proceed.

17           MR. SIDDIQI:  He's a member of the Bloods, a violent

18   gang that operates on the street and in jail.

19           Unfortunately, from time to time weapons are smuggled

20   into Rikers Island.  On February 19, 2015, a smuggled weapon

21   was used in a violent slashing.

22           At Rikers Island, the inmates are required to follow

23   the orders of correction officers so that everyone is safe.

24   When those orders are not followed, when inmates act like

25   plaintiff, then everyone in the facility is placed in danger.

J941mcc1                        Opening – Mr. Siddiqi

1          On February 19, 2015, there was a slashing in the

2     commissary area of the Anna M. Kross Center, which is also

3     known as AMKC.  It's a facility on Rikers Island.  The

4     commissary is where inmates can go to buy snacks or toiletries

5     or other kinds of food.

6          The slashing was done using a surgical scalpel, the

7     kind that doctors use, and it had been smuggled into the

8     facility.  So the officers now had a duty to try to find that

9     weapon and make sure that no inmates were hiding other weapons.

10    So the facility was shut down and the inmates were sent back to

11    their respective housing areas so they could be searched for

12    weapons and any other contraband.

13         Chance McCurdy was one of those inmates.  He went back

14    to his housing area, but for some reason he did not want to be

15    searched.  He knew from the moment he got to his cell that he

16    was going to make trouble.  He told the officers –- and these

17    are his words -– "If I get cuffed, I might as well do

18    something, right?"  The officers took the inmates back to their

19    cells to conduct strip searches.  You're going to learn that in

20    a strip search, officers search the outside and the inside of

21    an inmate's body to see if they're hiding any weapons.  This is

22    because inmates sometimes hide knives, shivs, and other

23    weapons, like scalpels, inside their body.  The only way to

24    check if there's contraband is to strip search.

25         Now Captain Bell was nowhere near the search, and the

J941mcc1                        Opening – Mr. Siddiqi

1   reason for that is that female DOC staff is not allowed to view

2   the strip search of male inmates, just like male DOC staff

3   cannot view the search of female inmates.

4            Plaintiff was angry that he was going to be searched,

5   and so he decided to lash out.  He lashed out at Officer

6   Mitchell.  When Officer Mitchell ordered the plaintiff to start

7   taking his clothing off, plaintiff yelled, "I'm not stripping.

8   F you.  It's lit."  Meaning it's time to fight.  Officer

9   Mitchell continued to try to give verbal orders to the

10  plaintiff to comply, but the plaintiff continued to disobey.

11  Finally, plaintiff yelled, "F you.  I'm going to cut one of

12  you."  Plaintiff said this at the same time that there had just

13  been a slashing in the facility and the officers were looking

14  for the weapon.  It was at that moment that the plaintiff took

15  off his T-shirt, threw it at Officer Mitchell's face and then

16  sucker-punched him, right in the face.

17           Ladies and gentlemen of the jury, I want you to

18  consider how dangerous this is.  A violent inmate is attacking

19  an officer.  Plaintiff is bigger than Officer Mitchell.  There

20  were other inmates all around.  If Officer Mitchell had waited

21  for even a moment and let the plaintiff attack him further, he

22  could have been horribly injured and the situation could have

23  turned into anarchy.  The only thing that Officer Mitchell

24  could do was to hit back, and so Officer Mitchell reacted

25  within reason; he punched the plaintiff's back.  He punched

J941mcc1                         Opening – Mr. Siddiqi

1   plaintiff's back in an effort to regain control of this

2   situation.  But the plaintiff did not comply.  He kept

3   fighting.  He kept lashing out and being violent.  And another

4   officer, Officer Cutler, who is not a party to this case, had

5   to rush into the cell to help Officer Mitchell.

6           But even these two officers had trouble controlling

7   the plaintiff.  He was fighting, and they were moving all

8   around this small cell.  They were bumping into the toilet,

9   into the sink, into the bed, into the wall.  Finally, the

10  officers were able to bring the plaintiff down to the floor,

11  but he kept fighting even then.  The officers were eventually

12  able to get the plaintiff into handcuffs.  They handed the

13  plaintiff to other officers, who took him out of the housing

14  area, into the clinic.

15          Officer Mitchell was injured due to the punch he

16  received from the plaintiff.

17          Now the only time that Captain Bell saw the plaintiff

18  during this incident was for a moment when he came out of the

19  cell.  Her only focus was to get the plaintiff out of the

20  housing area and to regain control of the situation.

21          That's everything that happened.  That's the whole

22  story.  It is simple and it's straightforward because it's the

23  truth.

24          Now you just heard plaintiff's counsel's opening

25  statement.  Let me just say this.  Plaintiff is going to tell

J941mcc1                        Mitchell - Direct

1    you that several grown men beat him, that they stomped on him,

2    that they punched him, and that they kicked him.  He's going to

3    tell you that Officer Mitchell kicked him square in the face.

4    But the objective medical evidence is not going to show any

5    injury that is consistent with that kind of abuse.  The medical

6    evidence is going to show at best some scrapes and bruises.

7    That's it.  The injuries are not consistent with plaintiff's

8    story because his story is made up.  The injuries are

9    consistent with what the defendants are going to tell you,

10   because that's what actually happened.  And what happened was

11   not excessive force.

12          Ladies and gentlemen of the jury, you just heard that

13   this case is not about money.  This case is about money.  This

14   is a civil trial.  Plaintiff's goal is to get money, and the

15   way he's going to try to get money in this case is by trying to

16   make you feel bad for him, and the way he's going to try to

17   make you feel bad for him is by making up a story that he was

18   beat up by officers.  That is false.  We're confident that you

19   will not let the plaintiff manipulate you and that at the end

20   of this trial, you will come to a verdict that neither Officer

21   Mitchell nor Captain Bell used excessive force against the

22   plaintiff.

23          Thank you.

24          THE COURT:  Thank you, counsel.

25          Counsel for plaintiff, would you like to call your

J941MCC1                          Mitchell - Direct

1   first witness.

2             MR. LICHTMACHER:  Sure.  Plaintiff calls Correction

3   Officer Defendant Mitchell.

4             THE COURT:  Thank you.  Officer Mitchell, please come

5   forward.

6             Please remain standing for a moment, Officer Mitchell.

7             Would you please state your name and spell your last

8   name for the record.

9             THE WITNESS:  Jerrel Mitchell, M-I-T-C-H-E-L-L.

10            THE COURT:  Thank you.  Please raise your right hand.

11

12            (Witness sworn)

13   JERREL MITCHELL,

14        called as a witness by the Plaintiff,

15        having been duly sworn, testified as follows:

16   DIRECT EXAMINATION

17   BY MR. LICHTMACHER:

18   Q.  Are you employed, sir?

19   A.  Yes.

20   Q.  By who?

21   A.  New York City Department of Correction.

22   Q.  And how long have you been with the New York City

23   Department of Correction?

24   A.  Little over six years.

25   Q.  And on February 19, 2015, were you working in AMKC?

J941MCC1                        Mitchell - Direct

1    A.  Yes.

2    Q.  Now at that point in time how long had you been with the

3    Department of Correction?

4    A.  At that time, approximately two years.

5    Q.  And when you started at the Department of Correction,

6    initially -- correct me if I'm wrong -- you are on probation,

7    correct?

8    A.  Yes.

9    Q.  And how long are you on probation?

10   A.  Two years.

11   Q.  So at the time of this incident were you still on

12   probation?

13   A.  I don't recall.

14   Q.  You don't recall?  What day did you start with the

15   Department of Correction?

16   A.  May 16, 2013.

17   Q.  So this would be less than two years after that, wouldn't

18   it, February 19, 2015?  Am I correct?

19   A.  Yes.

20   Q.  And Correction Officer is the first rank when you start off

21   in the Department of Correction in New York City, correct?

22   A.  Yes.

23   Q.  And the second rank -- and correct me if I'm wrong -- is

24   Captain, correct?

25   A.  Yes.

J941MCC1                    Mitchell - Direct

1   Q.  So captains are supervisors, more or less, to correction

2   officers?

3   A.  Yes.

4   Q.  And captains can do things like write correction officers

5   up for inappropriate behavior if they behave inappropriately?

6   A.  Yes.

7   Q.  And they can have an influence over their assignment,

8   correct?

9   A.  Yes.

10  Q.  And they can have some kind of influence over whether or

11  not they get overtime, correct?

12  A.  Yes.

13  Q.  And they can have some kind of influence over whether or

14  not they successfully complete probation and continue as a

15  correction officer, correct?

16  A.  Yes.

17  Q.  And in fact, if you displease a captain, that captain could

18  have a negative influence on your career, correct?

19           MR. SIDDIQI:  Objection.

20           THE COURT:  Thank you.

21           You can answer the question.

22  A.  I guess, yes.

23  Q.  And in fact, Captain Bell was the supervisor in AMKC the

24  date of this incident, correct?

25  A.  Yes.

J941MCC1                          Mitchell - Direct

1    Q.  And do you know her or did you know who she was before this
2    date?
3    A.  Yes.
4    Q.  And at all times that you knew her, was she a person who
5    was a superior rank to you?  And I don't mean by qualitatively;
6    I mean, was she a higher rank than you were?
7    A.  Yes.
8    Q.  So she was a person, according to your testimony, that
9    could have some kind of influence over the terms and conditions
10   of your employment at Rikers, correct?
11   A.  Yes.
12   Q.  And she was a person who could have some kind of influence
13   over whether or not you successfully completed probation,
14   correct?
15   A.  Yes.
16   Q.  Now prior to the date of this incident -- withdrawn.
17           Do you know what the last order rule is?
18   A.  No.
19   Q.  Well, is it fair to say that any captain who gives a
20   correction officer an order, that correction officer has to
21   abide by it?
22   A.  If it's lawful, yes.
23   Q.  A lawful order, correct?
24   A.  Correct.
25   Q.  All right.  Now prior to the date of this incident,

1    February 19, 2015, did you know someone named Chance McCurdy?

2    A.  Prior to?  No.

3    Q.  Did you know who he was?

4    A.  No.

5    Q.  Had you been working at AMKC the entire time you were in

6    corrections at that point in time?

7    A.  Prior to that I was at the academy, but that was the first

8    facility I was assigned to, yes.

9    Q.  How long was the academy?

10   A.  Approximately four months.

11   Q.  You started in May in the academy, is that correct?

12   A.  Correct.

13   Q.  June, July, August, so September or so of 2013, you're in

14   AMKC, is that correct?

15   A.  Correct.

16   Q.  And you worked there straight through at least till the

17   date of this incident, correct?

18   A.  Yes.

19   Q.  Are you still working there?

20   A.  Yes.

21   Q.  So have you been there continually through this whole time?

22   A.  Yes.

23   Q.  And how about Captain Bell?  If you know, has she been

24   there most of the time that you've been there?

25   A.  Yes.

J941MCC1                        Mitchell - Direct

1   Q.  Now did you ever get a chance to talk to Captain Bell about
2   this incident?
3   A.  No.
4   Q.  Did she ever instruct you to say anything about this
5   incident?
6   A.  No.
7   Q.  Now at some point in your encounter with Mr. McCurdy you
8   punched him, correct?
9   A.  Yes.
10  Q.  And you punched him several times, didn't you?
11  A.  I don't recall.
12  Q.  You don't recall how many times you punched him?
13  A.  No, sir.
14  Q.  And did you see anybody else punch him?
15  A.  No.
16  Q.  So you're the only one that you saw punch him.
17  A.  Yes.
18  Q.  And you don't know of anyone else punching him.
19  A.  No, I don't.
20  Q.  You have no personal knowledge of anyone else punching him.
21  A.  No.
22  Q.  Is it fair to say then any injuries he got from punches
23  would have been incurred due to what you did to him?
24           MR. SIDDIQI:  Objection.
25           THE COURT:  Thank you.

J941MCC1                         Mitchell - Direct

1           You can answer the question.

2   A.  To the best of my knowledge, yes.

3   Q.  Because you know of nobody else who took physical action to

4   punch Mr. McCurdy, correct?

5   A.  Correct.

6   Q.  Did you kick Mr. McCurdy?

7   A.  Absolutely not.

8   Q.  Mr. McCurdy was handcuffed at some point during this

9   incident, correct?

10  A.  Yes.

11  Q.  What color were the handcuffs?

12  A.  I do not recall.

13  Q.  Does anybody in that facility use pink handcuffs?

14  A.  No.

15  Q.  Never saw Captain Bell use pink handcuffs?

16  A.  I've never seen it.

17  Q.  Never saw that in your life, in your career there.

18  A.  No, sir.

19  Q.  Have you seen other people handcuffed at AMKC since you

20  worked there?

21  A.  Yes, I have.

22  Q.  Have you seen other people handcuffed in the presence of

23  Captain Bell since you worked there?

24  A.  I don't recall.

25  Q.  Now the injuries you allege you sustained were right wrist

1   swelling and right thumb swelling, correct?

2   A.  Yes.

3   Q.  Now you heard your attorney's opening, correct?

4   A.  Yes.

5   Q.  And he said in sum and substance you were injured by a

6   punch to the face.

7   A.  Correct.

8   Q.  However, you gave a deposition in this case and you just

9   testified in this case that your injuries were right wrist

10  swelling and right thumb swelling, is that correct?

11          MR. SIDDIQI:  Objection, your Honor.  He's referring

12  to the deposition.  If we could get a --

13          THE COURT:  Counsel, no speaking objections.

14          MR. SIDDIQI:  Sorry, your Honor.

15          THE COURT:  Thank you.

16          Counsel, can you please rephrase the question.

17          MR. LICHTMACHER:  Sure.

18  BY MR. LICHTMACHER:

19  Q.  Correct me if I'm wrong.  Didn't you just testify that the

20  injuries you sustained were right wrist swelling and right

21  thumb swelling?

22  A.  Yes.

23  Q.  And did you have another injury?

24  A.  Yes, I did.

25  Q.  What was that injury?

J941MCC1                          Mitchell - Direct

1   A.  I had left facial swelling.

2   Q.  Well, you gave a deposition in this case, correct?

3   A.  Yes.

4   Q.  And that deposition was conducted on May 30, 2018, in my

5   office, correct?

6   A.  I don't recall the date.

7   Q.  Well, I'll show the deposition transcript to your attorney.

8   Maybe they'll stipulate to it.

9            MR. LICHTMACHER:  Counsel.

10           I believe they just stipulated.  I believe they just

11  stipulated that that deposition took place on May 30th of 2018.

12  Q.  And that was in my office, correct?

13  A.  Yes.

14  Q.  Now in that deposition you raised your right hand and you

15  swore to tell the truth, correct?

16  A.  Yes.

17  Q.  And you understood that you were sworn in under penalty of

18  perjury, correct?

19  A.  Yes.

20  Q.  And you provided answers that you knew could be considered

21  perjury if they were inaccurate, correct?

22  A.  Yes.

23  Q.  Did you give the following answer to the following

24  questions on that date -- page 10, line 21, to page 11, line 2.

25           MR. LICHTMACHER:  Your Honor, do you need a copy?

1          THE COURT:  I'm sorry, counsel.  Do you have a copy of

2     the document for the witness and the Court?

3          MR. LICHTMACHER:  Yes, I do.

4          THE COURT:  Thank you.

5          MR. LICHTMACHER:  May I approach, your Honor.

6          THE COURT:  You may.

7          Thank you.  A copy of the document has been handed to

8     the witness.

9          Counsel, you may proceed.

10          MR. LICHTMACHER:  Thank you, your Honor.

11     BY MR. LICHTMACHER:

12     Q.  Did you give the following answers to the following

13     questions on that day -- page 10, line 21 to page 11, line 2:

14          "Actually, what part of your body --"

15          THE COURT:  Sorry.  Can you say "Question" where

16     there's a question and then say "Answer" where there's an

17     answer.

18     Q.  "Q.  Actually, what part of your body -- I phrased the

19     question badly.  My mistake.

20          "What injuries did you have that day?

21          "A.  I had right wrist swelling and right thumb

22     swelling."

23          Did you give that answer to that question?

24     A.  Yes.

25     Q.  You didn't make any mention of your face being injured in

J941MCC1                        Mitchell - Direct

1    response to that question, did you?

2    A.  No, I didn't.

3    Q.  And in fact, you were provided with a copy -- or your

4    attorney was provided with a copy of that deposition transcript

5    with the understanding that you'd get an opportunity to make

6    changes to the transcript if in fact it was in error, correct?

7    A.  Yes.

8    Q.  Did you change that?

9    A.  No, I didn't change it.  I didn't personally change it.

10   Q.  So as you sit here today, was your face injured during this

11   incident?

12   A.  Yes.

13   Q.  But you didn't say it in your deposition, did you?

14          MR. SIDDIQI:  Objection, your Honor.

15          THE COURT:  Thank you.

16          Can you please rephrase the question, counsel.

17   Q.  Well, in your deposition, as I just read to you your

18   questions and answers, you didn't indicate that in those

19   questions and answers, did you?

20          MR. SIDDIQI:  Objection, your Honor.

21          THE COURT:  Thank you.

22          You can answer that question.

23   A.  No, I didn't, but that was based on my immediate

24   recollection of the events.

25   Q.  So as you sit here today, you remember you had a facial

1  injury, is that correct?

2  A.  Yes.

3  Q.  Is it fair to say that, well, May 30, 2018 was

4  substantially closer to the event than we are today, in

5  September of 2019?

6  A.  Yes.

7  Q.  And in fact, you generated other documents about your

8  alleged injuries regarding this incident, correct?

9  A.  Yes.

10         MR. LICHTMACHER:  In fact, I'll show this to adversary

11  counsel.

12  Q.  You generated an employee claim regarding your alleged

13  injuries, correct?

14  A.  Yes.

15  Q.  And in fact, that's a document that you generate in your

16  regular course of business when you're alleging an injury and

17  you work for DOCS, correct?

18  A.  Yes.

19  Q.  Now is it part of your job requirements that if you get an

20  injury, to generate such a document?

21  A.  Yes.

22  Q.  And in fact, the employee claim that you generated, was it

23  in fact generated with your handwriting?

24         And I will approach and hand it to you if that will be

25  helpful.

1            MR. LICHTMACHER:  Your Honor, may I approach?

2            THE COURT:  Yes.

3     A.  Thank you.

4     Q.  You're welcome.

5            Now I've handed you a document that's marked for

6     identification as Plaintiff's 1.  Please take a minute and look

7     at the document.

8            Have you had a minute to peruse the document?

9     A.  Yes.

10    Q.  Now does this document have anybody's handwriting on it on

11    both pages besides yours?

12    A.  No.

13    Q.  And this document was generated and signed by you, correct?

14    A.  Correct.

15           MR. LICHTMACHER:  Your Honor, I offer this into

16    evidence as Plaintiff's Exhibit 1.

17           THE COURT:  Thank you.

18           Counsel?

19           MR. SIDDIQI:  We have an objection, your Honor.  That

20    document's incomplete.

21           THE COURT:  Thank you.  That's fine.  Is there an

22    additional -- why don't you come up.

23           (Continued on next page)

24

25

1           (At the sidebar)

2           THE COURT:  Thank you.

3           So I have the document, counsel.  What's the issue?

4           MR. SIDDIQI:  Your Honor, there's an additional page

5    in the document that's not included in the exhibit.  I'm

6    handing it to the Court now.  And that includes that Officer

7    Mitchell stated at the time that he had a left facial injury.

8    I believe that introduction of the document as is would be

9    misleading to the jury.

10          MR. LICHTMACHER:  Your Honor, the document clearly

11   indicates it's page 1 of 2 and page 2 of 2.  That other

12   document was never indicated to me to be part of this document.

13   If they want to try and do that, but it says page 1 of 2 and

14   page 2 of 2.  I don't know how much clearer it can be.  I'm

15   showing you the bottom of the document.

16          THE COURT:  Thank you.  I see that.

17          Counsel, why do you say that this is part of the same

18   document?  I note that the document that's been marked as

19   Exhibit 1 is an employee claim; the other document that you've

20   handed to me described as part of the same document describes

21   itself as a limited release of health information.

22          MR. SIDDIQI:  Your Honor, it's our position that these

23   documents were submitted together as part of the employee claim

24   by Officer Mitchell.

25          THE COURT:  Thank you.

J941MCC1                     Mitchell – Direct

1              I'll allow counsel to proceed.  If you'd like to

2     introduce this separately as another document that he

3     introduced at the same time, you'll have an opportunity to do

4     that on your redirect.

5              MR. SIDDIQI:  Thank you, Judge.

6              MR. LICHTMACHER:  Is the document in evidence?

7              THE COURT:  I'll bring it in after we go back on the

8     record.

9              MR. LICHTMACHER:  Thank you.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2           THE COURT:  Thank you very much, counsel.  Objection

3    overruled.  I'm accepting Exhibit 1, Plaintiff's Exhibit 1,

4    into evidence.

5           Counsel, you can proceed.

6           MR. LICHTMACHER:  Thank you, your Honor.

7           (Plaintiff's Exhibit 1 received in evidence)

8           MR. LICHTMACHER:  Let me turn this on.

9           May I show it to the jury, your Honor.

10          THE COURT:  You may.

11          MR. LICHTMACHER:  Would your Honor inquire if the jury

12   can now see this document.

13          THE COURT:  Thank you.  It appears that they can.

14          MS. GOYKADOSH:  Your Honor, we can't see it on our

15   screens.  I don't know why.  I'm sorry.

16          MR. LICHTMACHER:  I can't either.

17          MS. GOYKADOSH:  Ah.  Thank you.

18          THE COURT:  Thank you.  Proceed.

19   BY MR. LICHTMACHER:

20   Q.  Now you're looking at the document that's been offered into

21   evidence as Exhibit 1, correct?

22   A.  Yes.

23   Q.  I turn your attention to the bottom of the document.  I'm

24   going to point to it, right there.  Do you see that?  Will you

25   read what that says.

J941MCC1                         Mitchell - Direct

1  A.  "Sprained wrist."

2  Q.  No, no.  I'm talking about underneath.

3  A.  Underneath?

4  Q.  Exactly -- a little over my finger.

5  A.  Oh, okay.

6  Q.  It says -- well, let me ask you, does that say page 1 of 2?

7  A.  Yes.

8  Q.  Let's turn to the next page.

9  A.  Okay.

10  Q.  Also at the bottom, does that say page 2 of 2?

11  A.  Yes.

12  Q.  So it's a two-page document, correct?

13  A.  Correct.

14  Q.  Now you submitted this claim, correct?

15  A.  Yes.

16  Q.  And the date that you submitted the claim was what?

17  A.  The date that I wrote the claim was the next day, 2/20/15.

18  Q.  And that's 5:16:13?

19  A.  Say that again?

20  Q.  Oh, I'm sorry.  That was the date you got there.  My

21  mistake.  Yeah.  2/20 of '15?

22  A.  Correct.

23  Q.  And where is that indicated; which page?

24  A.  Would be on page 2 of 2.

25  Q.  You submitted it the very next day, correct?

J941MCC1                    Mitchell - Direct

1    A.  Yes.

2    Q.  Now the date that you submitted that, did you know whether

3    or not Chance McCurdy had injuries?

4    A.  No, I wasn't aware.

5    Q.  Did you know whether or not Chance McCurdy had been taken

6    to the clinic?

7    A.  No, I wasn't aware.

8    Q.  Do you know whether or not Chance McCurdy had been brought

9    to Elmhurst Hospital at that point in time?

10   A.  No, I wasn't aware.

11   Q.  Now when an inmate suffers injuries and is brought to the

12   clinic, does he just walk by himself?

13   A.  No.

14   Q.  Who takes him?

15   A.  Officers.

16            (Continued on next page)

17

18

19

20

21

22

23

24

25

J94Qmcc2                          Mitchell - Direct

1    BY MR. LICHTMACHER:    (Continued)

2    Q.  Officers take him from the correctional facility, correct?

3    A.  Correct.

4    Q.  When an officer is taken to the hospital, who takes him

5    there?

6    A.  Other officers.

7    Q.  And other officers from the correctional facility?

8    A.  Correct.

9    Q.  So people who work for the same people that you work for,

10   correct?

11   A.  Correct.

12   Q.  OK.  And let's look at the injury section of this,

13   specifically on page 1, number 7.  That's your handwriting,

14   correct?

15   A.  Correct.

16   Q.  And can you please read what it says your injuries are?

17   A.  Sprained wrist, swelling and pain in right index finger.

18   Q.  See anything about your face being injured there?

19   A.  No.

20   Q.  Anything on page 2 about your face being injured?

21   A.  No.

22   Q.  And that's your signature there, correct?

23   A.  Correct.

24   Q.  And it's important you fill these forms out accurately and

25   truthfully, isn't it, sir?

1    A.  Yes.

2    Q.  And this is -- unlike today where we're five years after

3    the incident, this is filled out by you, according to you, the

4    next day, correct?

5    A.  Correct.

6    Q.  And on the next day you would have a pretty good memory of

7    what happened to you that day, correct?

8    A.  Yes.

9    Q.  But you don't have anything on it about a facial injury on

10   either of these two pages which are submitted as an employee

11   claim, correct?

12   A.  Correct.

13   Q.  And that's a claim to the workers' compensation board,

14   correct?

15   A.  Yes.

16   Q.  And the workers' compensation board is in a position to

17   give you money, correct?

18   A.  Correct.

19   Q.  So you made a claim for money, and you didn't put down an

20   injury that you allegedly had to your face.  Is that correct?

21   A.  Correct.

22   Q.  In fact, you heard your attorney's opening.  He talked

23   about your facial injury, but that's not in there, is it?

24   A.  No.

25   Q.  Now, did you generate any other documents as part of your

J94Qmcc2                          Mitchell - Direct

 1  workers' comp. claim for money?

 2  A.  I don't recall.

 3          MR. LICHTMACHER:  Would you like to see it, Counsel?

 4          May I approach the witness, your Honor?

 5          THE COURT:  You may.

 6  Q.  Now, is it fair to say you also generated a document called

 7  an employee statement with regard to workers' compensation

 8  claim initiation?

 9  A.  Yes.

10  Q.  And on that document, does your handwriting -- you have it

11  in front of you.  Excuse me, your Honor.

12          You have in front of you, a document marked Exhibit 2

13  for identification, correct?

14  A.  Yes.

15  Q.  Now, is that your employee statement to workers'

16  compensation?

17  A.  Yes.

18  Q.  And is that a document that's generated in the regular

19  course of business when it's necessary to do so?

20  A.  Yes.

21  Q.  And is part of your job as an employee when necessary to

22  generate such a document if you're making a workers'

23  compensation claim?

24  A.  Yes.

25  Q.  And is there handwriting on this page that belongs to

J94Qmcc2                          Mitchell - Direct

1    anybody but you?

2    A.  No.

3              MR. LICHTMACHER:  Offer this into evidence as

4    Plaintiff's Exhibit 2, your Honor.

5              THE COURT:  Thank you.

6              Counsel?

7              MR. SIDDIQI:  No objection, your Honor.

8              THE COURT:  Thank you.  I'm accepting Plaintiff's

9    Exhibit 2 into evidence.

10             MR. LICHTMACHER:  Publish it to the jury, your Honor?

11             THE COURT:  Thank you.  You may.

12             (Plaintiff's Exhibit 2 received in evidence)

13   Q.  Now, in this statement which you generated, you indicate,

14   if I may read from it and ask you if I'm reading your

15   handwriting correctly, in the middle "While performing a search

16   of an inmate, said inmate became physically assaultive by

17   punching this writer in the facial area with a closed fist.

18   This writer had no choice but to defend himself from attack."

19             You wrote that, correct?

20   A.  Yes.

21   Q.  Please take a look at the date at the bottom of this page.

22   Does that say March 4, 2015?

23   A.  Yes.

24   Q.  In fact, this document was generated well after the other

25   document was generated, correct, Plaintiff's 1?

J94Qmcc2                         Mitchell - Direct

1    A.  Yes.

2    Q.  So suddenly on March 4 you had a punch to the face whereas

3    directly after the incident on February 20 there was nothing

4    about a punch to the face, and there was nothing about an

5    injury to your face, was there?

6    A.  Well, there was nothing about an injury to the face.  The

7    punch to the face there was nothing on that document entered as

8    Plaintiff's Exhibit 1 that stated what happened -- like

9    basically me saying me getting punched in the face.

10   Q.  OK.  You indicated your injuries, and you did not indicate

11   that you had an injury to your face on Plaintiff's 1, did you?

12   A.  No.

13   Q.  And, in fact, that says page 1 of 2, and page 2 of 2 is a

14   complete document, correct?

15   A.  For Exhibit 1?

16   Q.  Exhibit 1.

17   A.  Yes, correct.

18   Q.  All right.  So now about two weeks later, suddenly you're

19   talking about a punch to the face.  And that's the first time

20   that appears on part of the employee workers' comp. claim for

21   money, correct?

22   A.  Correct.

23   Q.  And did you get the workers' comp.?

24   A.  No, I didn't.  I didn't receive anything -- any money from

25   this.

1   Q.  So you applied for the money and you didn't get it,

2   correct?

3   A.  I didn't complete it, no.

4   Q.  You didn't complete it.  Did you get time off from work as

5   a result of this punch to the face?

6   A.  No, I didn't.

7           MR. LICHTMACHER:  Removing that document.

8           Your Honor, was that accepted into evidence,

9   Plaintiff's 2?

10          THE COURT:  Yes, I accepted Plaintiff's Exhibit 2.

11          MR. LICHTMACHER:  Sorry, your Honor.

12          THE COURT:  It's all right.

13  Q.  Now, had you been back to work after February 20 and before

14  March 5?

15  A.  Yes.

16  Q.  Excuse me, before March 4, same question?

17  A.  Yes.

18  Q.  And when you went back to work, you went back to work at

19  AMKC, correct?

20  A.  Correct.

21  Q.  And you got to talk to some of the same people you work

22  with at AMKC at that time?

23          MR. SIDDIQI:  Objection, your Honor.

24          THE COURT:  Can you rephrase the question?

25  Q.  Sure.

J94Qmcc2                        Mitchell - Direct

1         Did you run into the same people you usually work with

2    at AMKC at that time?

3    A.  Correct.

4    Q.  You did?

5    A.  Correct.

6    Q.  Was Captain Bell one of those people?

7    A.  Yes.

8    Q.  Did Captain Bell tell you to start indicating that you had

9    been punched in the face?

10   A.  No.

11   Q.  Well, try to understand.  Nothing about an injury to your

12   face -- you were injured in your face, right?

13   A.  Correct.

14   Q.  You didn't indicate anything about it the day afterwards,

15   and you first indicated it after you went back to work and

16   after you might have run into Captain Bell, correct?

17   A.  No.

18   Q.  Did you run into Captain Bell after the incident?

19   A.  Yes.

20   Q.  Did you discuss the incident with her at all?

21   A.  No.

22   Q.  Now, Mr. McCurdy is a large man, isn't he?

23   A.  Yes.

24   Q.  He's about, I think, six-four -- everyone looks tall to me,

25   but he looks to be about six-four to me.

1       THE COURT:  Thank you.  Counsel, can you please

2  inquire.

3  Q.  Yes.  Does he look to be about six-four to you?

4  A.  About six-four.

5  Q.  And he's strong looking at least?

6  A.  Yes.

7  Q.  And he punched you in the face, but you didn't mention that

8  as an injury in your initial claim, correct?

9  A.  Correct.

10  Q.  Would you know if he's right-hand dominant, Mr. McCurdy?

11  A.  I'm not aware of his dominant hand.

12  Q.  Now, where in your face do you allege that Mr. McCurdy

13  struck you?

14  A.  My left side, my left eye.

15  Q.  In the eye?

16  A.  Fairly -- around the eye area.

17  Q.  Around the eye area?  OK.

18       Did Mr. McCurdy appear at all injured during this

19  incident?

20  A.  To my recollection, no.

21  Q.  You didn't see any injuries, noticeable injuries on him?

22  A.  No.

23  Q.  And the punch or punches you threw, did they connect?

24  A.  Yes.

25  Q.  What parts of his body did they connect with?

1    A.  I don't recall.

2    Q.  And did you hit him in the head, do you remember?

3    A.  I don't recall.

4    Q.  Do you remember if you used anything besides punches to hit

5    him with?

6    A.  No.

7    Q.  You didn't kick him, did you?

8    A.  Absolutely not.

9    Q.  Were you wearing boots that day?

10   A.  Yes.

11   Q.  Is that standard fare, you wear boots to work when you go

12   to work at AMKC?

13   A.  Correct.

14   Q.  What kind of boots are they?

15   A.  Police military-style boots.

16   Q.  They hard?

17   A.  Yes.

18   Q.  And have you ever kicked anybody with those boots?

19   A.  Absolutely not.

20   Q.  Because, in fact, kicking someone with those boots could

21   inflict a lot of damage, couldn't they?

22   A.  Correct.

23   Q.  And you're not supposed to do that, are you?

24   A.  No.

25   Q.  In fact, it's not a recommended way to use force when

J94Qmcc2                          Mitchell - Direct

1  necessary, is it?

2  A.  Correct.

3  Q.  Kicking someone, correct?

4  A.  Yes, correct.

5  Q.  Now, you say he hit you in the eye.  Did that affect your

6  vision in any way?

7  A.  Yes.

8  Q.  How did it affect your vision?

9  A.  It blurred my vision.

10 Q.  Now, did you report that on either of your -- either parts

11 of the workers' comp. claim?

12 A.  No, I didn't.

13 Q.  Did you run to the eye doctor and say, hey, my vision is

14 hurt?

15 A.  I was seen in the clinic and followed by the hospital.

16 Q.  And, in fact, nobody diagnosed you with any loss of vision,

17 did they?

18 A.  No.

19 Q.  So you wouldn't have had a problem if -- well, withdrawn.

20         There came a point in time when Mr. McCurdy was

21 handcuffed, correct?

22 A.  Correct.

23 Q.  And you were able to see him when he was handcuffed,

24 correct?

25 A.  No.

J94Qmcc2                         Mitchell - Direct

1    Q.  Why couldn't you see him?

2    A.  My left eye was blurry, like I said.

3    Q.  How about your right eye?

4    A.  Yes.

5    Q.  Was your right eye working?

6    A.  Yes.

7    Q.  And your left eye recovered pretty quickly, right?

8    A.  Not really that quickly, but it recovered.  It eventually

9    recovered, yes.

10   Q.  Well, you went back to work, right?

11   A.  Correct.

12   Q.  And you didn't put it on your workers' comp. form as we

13   already covered?

14   A.  I'm still on probation, sir, so I didn't want to miss any

15   days of work.

16   Q.  When you're on probation, if you get hurt, legitimately get

17   hurt, not through your own fault, you could still claim an

18   injury, correct?

19   A.  Correct.

20   Q.  And, again, nothing about vision problems appears on the

21   two documents we looked at, does it?

22   A.  Correct.

23   Q.  And you didn't say anything happened to your right eye, did

24   you?

25   A.  No, I didn't.

1  Q.  So after Mr. McCurdy was handcuffed, was he anywhere near

2  you?

3  A.  No.

4  Q.  So you were gone by the time he was handcuffed?

5  A.  No.  Once he was handcuffed and secured, I immediately left

6  the area and went to go seek medical treatment.

7  Q.  You didn't take him for medical treatment, did you?

8  A.  No, I didn't.

9  Q.  Because it's inappropriate if you're involved in the use of

10  force to bring an inmate to the clinic, correct?

11  A.  Correct, once the inmate is secured and the person that was

12  involved in the use of force, we pretty much hand it over to

13  somebody else.

14  Q.  Well, you wanted to stay around to make sure, as you said,

15  Mr. McCurdy was secured?

16          MR. SIDDIQI:  Objection.

17          THE COURT:  Can you rephrase the question?

18  Q.  Sure.

19          Did you in fact stay on the scene until Mr. McCurdy

20  was secured?

21  A.  Yes.

22  Q.  So at that time you would have been able to see him at

23  least with your right eye, correct?

24          MR. SIDDIQI:  Objection.

25          THE COURT:  Thank you.

J94Qmcc2                      Mitchell - Direct

 1              You can answer the question?

 2    A.  Yes.

 3    Q.  And you didn't see any injuries on him, did you?

 4    A.  No.

 5    Q.  Did you become aware at any point in time that he had

 6    injuries?

 7    A.  Repeat the question, please.

 8    Q.  Did you report at any point in time that Mr. McCurdy had

 9    injuries?

10    A.  No.

11              MR. LICHTMACHER:  Can I approach, your Honor?

12              THE COURT:  You may.

13              MR. LICHTMACHER:  Oh, to talk to the Judge, your

14    Honor.  I want a sidebar.

15              THE COURT:  Thank you.

16              Yes, please come forward.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  Go ahead, counsel.

3          MR. LICHTMACHER:  I think I know the answer, but I

4    don't want to overstep.  You will not allow anything about the

5    possibility of criminal charges being brought against

6    Mr. McCurdy for what he did.  Is that correct?

7          THE COURT:  Thank you.

8          Counsel for defendants?

9          MR. SIDDIQI:  Your Honor, I think that I believe that

10   your ruling earlier today was clear that there is not to be any

11   questioning with regards to whether there was a criminal

12   prosecution, whether there could have been a criminal

13   prosecution, especially considering the fact that this officer

14   and Captain Bell don't have the authority to make a

15   prosecutorial decision I think it would be very misleading to

16   the jury, and I think the prejudicial effect would outweigh any

17   probative value which would be minimal.

18         THE COURT:  Thank you.

19         So, Counsel, my ruling was based on what I understood

20   the anticipated questioning and, I'll call it, story line to

21   be.  I believe that that ruling was clear.  Are you suggesting

22   more limited inquiry now?

23         MR. LICHTMACHER:  I would just -- based on the fact

24   that he said he was temporarily blinded and he applied for

25   workers' comp. after the incident from the injury, that denotes

a serious injury.  And if he had a serious injury there's a

higher level of crime.  And if there's a higher level of crime,

I should at least be able to ask him was Mr. McCurdy to your

knowledge criminally prosecuted for a crime regarding his

allegedly punching you in the face -- in the eye that day.  I'd

like to ask him that, and I'd like to ask him if he's ever been

involved in a criminal prosecution of an inmate, and if so,

under those circumstances, did you have to sign a supporting

deposition under penalty of perjury.  There is additional

information now which I think makes these questions viable.

THE COURT:  Thank you.

And I think that both of those questions are covered

by my prior ruling.  I won't hypothesize other questions that

would not fall within their scope, but both of those proposed

questions would, and I would not permit those two particular

questions given the scope of my prior ruling.

MR. LICHTMACHER:  Note my objection for the record,

your Honor.

THE COURT:  Thank you.  Understood.

(Continued on next page)

J94Qmcc2                        Mitchell - Direct

1              (In open court)

2              THE COURT:  Thank you, Counsel.  You can proceed.

3              MR. LICHTMACHER:  Half a second, your Honor.

4              (Pause)

5    BY MR. LICHTMACHER:

6    Q.  Now, did there come a time when Mr. McCurdy was taken to

7    the ground?

8    A.  Yes.

9    Q.  And were you involved in taking him to the ground?

10   A.  Yes.

11   Q.  And at that point in time, had he already allegedly punched

12   you?

13   A.  Yes.

14   Q.  And when you went to the ground, what part of your body hit

15   the ground?

16   A.  What part of my body?

17   Q.  Yeah.

18   A.  My arm, my -- my wrist, my arm, my shoulder, my knee.

19   Q.  How about your -- well, those are all parts in front of

20   your body, correct?

21   A.  Correct.

22   Q.  No part is in back of your body, correct?

23   A.  Correct.

24   Q.  That you just described, correct?

25   A.  Correct.

J94Qmcc2                      Mitchell - Cross

1    Q.  So you must have gone facedown, correct?

2    A.  Correct.

3    Q.  And when you went facedown, did you bang your head?

4    A.  No.

5             MR. LICHTMACHER:  No more questions, your Honor.

6             THE COURT:  Thank you.

7             Counsel for defendants.

8             MR. SIDDIQI:  Thank you, your Honor.

9    CROSS-EXAMINATION

10   BY MR. SIDDIQI:

11   Q.  Good morning, Officer Mitchell.  How are you?

12   A.  Good morning.  I'm good.

13   Q.  So, Officer Mitchell, you testified earlier that in

14   February 2015, you had the rank of corrections officer.  Is

15   that correct?

16   A.  Yes.

17   Q.  What were your responsibilities as a correction officer?

18   A.  The care, custody and control of inmates.

19   Q.  And when you're on duty, do you wear any type of a utility

20   belt?

21   A.  Yes.

22   Q.  What's on that belt?

23   A.  Flashlight, handcuffs, OC chemical agent and pepper spray,

24   pretty much.

25   Q.  What is OC chemical agent?

1  A.  Pepper spray.

2  Q.  Is there a distance at which you need to be for pepper

3  spray to be effective?

4  A.  Correct, approximately three feet.

5  Q.  Do you ever carry a firearm?

6  A.  Not while in a facility, but yes.

7  Q.  So you carry a firearm outside the facility?

8  A.  Correct.

9  Q.  Is there a reason you do not carry a firearm inside the

10  facility?

11  A.  It could be taken away from --

12          MR. LICHTMACHER:  Objection, your Honor.

13          THE COURT:  Thank you.  You can answer the question.

14  A.  Because it could be we're outnumbered inside a facility

15  with inmates, and it could be taken away from me and used

16  against me.

17  Q.  Officer Mitchell, what's the primary duty of a correction

18  officer?

19  A.  The care, custody and control of inmates.

20  Q.  Officer Mitchell, did you have a specific area or

21  assignment as a correction officer in February 2015?

22  A.  Yes, secured, SRG officer.

23  Q.  What does SRG stand for?

24  A.  Security risk group.

25  Q.  What is a security risk group?

J94Qmcc2                     Mitchell - Cross

1    A.  A gang.

2    Q.  Is it part of your job to be aware of whether or not

3    inmates are in gangs?

4    A.  Yes.

5    Q.  Why is that important?

6              MR. LICHTMACHER:  Objection, your Honor.

7              THE COURT:  Thank you.  You can answer the question.

8    A.  It's important for me to be aware because just to make sure

9    all parties are involved when inmates are around, basically to

10   make sure, keep the safety of all inmates and officers.

11   Q.  Is there a special way in which inmates who have SRG

12   statuses or are in gangs are housed?

13   A.  Yes.

14   Q.  Can you please describe what that special way is?

15   A.  Generally, they're housed together with their same -- their

16   same gang.

17   Q.  Is there a reason that gangs are housed the same gang in

18   one housing area?

19   A.  Basically for the safety of themselves to basically prevent

20   incidents of violence from happening.

21   Q.  What was the housing area where Mr. McCurdy was during this

22   incident?

23   A.  Quad lower 14.

24   Q.  And did quad lower 14 correspond to a particular gang?

25   A.  Yes.

J94Qmcc2                          Mitchell – Cross

 1   Q.   What gang was that?

 2   A.   Bloods.

 3   Q.   And what are the Bloods?

 4   A.   The Bloods are a violent street gang which operate also in

 5   jail and outside.

 6   Q.   Is the Bloods one thing or are there subsets?

 7              MR. LICHTMACHER:  Objection, your Honor.

 8              THE COURT:  Thank you.  Counsel, please come forward.

 9              MR. SIDDIQI:  Yes, your Honor.

10         (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    (At the sidebar)

                    THE COURT:  So, Counsel, there's an objection?

                    MR. LICHTMACHER:  Yes, your Honor.  I wasn't aware
that this witness was going to be asked -- testify as an expert
about the Bloods.  I understand about the housing areas.
That's one thing.  I understand about the classifications.  But
for him to start opining about, you know, basically the
construction of the Bloods, how they're put together and how
they operate, that's well beyond his scope, and I have no
expert report on that.

                    THE COURT:  Thank you.

                    Counsel, what's the pertinence of this line of inquiry
regarding the particular structure of the Bloods?  Counsel?

                    MR. SIDDIQI:  Your Honor, it's our understanding that
plaintiff is eventually going to testify that his so-called
beating was retaliation because he was not helping the officers
to enforce rules and regulations within the housing area and
that he would have been positioned to do so as a high-ranking
member of the Bloods.

                    THE COURT:  I understand, which is why I understand
that the testimony regarding the Bloods is coming in.  The
particular request by counsel for plaintiff is why is it this
witness is testifying about, I'll call it, the specific makeup
or sets of the Bloods, which I understand to be the subject of
this question.

J94Qmcc2                        Mitchell - Cross

1              MR. SIDDIQI:  Your Honor, there are two reasons.  One

2       is that the testimony that will be elicited is going to show

3       that different sets have different levels of power within the

4       housing areas.  And, number two, plaintiff is going to

5       testify -- at least he testified in his deposition as to how

6       large the Bloods are, that there are divisions of the Bloods,

7       and that it's a large organization.  To the extent that

8       plaintiff is going to put on that testimony, we think that we

9       should be allowed to explore the structure of the Bloods as it

10      exists within Rikers Island.

11             THE COURT:  Thank you.

12             What's the basis for this witness's knowledge

13      regarding those issues?  I understand plaintiff was a member of

14      the Bloods.  What's this witness's basis for knowledge

15      regarding this issue?

16             MR. SIDDIQI:  Your Honor, I can elicit more testimony,

17      but as an SRG officer, these officers who are SRG officers are

18      given additional training in identifying gang markings and

19      identifying subsets of the gangs, and they need to know this in

20      order to effectively do their jobs in policing the inmates.

21             THE COURT:  Thank you.

22             So this is based on his personal observation?

23             MR. SIDDIQI:  His personal observation and experience

24      at Rikers Island.

25             THE COURT:  Thank you.

1          Counsel for plaintiff?

2          MR. LICHTMACHER:  He's still seeking to testify as an

3     expert, your Honor.  It's inappropriate.  He's still seeking to

4     do that.  In fact, they just acknowledged they can get this

5     information out of my client.  I don't see why they have to do

6     it with an officer who would have no inside knowledge of this

7     in any way.  So, you know, I got no expert report from him.  I

8     was not told of anything like this, and now suddenly it's being

9     brought into trial.  It's unfair.

10         THE COURT:  Thank you.

11         Counsel, you understand the objection; namely, that

12    you're having this lay witness testify, according to plaintiff,

13    about areas of which he has perhaps limited personal knowledge,

14    but largely based on, I'll call it, education and things that

15    he has learned; in other words, arguably as an expert regarding

16    policing and gang characteristics in the absence of a report.

17    Why is this proper?

18         MR. SIDDIQI:  Your Honor, I understand that, you know,

19    at first blush it may seem like this is an expert area, but I

20    think that the testimony that is going to come out is going to

21    be clear that these officers even sometimes have to separate

22    people who are within the Bloods gang itself.

23         So there are, for example, there's a set called Mac

24    Baller Brims, and there's another set called Gorilla Stone.

25    It's my understanding that these two sets within the Bloods

J94Qmcc2                    Mitchell - Cross

1    sometimes fight with each other and cause violence against each

2    other.  An SRG officer has to know that inmates of these sets

3    have to be separated and kept away from each other in order to

4    maintain the security in the facility.

5              THE COURT:  What's the pertinence of this?

6              MR. SIDDIQI:  Your Honor, the plaintiff testified that

7    the slashing at issue was an internal Bloods matter, and that

8    it was a dispute within the gang.

9              Furthermore, if plaintiff is going to testify that he

10   was some sort of an influential member of the Bloods gang, I

11   think it's pertinent if we're going to later impeach plaintiff

12   on his testimony to show that he was either a member of

13   lower-ranking set or that he is not actually competent to

14   testify as to the dynamics of the Blood gang on Rikers Island.

15             THE COURT:  I'm sorry, plaintiff is not competent but

16   this witness is?

17             MR. SIDDIQI:  Your Honor, it's our testimony that

18   plaintiff -- it's going to be our argument that plaintiff is,

19   through a mixture of bravado and exaggeration, exaggerating his

20   position within the gang so that he can state that the officers

21   needed to use him to enforce their policies on Rikers.

22             THE COURT:  Thank you.

23             I'm sustaining the objection to this question

24   regarding the, I'll call it, structure of the Bloods gang

25   generally.

J94Qmcc2                         Mitchell - Cross

1              First, I'm concerned about, I'll call it, the

2    foundation -- lack of foundation for the witness's knowledge

3    regarding this issue, at least as it's been established on the

4    record at this point.  That's the principal basis for my

5    ruling.

6              Thank you.

7          (Continued on next page)

1              (In open court)

2              THE COURT:  Thank you.

3              Counsel, you can proceed.

4              MR. SIDDIQI:  Thank you, your Honor.

5    BY MR. SIDDIQI:

6    Q.  Officer Mitchell, did there come a point in time where

7    there was an emergency situation at AMKC or the Anna M. Kross

8    Center on February 19, 2015?

9    A.  Yes.

10   Q.  What was that emergency?

11   A.  There was a slashing in the commissary.

12   Q.  What is the commissary?

13   A.  Commissary is an area where inmates go buy food, toiletries

14   and snacks, things like that.

15   Q.  Can you explain what you mean further by "slashing"?

16   A.  Basically there was an inmate-on-inmate altercation and an

17   instrument was used, a sharp instrument was used, to cut

18   another inmate.

19   Q.  Officer Mitchell, based on your experience, do you know how

20   a sharpened instrument would make its way into Rikers?

21   A.  Usually, they're fashioned.  You know, they'll make them

22   themselves or they could basically come in through the visits

23   areas or they could come in through other packages and things

24   like that.

25   Q.  Officer Mitchell, after an inmate-on-inmate slashing, what

1   steps do you take as a corrections officer?

2   A.  As a corrections officer, we separate all parties involved

3   and people in the vicinity, and basically they're separated and

4   secured, and we escort them to an area to be strip-searched.

5   Q.  Is that what you did on February 19, 2015?

6   A.  Yes.

7   Q.  Where did you take the inmates to be searched?

8   A.  To the housing area.

9   Q.  And what's the purpose of this search after an

10  inmate-on-inmate slashing?

11  A.  To recover the item used and basically to recover any

12  additional contraband or weapons.

13  Q.  Did there come a point in time on February 19, 2015 that

14  you noticed Chance McCurdy?

15  A.  Yes.

16  Q.  How did you notice him?

17  A.  I was assigned to strip-search him.

18  Q.  How was he behaving?

19          MR. LICHTMACHER:  Objection.

20          THE COURT:  Thank you.

21          You can answer the question.

22  A.  He seemed very irate, kind of -- kind of agitated.

23  Q.  And did his behavior lead you to any conclusion with

24  regards to why he was acting that way?

25          MR. LICHTMACHER:  Objection, your Honor.

1              THE COURT:  Thank you.  Sustained.

2              Can you please rephrase the question?

3    BY MR. SIDDIQI:

4    Q.  Did you come to any conclusion based on plaintiff's

5    behavior?

6              MR. LICHTMACHER:  Objection, your Honor.

7              THE COURT:  Thank you.

8              You can answer the question.

9    A.  Yes.

10   Q.  And what was that conclusion?

11   A.  That he was possibly in possession of contraband.

12   Q.  Are you aware of the plaintiff's SRG status?

13   A.  Yes.

14   Q.  And what's that?

15   A.  Blood.

16   Q.  Are you aware of the substance of the crime for which

17   plaintiff was previously convicted?

18             MR. LICHTMACHER:  Objection, your Honor.

19             THE COURT:  Thank you.

20             Counsel, you can ask the question.  Please proceed.

21             MR. SIDDIQI:  Your Honor, may I have a sidebar?

22             THE COURT:  Thank you.  Yes you may.

23        (Continued on next page)

24

25

J94Qmcc2                        Mitchell - Cross

1          (At the side bar)

2          THE COURT:  Thank you.

3          So, Counsel, why are you asking this witness this

4    question?  What's purpose of it, and why does it come in?

5          MR. SIDDIQI:  Your Honor, as an initial matter --

6    well, actually, sorry, let me answer your question.

7          I'm trying to elicit testimony as to the fact that

8    plaintiff has been convicted of being a sexual offender, this

9    is to later deal with plaintiff's testimony that he was a

10   high-ranking member of the Bloods.  The officer will testify

11   that based on his experience, inmates who are convicted of

12   sexual offenses are not respected by other inmates, and,

13   furthermore, that inmates who are convicted of sexual offenses

14   are not respected within the Bloods gang.

15         THE COURT:  Thank you.

16         Counsel?

17         MR. LICHTMACHER:  Your Honor, it's a little convoluted

18   the way he's going about it.  Certainly with Mr. McCurdy, he

19   can ask about his convictions as they already noted they want

20   to and get them in that way.

21         So, through this witness it would be hearsay, number

22   one, for it to come in, so -- and that alone should preclude

23   it.  This witness, they seem to be trying to expand the scope

24   of what he is here and should be here to testify about.  He's

25   not an expert.  And he's not an expert on McCurdy's criminal

J94Qmcc2                          Mitchell - Cross

1    record.  You know, I don't see how this can possibly come in

2    through this person.

3                THE COURT:  Thank you.

4                Counsel, any further argument?

5                MR. SIDDIQI:  Your Honor, the officer has testified

6    that he is an SRG officer.  The officer has testified that he

7    is charged with dealing with inmates with SRG statuses.  I

8    think that if Mr. McCurdy is going to forward a theory that

9    this alleged assault was caused because the officers were angry

10   at him for not enforcing their rules --

11               THE COURT:  Counsel, that's not the question.  The

12   question is, why does this -- why can this witness testify what

13   Mr. McCurdy's criminal record is?  Counsel has argued that that

14   is hearsay.  This is a separate question from whether or not he

15   can testify that he was understood to be a sex offender to deal

16   with the narrative.

17               The question is why he can answer this specific

18   question; namely, what is Mr. McCurdy's criminal record?  Why

19   can this security officer answer that particular question?

20               MR. SIDDIQI:  Your Honor, would it be appropriate if

21   the question was changed to:  Are you aware Mr. McCurdy is

22   convicted of a sexual offense?

23               THE COURT:  Thank you.  What's the context?

24               MR. SIDDIQI:  Again -- if I can have a moment?

25               (Pause)

J94Qmcc2                         Mitchell - Cross

1              MR. SIDDIQI:  Your Honor, I'll withdraw the question.

2              THE COURT:  Thank you.

3         (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2           THE COURT:  Thank you.  Counsel, you can proceed.

3           MR. SIDDIQI:  Yes, your Honor.

4   BY MR. SIDDIQI:

5   Q.  Officer Mitchell, have you conducted strip searches in the

6   past?

7   A.  Yes.

8   Q.  Have you ever found contraband on or inside an inmate as a

9   result of a strip-search?

10  A.  Yes.

11  Q.  What contraband have you found in the past?

12          MR. LICHTMACHER:  Objection, your Honor.

13          THE COURT:  Thank you.

14          You can answer the question.

15  A.  Scalpels, razors, drugs, things like that.

16  Q.  On February 19, 2015, did you ask the plaintiff to comply

17  with a strip-search?

18  A.  Yes.

19  Q.  And do you know what words you said to tell him to do that?

20  A.  Yes.  I told him basically we're just going to conduct --

21  I'm going to conduct a strip-search; to hand me one item of

22  clothing at a time, to not shake or throw anything.

23  Q.  Why do you give those instructions?

24  A.  In case there's contraband secreted inside the shirt or,

25  you know, in the lining of the shirt or the clothing.

1    Q.  Did Mr. McCurdy say anything in response to you?

2    A.  He said, "Fuck y'all.  It's lit."

3    Q.  And what does "it's lit" mean?

4           MR. LICHTMACHER:  Objection.

5           THE COURT:  Thank you.

6           Can you please rephrase the question?

7    Q.  Did you understand what he meant when he said "it's lit"?

8    A.  Yes.

9    Q.  What did you understand him to mean?

10   A.  Be prepared for an altercation.

11   Q.  What did you do after he used those words?

12   A.  I tried to gain compliance.  I told him basically like

13   let's complete the search.  It's one, two, three, we'll be in

14   and out.  Let's complete the search.  Just to hand me his

15   shirt, one item of clothing at a time.

16   Q.  Did the plaintiff in fact comply?

17   A.  No.

18   Q.  Did he do something else?

19   A.  Yes.

20   Q.  What did he do?

21   A.  He began to remove his shirt.  He removed his shirt and

22   immediately threw it at me.

23   Q.  And did he say anything to you at the time he threw his

24   shirt?

25   A.  Yes.

1   Q.  Do you remember what he said?

2   A.  He said, "Fuck y'all.  It's lit.  I'm gonna cut one of

3   y'all."

4   Q.  And did you understand what he meant when he said, "I'm

5   going to cut one of you"?

6   A.  Yes.

7   Q.  What did you understand that to mean?

8   A.  That he was going to use an instrument to cut me.

9   Q.  And what did Mr. McCurdy do, if anything, after he threw

10  the T-shirt at you?

11  A.  He immediately punched me in the face.

12  Q.  Did that punch land?

13  A.  Yes.

14  Q.  What part of your face did it land on?

15  A.  My left eye.

16  Q.  How close were you to Mr. McCurdy at the time that he

17  punched you?

18  A.  I don't recall.  I was close, pretty close.

19  Q.  Do you recall the strength of the punch?

20  A.  It was fairly strong.

21  Q.  What did you feel after being punched by the plaintiff?

22  A.  I immediately felt a sharp pain in my eye, like a sharp

23  pain in my eye, and my eye started bruising and swelling and

24  tearing.

25  Q.  Could you see?

1   A.  Not out of my left eye, no.

2   Q.  And did you do anything in response to being punched by the

3   plaintiff?

4   A.  I immediately went in reflex, I threw a punch back.

5   Q.  Is there a reason you did not use your chemical agent?

6   A.  I was too close, and I felt like it wouldn't have been as

7   effective.

8   Q.  Do you know how many times you punched the plaintiff?

9   A.  I don't recall.

10  Q.  Could you just speak up?  I couldn't hear what you said.

11  A.  I do not recall.

12  Q.  Is there a reason you cannot recall?

13  A.  I was in the heat of the moment, and in the heat of the

14  moment I really don't recall how many times.

15  Q.  After you punched the plaintiff, did he then comply and

16  stop fighting you?

17  A.  No.

18  Q.  What did he do next?

19  A.  He continued to resist.  He continued to basically look

20  like he was going to throw another punch.

21  Q.  Did any officer come to assist you?

22  A.  Yes.

23  Q.  Who was that officer?

24  A.  Officer Cutler.

25  Q.  Did the struggle continue?

J94Qmcc2                        Mitchell - Cross

1   A.  Yes.

2            MR. SIDDIQI:  Just one moment, your Honor.

3            (Pause)

4   Q.  Officer Mitchell, I'm going to show you a series of

5   photographs.  Officer Mitchell, are you familiar with quad 14 A

6   lower at the AMKC?

7   A.  Yes.

8   Q.  How are you familiar with that area?

9   A.  I worked in the housing area a couple times.

10  Q.  Is this photograph that's been marked for identification as

11  C, is that a fair representation of what tier 14 A lower looked

12  like on February 19, 2015?

13  A.  Yes.

14           MR. SIDDIQI:  Your Honor, I would like to show this

15  photograph to the jury for demonstrative purposes?

16           MR. LICHTMACHER:  Voir dire.

17           THE COURT:  Thank you.  Please proceed.

18  VOIR DIRE EXAMINATION

19  BY MR. LICHTMACHER:

20  Q.  Now, I think you testified that the whole time you've been

21  at DOCS, you've been at AMKC, correct?

22  A.  Correct.

23  Q.  And you haven't spent time working at the other facilities,

24  correct?

25  A.  Repeat the question?

J94Qmcc2                          Mitchell - Cross

1   Q.  You haven't spent time working at other facilities --
2   withdrawn.
3            Rikers Island has several facilities, correct?
4   A.  Correct.
5   Q.  How many is it now, something like 16?
6   A.  I don't know the exact number.
7   Q.  Neither do I.  All right.
8            So, but there are numerous facilities on Rikers.
9   You're aware of that?
10  A.  Correct.
11  Q.  And you haven't worked in the other ones, correct?
12  A.  Correct.
13  Q.  And, in fact, the one that you're most familiar with is
14  AMKC, correct?
15  A.  Correct.
16  Q.  So you don't really know if the other facilities look like
17  this as well, do you?
18  A.  To the best of my knowledge, no.
19  Q.  And have you -- did you take these photos?
20  A.  No, I didn't.
21            MR. LICHTMACHER:  At least the first one -- has he got
22  all of them in front of him or just that one?
23            MR. SIDDIQI:  Just this one.
24  Q.  Just that one.  You didn't take this photo.  Were you
25  present when it was being taken?

1   A.  Yes.

2   Q.  You were there with it, and this is a fair and accurate

3   representation of the way it looked on the day this photo was

4   taken?

5   A.  Yes.

6   Q.  When was the photo taken?

7   A.  I don't recall the date.

8   Q.  Well, was it in 2015?

9   A.  No.

10  Q.  Was it in 2016?

11  A.  No.

12  Q.  Was it in 2017?

13  A.  No.

14  Q.  Was it in 2018?

15  A.  No.

16  Q.  So, I gather, it was either taken before the incident or it

17  was taken this year, correct?

18  A.  Correct.

19  Q.  So, do you remember what, if any, changes were made in that

20  time period or if -- withdrawn.

21          Do you remember if any changes were made in that

22  facility during that time period?

23  A.  To the best of my knowledge, the most they do is just

24  repaint.

25  Q.  Repaint.  So this doesn't look exactly the way it did in

J94Qmcc2                    Mitchell - Cross

1    2015, does it?

2    A.  Minus the color?  No.

3    Q.  Minus the color?

4    A.  It looks exactly the same minus the color.

5    Q.  Minus the color, it looks exactly the same?

6            MR. LICHTMACHER:  Your Honor, I object to the exhibit

7    coming in.  I object because he can't -- well, withdrawn.

8    Q.  Do you know whether or not this exhibit could be from one

9    of the other facilities?

10   A.  That's for sure at AMKC.

11   Q.  You know it's AMKC?

12   A.  Correct.

13   Q.  But you don't know what the other facilities look like?

14   A.  I'm aware of what my facility looks like, yes.

15   Q.  Right, you're aware of --

16           MR. LICHTMACHER:  Your Honor, I still object to the

17   document coming in on two grounds.

18           THE COURT:  Counsel, please come forward.  No speaking

19   objections.

20               (Continued on next page)

21

22

23

24

25

1          (At the side bar)

2          THE COURT:  Thank you.

3          Let me just reiterate my statements to the parties at

4     our final pretrial conference and my reminder to counsel for

5     defendants earlier.  No speaking objections.  State the

6     objection and the basis for it briefly.  If you'd like to

7     discuss something in more depth, you should do it at sidebar

8     and not through a demonstration in front of the jury.

9          MR. LICHTMACHER:  OK.

10          THE COURT:  Thank you.

11          So what's the nature of the issue, understanding that

12     this is not being brought in to evidence, but that counsel

13     wants to bring it in as a demonstrative to show generally what

14     the hallway looks like.

15          My understanding was that the parties had conferred on

16     this topic, as I invited them to.  I invited you to let me know

17     in your August 29 letter the concerns regarding these.

18          With that introduction, Counsel, what's the concern?

19          MR. LICHTMACHER:  Well, we did discuss, I think at the

20     conference, but these weren't produced to me until well after

21     discovery ended on the eve of trial.  So I've had no discovery.

22     The closest I had discovery on this is what I just asked him

23     right now.  So I haven't had a chance to explore these.  I

24     haven't had a chance to really go over them to ask questions

25     about them.

J94Qmcc2                     Mitchell - Cross

1              So it is prejudicial to my client.  They should have

2      been produced in time.  They had access to the facility the

3      whole time.  They represent DOCS.  So I don't know why suddenly

4      they're able to be used right at the eve of our trial when they

5      were produced on the eve of trial.

6              THE COURT:  Thank you.  That's a legitimate concern.

7              Again, let me remind you that the context here, which

8      is that this issue was raised previously, that the Court

9      invited the parties to provide comments regarding their use in

10     a joint letter on August 29.  No comments were made at that

11     time.  We discussed these demonstratives earlier.  Now during

12     the trial, rather than at any of those prior points, this issue

13     has been raised despite the Court's invitation to the parties

14     to provide the Court with any information about potential

15     objections at any of those prior dates or in those prior

16     formats which would not require us to waste the jury's time.

17             But having again set forth that context for some

18     anticipated objection, counsel for defendants, what's your

19     position?

20             MS. GOYKADOSH:  If I may, your Honor?

21             THE COURT:  Yes.

22             MS. GOYKADOSH:  These exhibits are only being used for

23     demonstrative purposes.  I was not the one who conducted

24     discovery in this case.  However, these exhibits were not

25     provided to Mr. Lichtmacher until last week.  We agree with

1  that.  However, again, they're only being used for

2  demonstrative purposes.  They're an aid for the jury to

3  understand what the cell looked like, what the hallway looked

4  like.  These are locations that we're going to be talking about

5  in this case.  Mr. Lichtmacher did conduct discovery in this

6  case, and he certainly could have asked for any photos at that

7  time if he wanted them, but that's not the point.  The point is

8  we're here now, we want to use these for demonstratives as an

9  aid to help the jury understand.  And demonstratives I don't

10  believe need to be produced during discovery.  It's an aid for

11  the jury.

12       THE COURT:  Thank you.  So let me -- please, go ahead,

13  Counsel.

14       MR. LICHTMACHER:  One thing.  In my experience through

15  civil rights, which I guess I can say at this point is fairly

16  extensive, prison photos are almost never given to plaintiff's

17  attorneys for safety concerns, you know, knowing too much about

18  the prison, the way it's laid out.  So I've jumped through

19  great hoops in one case to get them Upstate, and usually

20  they're just routinely denied.

21       So under these circumstances, again, them having

22  access to it, you are correct, I should have raised this more

23  stringently, but I did raise it during the conference that we

24  did have.  You are correct about that though, your Honor.

25       THE COURT:  Thank you.

J94Qmcc2                          Mitchell - Cross

 1              What's the prejudice here, Counsel?

 2              MR. LICHTMACHER:  You know, I haven't had the

 3    opportunity to really -- particularly in light of the problems

 4    with bringing in my client, had the opportunity to go over it

 5    with him.  I have no idea what the nature of these are.

 6    Excuse me, that's not true.  What they're being used for.

 7    Sorry, I misspoke.  What they're being used for, and, you know,

 8    trial by surprise is not really -- and it is surprise, because

 9    the purpose of them is surprise at this point.  You know, in

10    this type of instance, you know, I'm given no preparation about

11    what's going to be said about them, you know, is this the way

12    the prison look?

13              THE COURT:  I will permit you to use them.  I will

14    address the basis for the decision during a break.  I just

15    don't want to, again, use up too much of the jury's time.

16              MR. LICHTMACHER:  Sorry.

17              THE COURT:  The demonstratives were identified by

18    counsel for defendants previously.  There was a prior

19    opportunity for counsel for plaintiff to review them and to

20    comment on them.  I don't believe that it's a surprise as a

21    result.  I don't understand there to be appreciable prejudice.

22    These are images of the location at issue.  They have great

23    value as a result to help the jury understand the setting where

24    the incident occurred.

25              The parties will have the opportunity to explore any

J94Qmcc2                        Mitchell - Cross

1    distinctions between these images and the site as it existed at

2    the time of the events at issue during examination.  But again,

3    these are being used as demonstratives, not as being introduced

4    as direct evidence.  But I will, of course, give the parties

5    the opportunity to query the witnesses about these images to

6    identify the distinctions between them and the situation at the

7    time of the incident at issue here.

8            MR. LICHTMACHER:  Your Honor, I believe if the

9    entirety of testimony is going to be what happened inside the

10   cell, why are we getting pictures of the hallway?  How does it

11   assist the jury in any way?

12           THE COURT:  Thank you.  Understood.

13           We'll hear about that.  There are also images of the

14   hall.  Again, however, this is a waste of the jury's time,

15   Counsel, which is why I tried very hard to encourage the

16   parties to discuss this issue when it was first raised a week

17   ago and to submit written objections to the Court.  Having

18   failed to receive them, I am dealing with this on the fly.

19           MR. SIDDIQI:  Your Honor, so as to not to waste the

20   jury's time, can I just not have to go through each of these

21   photographs now and show them one at a time, or do we have to

22   do this exercise for each photograph?

23           THE COURT:  You need to do the exercise for each

24   photograph.

25           MR. SIDDIQI:  OK.  Thank you, your Honor.

J94Qmcc2                          Mitchell - Cross

1               (Continued on next page)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  Thank you.  Counsel, you can proceed.

3    BY MR. SIDDIQI:

4    Q.  Officer Mitchell, looking at what's been marked as Exhibit

5    C again, do you recognize what this is a photograph of?

6    A.  Yes.

7    Q.  And you're familiar with this area?

8    A.  Yes.

9    Q.  And why are you familiar with this area?

10   A.  I've worked there before.

11             MR. SIDDIQI:  Your Honor, I'd like to show this

12   photograph to the jury for demonstrative purposes.

13             THE COURT:  Thank you.  You can proceed.

14   Q.  So, Officer Mitchell, what's this a photograph of?

15   A.  Quad lower 14 housing area.

16   Q.  Officer Mitchell, what are these doors that have numbers

17   above them?

18   A.  Cells.

19   Q.  Officer Mitchell, I'm now showing you what's been marked as

20   Defendant's E for identification.  Do you recognize this

21   photograph?

22   A.  Yes.

23   Q.  What do you recognize this photograph to be?

24   A.  Quad 14 lower housing area.

25   Q.  Are you familiar with this housing area?

J94Qmcc2                    Mitchell - Cross

1    A.  Yes.

2    Q.  Is this a fair representation of what the housing area

3    looked like on February 19, 2015?

4    A.  Yes.

5            MR. SIDDIQI:  Your Honor, I'd like to show this

6    photograph to the jury for demonstrative purposes.

7            THE COURT:  Thank you.

8            Counsel?

9            MR. LICHTMACHER:  No objection.

10           THE COURT:  Thank you.  You can proceed.

11   Q.  Officer Mitchell, this gate over here, what's it looking

12   into?

13   A.  It's looking into the housing area, the tier area.

14   Q.  And the open door in the back, what's that?

15   A.  An emergency exit.

16   Q.  So is it fair to say that from this gate up till the door

17   in the back that's the length of the housing area?

18   A.  Correct.

19   Q.  Thank you.

20           Officer Mitchell, I'm now showing you what's been

21   marked as Defendant's F for identification, F as in Frank.  Do

22   you recognize what this is a photograph of?

23   A.  Yes.

24   Q.  What do you recognize it as a photograph of?

25   A.  Inmate cell on quad lower 14.

J94Qmcc2                        Mitchell - Cross

1    Q.  Are you familiar with inmates cells on quad lower 14?

2    A.  Yes.

3    Q.  How are you familiar with them?

4    A.  Again, I've worked the area.  I'm familiar with the area.

5    Q.  Is this a fair representation of what the cells looked like

6    on February 19, 2015?

7    A.  Yes.

8              MR. SIDDIQI:  Your Honor, I'd like to show this

9    photograph to the jury for demonstrative purposes.

10             MR. LICHTMACHER:  No objection.

11             THE COURT:  Thank you.  You can proceed.

12   BY MR. SIDDIQI:

13   Q.  Officer Mitchell, so what are we looking at in this

14   picture?

15   A.  A bed frame.

16   Q.  And this doorway, what's it the doorway to?

17   A.  A doorway to a cell.

18   Q.  And this closed doorway, is it the doorway to a different

19   cell?

20   A.  Yes.

21   Q.  Does this fairly depict the front of the area where you

22   would have been searching Mr. McCurdy on February 29, 2015?

23   A.  Yes.

24   Q.  You may take that off.

25             Officer Mitchell, I'm now showing you what's been

J94Qmcc2                         Mitchell - Cross

1    marked as Defendant's Exhibit G.  Are you familiar with what's

2    being depicted in this photograph?

3    A.  Yes.

4    Q.  Why are you familiar with what's being depicted in this

5    photograph?

6    A.  Again, I've seen the inside of a cell.

7    Q.  Is this what plaintiff's cell looked like on February 19,

8    2015?

9    A.  Yes.

10          MR. SIDDIQI:  Your Honor, I'd like to show this

11   photograph to the jury for demonstrative purposes.

12          MR. LICHTMACHER:  No objection, your Honor.

13          THE COURT:  Thank you.  You can proceed.

14   BY MR. SIDDIQI:

15   Q.  Officer Mitchell, is this the view inside the cell from the

16   door?

17   A.  Correct.

18   Q.  Can you please describe the furniture that we can see in

19   this photograph?

20   A.  A bed frame, toilet bowl and a sink.

21   Q.  Officer Mitchell, is that bed frame fixed to the floor or

22   the wall?

23          MR. LICHTMACHER:  Objection.  Leading.

24          THE COURT:  Thank you.  Counsel, I'll permit it.

25          You can answer the question.

J94Qmcc2                         Mitchell - Cross

1    A.  Yes, it's actually bolted into the floor and into the wall.

2    Q.  And what material is this bed made out of?

3    A.  Metal.

4    Q.  What material is this toilet made out of?

5    A.  Metal.

6    Q.  And what material is the sink made out of?

7    A.  Porcelain and metal.

8    Q.  And the floor is it a hard or soft floor?

9    A.  A hard floor.

10   Q.  Thank you.  You can take that off.

11           Officer Mitchell, I'm now showing you what's been

12   marked as Defendant's Exhibit H for identification.  Are you

13   familiar with what's depicted in this photograph?

14   A.  Yes.

15   Q.  And what do you understand it to be?

16   A.  The inside of a cell.

17   Q.  How are you familiar with this area?

18   A.  I've been inside of a cell.

19   Q.  Is this a fair depiction of what the interior of the

20   plaintiff's cell looked like on February 19, 2015?

21   A.  Yes.

22           MR. SIDDIQI:  Your Honor, I'd like to show this to the

23   jury for demonstrative purposes.

24           MR. LICHTMACHER:  No objection.

25           THE COURT:  Thank you.  Please proceed.

J94Qmcc2                        Mitchell - Cross

1    Q.  Officer Mitchell, is this another view of the same cell?

2    A.  Yes.

3    Q.  Officer Mitchell, you can point to the picture, and I think

4    it will show up, or am I wrong?  Officer Mitchell, where were

5    you standing when you asked Mr. McCurdy to remove his clothes?

6    A.  Inside the doorway of the cell.

7    Q.  Over here?

8    A.  Yes.

9    Q.  Where was --

10        THE COURT:  To be clear, counsel has indicated the

11   left side of the door on the right side of the image.

12        You can proceed.

13   Q.  Where was the plaintiff standing?

14   A.  He was standing --

15        MR. LICHTMACHER:  Objection.  When?

16        THE COURT:  Thank you.

17        Can you please rephrase the question, Counsel?

18   Q.  Where was the plaintiff standing when you asked him to

19   remove his clothes?

20   A.  In this area right here.  I don't know if you're able to

21   see what I just circled.

22        THE COURT:  Yes, the screen is touch-sensitive.  For

23   the witness, if you write on the screen, the jurors will be

24   able to see your marking.

25   Q.  Can you just draw an X where you were?

1   A.  I was (indicating).

2   Q.  So plaintiff was relatively close to you distance-wise?

3   A.  Yes.

4           THE COURT:  Thank you.

5           For the record, the witness has drawn an X over the

6   door and has drawn a circle slightly to the left of the X

7   centered on the right frame of the door.

8   Q.  I'm going to show you another photograph.  Officer

9   Mitchell, I'm showing you what's been marked as Defendant's

10  Exhibit I for identification.  Is this another view of the

11  cell?

12  A.  Yes.

13  Q.  Are you familiar with this cell?

14  A.  Yes.

15          MR. SIDDIQI:  Your Honor, I'd ask that this photograph

16  be shown to the jury for demonstrative purposes.

17          MR. LICHTMACHER:  No objection.

18          THE COURT:  Thank you.

19          Counsel, you can proceed.

20  Q.  Officer Mitchell, did there come a point in time -- well,

21  I'm sorry.  Earlier you testified that the plaintiff punched

22  you.  Is that correct?

23  A.  Correct.

24  Q.  Can you make an indication where you were standing when the

25  plaintiff punched you?

1    A.  (Indicating)

2    Q.  Can you make an indication with a circle as to where the

3    plaintiff was standing when he punched you?

4    A.  (Indicating)

5           (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Thank you.

2          For the record, the witness has drawn an X right in

3    front of the door shown in this image and has drawn a circle,

4    again, just to the right of the door near the door frame.

5    BY MR. SIDDIQI:

6    Q.  And you testified that you punched the plaintiff back, is

7    that correct?

8    A.  Correct.

9    Q.  Did the struggle with plaintiff move away from the doorway?

10   A.  Yes.

11   Q.  Okay.  And what area of the cell did it move to?

12   A.  (Indicating.)

13   Q.  Okay.  And you've indicated the area of the cell in front

14   of the toilet between the bed and the wall, is that correct?

15   A.  Yes.

16   Q.  Okay.  I'd like to show you another photograph.

17          I'm showing you what's been marked for identification

18   as Defendant's Exhibit J.  Is this another view of the cell?

19   A.  Yes.

20   Q.  And are you familiar with this for the same reasons stated

21   earlier?

22   A.  Yes.

23          MR. SIDDIQI:  Your Honor, I'd like to show this to the

24   jury for demonstrative purposes.

25          MR. LICHTMACHER:  No objection.

1          THE COURT:  Thank you.

2          Counsel, you can proceed.

3   Q.  Officer Mitchell, is this a fair depiction of the area

4   where the struggle with the plaintiff occurred?

5   A.  Yes.

6   Q.  And were you in one place when you were struggling with the

7   plaintiff?

8   A.  No.

9   Q.  Were you moving around?

10  A.  Yes.

11  Q.  Was Officer Cutler also moving around?

12          MR. LICHTMACHER:  Objection.  When?

13          THE COURT:  Thank you.

14          Counsel, can you rephrase the question.

15  Q.  Was Officer Cutler also moving during the struggle with

16  plaintiff?

17  A.  Yes.

18  Q.  And what was causing you and Officer Cutler to be moving

19  around?

20  A.  Inmate's resistance.

21  Q.  And can you describe the areas of the cell where you were

22  moving.

23  A.  You want me to draw it like -- it would be easier if we do

24  it that way?

25  Q.  Sure.

J941mcc3                    Mitchell - Cross

1    A.  Pretty much this area and this area over here.

2    Q.  I'm going to show you another picture --

3            THE COURT:  Thank you.  Just for the record, the

4    witness has indicated the right side of the photograph near the

5    wall and the floor near the -- or to the bottom of the image

6    below the toilet.

7    Q.  Officer Mitchell, I'm showing you what's been marked for

8    identification as Defendant's Exhibit K.  Is this another view

9    of the cell?

10   A.  Yes.

11   Q.  And are you familiar with it for the same reasons stated

12   earlier?

13   A.  Yes.

14           MR. SIDDIQI:  Your Honor, I'd like to show this to the

15   jury for demonstrative purposes.

16           MR. LICHTMACHER:  No objection.

17           THE COURT:  Thank you.

18           You can proceed.

19   Q.  Officer Mitchell, can you indicate again the area where the

20   struggle was occurring between plaintiff, yourself, and Officer

21   Cutler.

22   A.  Sure.  (Indicating.)

23   Q.  Officer Mitchell, during that struggle, did the plaintiff

24   bump into any of the furniture in that cell?

25           MR. LICHTMACHER:  Objection.  Leading, your Honor.

J941mcc3                          Mitchell - Cross

 1              THE COURT:  Thank you.

 2              Can you please rephrase the question, counsel.

 3    Q.  Officer Mitchell, was the plaintiff moving around during

 4    the struggle?

 5    A.  Yes.

 6    Q.  And did plaintiff come into contact with any of the objects

 7    depicted in this photograph?

 8              MR. LICHTMACHER:  Objection, your Honor.

 9              THE COURT:  Sustained.

10              Counsel, can you please rephrase.

11    Q.  Can you please describe the manner in which plaintiff was

12    moving around in the cell.

13    A.  Violently.

14    Q.  Okay.  Can you please describe the areas of the cell where

15    the movement was happening.

16    A.  They're hard surfaces, along the wall and on the floor, by

17    the bed area, and by the toilet area.

18    Q.  And when you say by the bed and by the toilet, what do you

19    mean?

20    A.  Basically right next to them, like on -- like basically

21    pretty much on top of them.

22    Q.  Did you ever see the plaintiff come in contact with any of

23    those objects?

24    A.  No, I didn't see.

25    Q.  Officer Mitchell, in your experience how many people can

1  fit inside this cell?

2  A.  It's a one-man cell, but generally, in my experience, I've

3  seen no more than two.

4  Q.  Would it be possible in your experience for six or seven

5  people to fight inside this cell?

6          MR. LICHTMACHER:  Objection.

7  A.  Absolutely not.

8          THE COURT:  I'm sorry.  Sustained.  I'm striking the

9  answer.

10          Counsel, can you please rephrase.

11  Q.  Officer Mitchell, did there come a point in time where

12  plaintiff was brought down to the ground?

13  A.  Yes.

14  Q.  And were you one of the people who brought the plaintiff

15  down the ground?

16  A.  Yes.

17  Q.  Okay.  And did you do that in a way that could be described

18  as gentle?

19  A.  No.

20  Q.  Why not?

21  A.  Basically the inmate's motions was really violent and like

22  really erratic, so he was trying to resist, so it was kind of

23  forceful.

24  Q.  And plaintiff was brought down to the ground, is that

25  correct?

1    A.  Correct.

2    Q.  What happened after the plaintiff was brought down to the

3    ground?

4    A.  He continued to resist.

5    Q.  Did there come a point in time where plaintiff was

6    handcuffed?

7    A.  Yes.

8    Q.  What did you do after he was handcuffed?

9    A.  Once he was handcuffed I immediately -- I exited the area

10   and went to seek medical attention.

11   Q.  Did you escort the plaintiff out of the housing area?

12   A.  No.

13   Q.  Is there a reason you did not do that?

14   A.  DOC policy pretty much that we -- once a -- I was involved

15   in a use of force with the inmate that we -- we surrender them

16   to another -- to another officer for escort purposes once

17   they're secured.

18   Q.  How did your face or your eye feel after you left the cell?

19   A.  I felt a lot of pain in my eye and my wrist area and my

20   hand area, my right hand, and my eye started to swell and

21   bruise.

22   Q.  Did you see any medical professional?

23   A.  Yes.

24   Q.  And did you receive any evaluation?

25   A.  Yes.

1   Q.  What did you understand that evaluation to be?

2   A.  Basically they said I had bruising and swelling on my eye

3   and --

4          MR. LICHTMACHER:  Objection.

5   A.  -- tenderness -- oh, I'm sorry.

6          THE COURT:  I'm sorry.  I'm sorry.  Give me one

7   moment, please.

8          Thank you.  Sustained.  I'm striking the response.

9          Counsel, can you please rephrase the question.

10  Q.  What did you understand your medical condition to be?

11  A.  Basically, for lack of better words, a black eye.

12  Q.  Officer Mitchell, I'm showing you what's already been

13  entered into evidence as Plaintiff's Exhibit 1.  So this is a

14  document that plaintiff showed you earlier, which on the top

15  right there it bears the marking C-3.  And it's an employee

16  claim.  Do you recognize that document?

17  A.  Yes, I do.

18  Q.  Now I'd like to show only you a document -- I'm handing it

19  also to plaintiff's counsel -- that's been marked for

20  identification as Defendant's Exhibit L.

21          Do you recognize this document, Officer Mitchell?

22  A.  Yes.

23  Q.  And do you see the notation on the top right of this

24  document that says C-3.3?

25  A.  Correct, yes, I do.

J941mcc3                         Mitchell - Cross

1    Q.  And do you understand this to be a part of a package that

2    was --

3              MR. LICHTMACHER:  Objection, your Honor.

4              THE COURT:  Sustained.

5              Counsel, can you please rephrase.

6    Q.  Do you remember when you filled out this document?

7    A.  It was part of the same packet.  I would have filled it out

8    the same time that I filled out the other paperwork.

9    Q.  And is this a document that you filled out as part of your

10   job as a correction officer?

11   A.  Correct.

12   Q.  And is this a document that's regularly kept in the course

13   of business of the Department of Corrections?

14   A.  Yes.

15             MR. SIDDIQI:  Your Honor, at this time I would like to

16   offer Defendant's Exhibit L into evidence.

17             THE COURT:  Thank you.

18             Counsel.

19             MR. LICHTMACHER:  Objection, your Honor.

20             Can I ask counsel something.

21             THE COURT:  Thank you.

22             MR. LICHTMACHER:  Based on time.

23             THE COURT:  Thank you.  You may ask counsel something.

24             (Counsel conferring)

25             MR. LICHTMACHER:  Objection, your Honor.  It's not in

J941mcc3                     Mitchell - Cross

1     the JPTO.

2               THE COURT:  Thank you.

3               Overruled.  Please proceed.  I'm accepting Defendant's

4     Exhibit L into evidence.

5               You can proceed.

6               (Defendant's Exhibit L received in evidence)

7               MR. SIDDIQI:  Thank you, your Honor.

8     BY MR. SIDDIQI:

9     Q.  Officer Mitchell, I'd like to direct your attention to the

10    portion of this document labeled A - Your Information.  Do you

11    see that?

12    A.  Yes.

13    Q.  And Officer Mitchell, is that your handwriting on this

14    document?

15    A.  Yes, it is.

16    Q.  And Officer Mitchell, is there a portion of this

17    document -- do you see the portion of this document saying A6?

18    A.  Yes, I do.

19    Q.  And what's the label on that portion of the document?

20    A.  "Current injury/illness, including all body parts injured."

21    Q.  And can you please tell the jury what you wrote there.

22    A.  "Right pointer finger, wrist, and left facial area."

23    Q.  And what were you describing in this portion of the

24    document?

25    A.  The injuries I've sustained.

J941mcc3                    Mitchell - Cross

1  Q.  And to be clear, you testified earlier you filled this out

2  at the same time you filled out what's been entered into

3  evidence as Plaintiff's Exhibit 1, which is the employee claim?

4  A.  Yes.

5  Q.  And what notation do you see on the top right of the

6  employee claim?

7  A.  C-3.

8  Q.  And what notation do you see on the top right of Exhibit L?

9  A.  C-3.3.

10 Q.  Thank you.

11         Officer Mitchell, after this incident were you

12 photographed?

13 A.  Yes.

14 Q.  I'd like to show a document only to you -- and I'm handing

15 it over to plaintiff's counsel -- marked as Exhibit M for

16 identification.

17         Officer Mitchell, is this a photograph of you?

18 A.  Yes.

19 Q.  Was it taken immediately after the incident?

20 A.  Yes.

21 Q.  Do you remember this photograph being taken?

22 A.  Yes, I do.

23 Q.  Are photographs of officers who have been involved in uses

24 of force taken in the regular course of business of the

25 Department of Corrections?

J941mcc3

A.  Yes, it is.

Q.  Is this a document that you understand to be generated in the regular course of business of the Department of Correction?

A.  Yes.

MR. SIDDIQI:  Your Honor, I would like to admit this document into evidence and publish it to the jury as Defendant's Exhibit M.

MR. LICHTMACHER:  Objection.  Not in the JPTO.

THE COURT:  Thank you.  Counsel, please come forward.

I'd actually like to see if I can ask that we take a short break now, if I can, ladies and gentlemen of the jury. It seems like a reasonable time to do so.  You might want to have a quick bite now.  I think that we may try to take about a 30-minute break.  So call this your lunch break, with apologies for starting a little bit early.

Let me give you some instructions that you'll hear me say throughout the course of the trial.  Please don't discuss the case amongst yourselves; don't communicate with anyone else about the case or anyone involved in it; and don't do any research about the case or any of the issues involved in the case.

So with that, I'll see you back here in about half an hour.  Thank you very much.

(Continued on next page)

J941mcc3

1           (Jury not present)

2           THE COURT:  Good.  Thank you.  You can be seated.

3           The witness can step down.

4           Let me just instruct the witness, before you step

5      away, Mr. Mitchell, you still have been called by counsel for

6      plaintiff.  As a result, I'm directing you not to discuss this

7      matter, your testimony, with anyone during this recess,

8      including, without limitation, counsel for defendants.

9           THE WITNESS:  Yes, your Honor.

10          THE COURT:  Thank you.

11          Good.  So counsel, there's an objection to this

12     exhibit.  Let me note that the prior exhibit, Exhibit L, was

13     not on the joint pretrial order.  I permitted it to be

14     introduced nonetheless because it was arguably necessary in

15     order to complete the document that was presented by counsel

16     for plaintiff, which was Exhibit 1, and there was an argument

17     that that comprised a portion of that.

18          Now with respect to this Exhibit M, it's not on the

19     joint pretrial order, and I see no reason why it should not

20     have been expected to be.  So the question, counsel for

21     defendants, is:  If you can make a showing of manifest

22     injustice for the introduction of an exhibit that you failed to

23     introduce prior to today, I look forward to hearing your

24     argument.

25          MR. SIDDIQI:  Your Honor, we were unaware until the

J941mcc3

1    trial began that the plaintiff was going to put forward a

2    theory that the punch never occurred.  This photograph clearly

3    shows that there's a bruise on Officer Mitchell's face, so

4    we're presenting this, or we'd like to present this document to

5    the jury.  We'd like to present this document to the jury to

6    show that there was a bruise to the officer's face on the date

7    of incident as rebuttal evidence.

8              Furthermore, Mr. Lichtmacher has forwarded the theory

9    that the first time that there was any mention of a punch to

10   the face occurred in March, weeks after the incident.  This

11   photograph is contemporaneous with the incident and would be

12   used as rebuttal evidence to show that there was a

13   contemporaneous documentation of the injury.

14             THE COURT:  Thank you.  Please hand the exhibit

15   forward.

16             MR. SIDDIQI:  Yes, your Honor.

17             THE COURT:  Thank you.

18             Counsel for plaintiff.

19             MR. LICHTMACHER:  Certainly.

20             Throughout the deposition, Mr. McCurdy was asked about

21   whether the punch happened, so the theory that this is for the

22   first time hearing he's going to say there's no punch happening

23   is -- I don't want to call it disingenuous but it's incorrect,

24   all right?  So they've known about this for over a year.  And

25   now suddenly they need rebuttal evidence to rebut a fact that

J941mcc3

1   they didn't know was coming in?  That's impossible to believe.

2   This is an oversight, but I am prejudiced by it.

3              THE COURT:  Thank you.

4              MR. LICHTMACHER:  And just as I, you know, failed, as

5   you pointed out, to object to certain things, you know, or

6   include certain things, on this point, they failed to include

7   this.  I don't see why they should be allowed leeway that I'm

8   not.

9              THE COURT:  Thank you.

10             What are you referring to, other than your client?

11             MR. LICHTMACHER:  You had mentioned about the -- I'm

12   sorry -- about the medical -- I forgot.  We discussed something

13   earlier.  I don't remember specifically what it was.  Forgive

14   me.  But you know, the point was, you know, you have been

15   fairly -- oh, yeah.  That I failed to object to the photos on

16   August 29th.  That's what I was referring to.

17             THE COURT:  Thank you.

18             MR. LICHTMACHER:  Okay.  Sorry about that.

19             THE COURT:  That's fine.

20             So I want to talk about this, but the reason why I

21   took the break was not to discuss this photograph but rather to

22   discuss Mr. McCurdy.  I have received some information.

23             So I've received some information, which is valuable,

24   and I will convey the substance of what has been conveyed to

25   me.  I don't have direct personal knowledge of this.  I'm

J941mcc3

1    summarizing the communications that have been provided to my

2    clerk.

3              So the deputy marshal who has been purposed to help to

4    make Mr. McCurdy available for this trial is at the MCC where

5    Mr. McCurdy I understand is now.  But Mr. McCurdy is refusing

6    to be produced.  What I understand is that he does not want to

7    adhere to marshals policy or BOP policy.  He's refusing to

8    leave jewelry and other personal items there at the MCC.  The

9    MCC and BOP does not allow inmates to have jewelry or other

10   personal items on their person.  Additionally, as recounted to

11   me, Mr. McCurdy is saying that he is not a federal inmate and

12   is refusing to be housed at MCC and that he is asking to go

13   back to Rikers Island to drop off his belongings.

14             So I wanted to break so that we could talk about this

15   information.  The last part that I just gave you I've literally

16   just received as I began to speak.  But right before I took the

17   break I was handed a note to let me know that Mr. McCurdy was

18   refusing to be produced, which is why I broke when I did.

19             So Mr. Lichtmacher, I will turn to you on this.  Is

20   there anything that you think that we might be able to do to

21   encourage Mr. McCurdy to decide to appear here?  I look to you

22   for guidance, and we'll try to develop a way to help encourage

23   him to decide to appear at his trial.  Counsel, what can we do?

24             MR. LICHTMACHER:  I think if your Honor conveyed to

25   Mr. McCurdy that if he did not appear, there might be

J941mcc3

1    consequences to the future of his suit, that he might be

2    inspired to comply with the BOP policies and regulations.

3           MS. GOYKADOSH:  Your Honor, may I be heard on this

4    issue as well?

5           THE COURT:  Yes.

6           MS. GOYKADOSH:  In line with what Mr. Lichtmacher is

7    saying, we would move under Rule 41(b) for a dismissal of this

8    case.  We do ask that the Court warn Mr. McCurdy that if he

9    does not appear for this trial, it will be dismissed for

10   failure to prosecute.

11          MR. LICHTMACHER:  Your Honor, I'm still hoping --

12          THE COURT:  I'm sorry.  Let me just say a couple

13   things, because there are several threads here.

14          First, I don't know that I have a basis to dismiss the

15   case under 41(b) for failure to prosecute because of this.

16   Mr. Lichtmacher may be able to prove his case through the

17   introduction of evidence apart from his client's testimony.

18   It's not apparent to me at the outset how he would do so, but

19   he might be able to do so, and he is here litigating the case

20   on his client's behalf.  As a result, it's not apparent to me

21   at this moment what the basis for me would be to dismiss the

22   case under 41(b).

23          I would, however, like to address -- and I say that

24   without prejudice to any further argument that the parties

25   would like to present to the Court.  I have not given this

J941mcc3

1    consideration with the benefit of further argument, which I

2    would invite.

3              MS. GOYKADOSH:  Can I say one more thing.

4              THE COURT:  I'm sorry.  Give me one moment.

5              MS. GOYKADOSH:  I'm sorry.

6              THE COURT:  The related question goes to Mr. McCurdy's

7    presence and availability as a witness here.  Mr. Lichtmacher

8    asked me a question yesterday regarding how I would treat his

9    failure to appear -- namely, would I treat him as having

10   functionally rested if Mr. McCurdy was not present -- and I

11   gave a very concrete answer, which was no.  That no was based

12   on the facts as I understood them -- namely, that Mr. McCurdy

13   was, through no fault of his own, not able to be produced here.

14   My conclusion regarding whether we should take up the jury's

15   time and the Court's time would be evaluated very differently

16   if the reason why Mr. McCurdy is not appearing is because he's

17   made a conscientious decision not to appear here to testify.

18   If that's the case, then following the other witnesses who have

19   been called by counsel for plaintiff, I may very well be left

20   with little option -- I should say maybe left with a very sound

21   option, which is to conclude that plaintiff has chosen not to

22   testify here and to therefore require plaintiff to rest on the

23   basis of the evidence that has been presented.

24              So at this point the limited information that I have

25   suggests that Mr. McCurdy is making a conscious decision not to

J941mcc3

appear at this trial and to provide the testimony that

presumably would be valuable in order to make out his case.

So what I would like to do, counsel, is to ask for

your views about what we can best communicate.  I am very

hesitant to/I'm not willing to on this record order the

Marshals to use force to have Mr. McCurdy produced here.  This

is not a criminal proceeding.  He is not a criminal defendant.

If he chooses not to appear at his trial to testify, I am not

at this point willing to order the Marshals Service to use

force to produce him.  It is his choice.  I do, however, want

to encourage him to appear here.

So counsel for plaintiff, I look to you principally to

help me understand what I can best have communicated back to

him in order to help him make a decision that would lead him to

be here.  I want him to here.  We are all here for him, and it

would be unfortunate for us to have a trial without a

plaintiff.  So counsel, what would you propose that I do at

this point?

MR. LICHTMACHER:  I would say that what you just

instructed us as to how you would proceed should be conveyed to

him, and if that is in fact conveyed to him and if it doesn't

inspire him to show up, I would be perplexed, for lack of a

better term, your Honor, or word.

THE COURT:  Thank you.

Give me one moment.  Let me propose text that I would

J941mcc3

1   send back through the Marshals to be communicated to

2   Mr. McCurdy.

3          Thank you.  So I could send the following

4   communication back to Mr. McCurdy, if this is acceptable to the

5   parties: "Please let Mr. McCurdy know that his counsel wants

6   him to appear to testify.  If he chooses not to appear for

7   trial, the Court is likely to require the plaintiff to rest his

8   case after the officers' testimony, which is expected to

9   conclude today."

10          Counsel, what do you think about that communication?

11   First, counsel for plaintiff, is there anything else I can say

12   here or do you have any word choice, suggestions, or any other

13   ways that we might be able to communicate effectively with

14   Mr. McCurdy?  I again look to you for your guidance.

15          MR. LICHTMACHER:  Give me ten seconds to ponder it.

16          THE COURT:  Thank you.  Please take your time.

17          MR. LICHTMACHER:  Could you include that his counsel

18   adds that should he not prevail with him not showing up, his

19   chances of rejuvenating this case on appeal are de minimis?

20   Are small; let's put it that way.  Does the Court believe that

21   would be appropriate?

22          THE COURT:  I would frame it to make it clear that

23   this is a communication from you and not the Court.

24          MR. LICHTMACHER:  Yes, absolutely.

25          THE COURT:  Thank you.

J941mcc3

1          Thank you.  Give me just one moment and I will tell

2     you what I would send back.

3          Thank you.  So the message that I would send back

4     would say the following.  It would be introduced with the

5     following words:

6          "Please let Mr. McCurdy know the following:  His

7     counsel wants him to appear to testify.  If he chooses not to

8     appear for trial, the Court is likely to require the plaintiff

9     to rest his case after the officers' testimony, which is

10    expected to conclude today.

11         "His counsel also wants to communicate to Mr. McCurdy

12    that if he chooses not to appear at trial and loses as a

13    result, that the likelihood that the case will be rejuvenated

14    on appeal is very small."

15         Let me put that in easier language.  Let me just

16    change it to make it simpler language.

17         MR. LICHTMACHER:  Could you change from -- I think you

18    said "would be rejuvenated."  Let's make it "could be

19    rejuvenated."

20         THE COURT:  Thank you.

21         I modified the language because I thought it was

22    unnecessarily wordy.  So the last sentence would read:  "His

23    counsel also wants to communicate to Mr. McCurdy that if he

24    chooses not to appear at the trial and loses as a result, that

25    it is not likely that the case could be rejuvenated on appeal."

J941mcc3

1   Is that fair, counsel for plaintiff?

2          MR. LICHTMACHER:  Extremely fair, your Honor.

3          THE COURT:  Thank you.  So I will send this note.

4          MS. GOYKADOSH:  Your Honor, may I be heard on the

5   note.

6          THE COURT:  Yes.

7          MS. GOYKADOSH:  Thank you, your Honor.

8       I understand that this is a communication from

9   plaintiff's counsel to plaintiff, so I don't want to insert

10  myself into this.

11         THE COURT:  Thank you.

12         MS. GOYKADOSH:  However, there are concerns I have

13  about the rest of this trial based on plaintiff's conduct now,

14  so I just want to very quickly talk about some of the threads

15  that your Honor mentioned and how they might impact the note,

16  if that's okay.

17         THE COURT:  I'm sorry.  Some of the what?

18         MS. GOYKADOSH:  Like the threads your Honor mentioned,

19  that there are a few threads to this issue.

20       So I think one of the threads of this issue is that

21  the jury has been instructed multiple times that plaintiff is

22  not here through no fault of his own, and that's been accurate.

23         THE COURT:  I'm sorry.  Is this something that will

24  inform the content of the note?  Because I'd like to send it

25  back as promptly as possible.

J941mcc3

1          MS. GOYKADOSH:  Yes.  So I'll just start backwards.

2          So I think the Court should also tell plaintiff that

3     the Court might instruct the jury that plaintiff chose not to

4     be here.

5          THE COURT:  Thank you.

6          I don't expect that I would do that.  That would be me

7     testifying.  They will have an absence of evidence but not a

8     statement that he was not here properly.  I may need to unring

9     the bell about not holding his lack of presence here against

10    him.  It will need to be clear that they need to evaluate the

11    evidence, which includes here a lack of evidence from

12    plaintiff, so I will need to do something to change the nature

13    of my prior instructions, but I don't expect to instruct them

14    regarding facts that have not been put into evidence here.

15    Instead, I would expect to permit the jury, or the Court,

16    depending on what the evidence is, to make a finding regarding

17    the case based on the evidence or lack of evidence.

18         MS. GOYKADOSH:  I understand, your Honor.

19         I have nothing further regarding the note.  I do have

20    two other things, but I understand the note is urgent right

21    now, so I'll wait until that's done.

22         THE COURT:  Thank you.

23         So I'm going to send the following note to my clerk,

24    who will then communicate it to the Marshals.  It reads as

25    follows:

J941mcc3

1              "Please let Mr. McCurdy know the following:  His

2       counsel wants him to appear to testify.  If he chooses not to

3       appear for trial, the Court is likely to require the plaintiff

4       to rest his case after the officers' testimony, which is

5       expected to conclude today.

6              "His counsel also wants to communicate to Mr. McCurdy

7       that if he chooses not to appear at the trial and loses as a

8       result, that it is not likely that the case could be

9       rejuvenated on appeal."

10             So I'm sending this note right now to my clerk, who

11      will communicate it to the Marshals, and with luck, this will

12      work.  Otherwise, unfortunately we'll be left to deal with the

13      consequences of Mr. McCurdy's decision here.  We should

14      hopefully have a response promptly.

15             So counsel, I do want to start up again with the jury

16      very promptly, so I want to step down.  I'm going to eat

17      something quickly.  I encourage you to do the same.  I want to

18      begin again at 11:45 with the jury.

19             I'm going to let in Plaintiff's Exhibit M.  I

20      recognize that it's not included in the joint pretrial order,

21      but the evidence is properly presented as rebuttal evidence in

22      light of the arguments made today that the facial injury did

23      not occur.  This is ultimately a truth-gathering exercise, and

24      I believe that this photograph from the time should be

25      introduced.  I believe it's in the interest of justice to do

J941mcc3

so.

So I'll see you back here, counsel, at 11:45.

MS. GOYKADOSH:  I'm sorry, your Honor.  First, I think your Honor said Plaintiff's Exhibit M.  It's Defendant's Exhibit M, just to be clear.

THE COURT:  Thank you.

MS. GOYKADOSH:  Second, will I have a chance to be heard on these issues after the break?  I just want to make sure my record is clear.

THE COURT:  Yes, but it will have to be very quick because I want to start with the jury promptly.

MS. GOYKADOSH:  Yes.  Thank you, your Honor.

THE COURT:  Thank you.  I'll see you all back here in about five minutes for you all?

MR. LICHTMACHER:  Five minutes?  Five minutes?

THE COURT:  Yes.

(Luncheon recess)

J941mcc3

                            AFTERNOON SESSION

                              11:48 a.m.

           (In open court; jury not present)

           THE COURT:  Counsel, we're back after our lunch break.

           Counsel for defendants, what was the additional

comment that you wanted to make on the record before we bring

the jury back in?

           MS. GOYKADOSH:  Very quickly, your Honor.

           With regards to the Rule 41(b) issue, we believe that

we will be prejudiced if we're not able to cross-examine

plaintiff.  One of the issues in this case is the parties'

credibility.  There are two very different sets of facts about

what happened in this case.  I should be able to question

plaintiff, the jury should be able to evaluate who he is as a

witness, and to the extent that we're not able to do so, we are

prejudiced.

           My colleague had a case before Judge Daniels in the

Southern District.  I will let him just very quickly talk about

it.

           MR. SIDDIQI:  Very quickly, your Honor, the case had

almost identical circumstances.  The name of the case was Kevin

Fortune v. City of New York, 15 Civ. 7088.  In that case, the

morning of trial, plaintiff's counsel appeared and informed the

Court that -- plaintiff was not incarcerated -- plaintiff was

refusing to appear for trial and did not want to testify.  On

J941mcc3

1      the basis of plaintiff's refusal to testify, Judge Daniels

2      dismissed that case pursuant to Rule 41(b).

3                MR. LICHTMACHER:  May I, your Honor.

4                THE COURT:  Thank you.

5                MR. LICHTMACHER:  Well --

6                THE COURT:  I'm sorry.  Can I ask, were there other

7      plaintiff's witnesses in that case?

8                MR. SIDDIQI:  Your Honor, at this time I don't recall

9      if plaintiff was planning to call the officers in his case in

10     chief.

11               THE COURT:  Thank you.

12               Please go on, counsel.

13               MR. LICHTMACHER:  In *Soto v. New York City*, my

14     plaintiff refused to show up.  He had been shot in the

15     testicle, in the back, and through his side and beaten by New

16     York City police officers, and he refused to show up.  And

17     there was another plaintiff who had de minimis injuries.  That

18     was before Judge Abrams.  And she allowed us to proceed to a

19     verdict -- not a good one, but -- for both plaintiffs, you

20     know, despite his absence.

21               Now even though Mr. McCurdy's excuse for not appearing

22     may not be great legal justification, and I acknowledge that,

23     you know, at least in the Court's eyes, I'm sure it's not; in

24     his eyes, it is.

25               There are a couple of options that we have here.  If

J941mcc3

```
1    they really feel that they'll be prejudiced, they could admit

2    such parts of his deposition testimony as they feel, you

3    know --

4           THE COURT:  Can I just comment on one thing, because I

5    failed to appreciate the argument made by Ms. Goykadosh.  I

6    just want to begin my remarks to explain my lack of

7    understanding regarding the basis for those comments with the

8    basic principle that statements by counsel are not evidence, so

9    to the extent that the prejudice described by Ms. Goykadosh is

10   that there are two versions of the event and that therefore

11   they must cross-examine the plaintiff in order to hear the

12   other side of his version of the events, I want to raise the

13   basic principle that there is no version of the events by

14   plaintiff in the record unless and until he testifies.  My hope

15   and expectation is that the jury will follow my instruction

16   that arguments by counsel are not evidence.  So counsel for

17   defendant, can you explain your concern regarding prejudice

18   further, because as far as I know, until plaintiff testifies,

19   his version of the facts are not in evidence.

20          MS. GOYKADOSH:  Yes, your Honor.

21          I understand, and perhaps I didn't speak as clearly as

22   I should before.  What I meant when I said plaintiff's version

23   of events and there are two versions of events is that

24   plaintiff's version of events lacks credibility, so if I do

25   have the opportunity to cross-examine him, the jury will be
```

J941mcc3

1  able to assess his credibility based on how he recounts the

2  version of events.  So for instance, one thing that --

3          THE COURT:  I'm sorry.  Just to be clear, is the

4  defense more prejudiced by your not being able to cross-examine

5  him regarding his testimony or is it more prejudiced by hearing

6  him testify?  That's the fundamental question that I have

7  regarding your comments.

8          MS. GOYKADOSH:  About more?  With regards to more, I

9  don't really think I can answer that at this point.

10          THE COURT:  So the defense's preference is to have

11  Mr. McCurdy appear; you think it's more beneficial to you to

12  have Mr. McCurdy appear here to testify, is that right?

13  Because it's more important for you to have his version of the

14  events in evidence and then to be able to show why you believed

15  them not to be credible through cross-examination.  That's the

16  prejudice that you're describing, as I understand it, counsel.

17          MS. GOYKADOSH:  In my application for dismissal of

18  this action, at this point.

19          THE COURT:  Thank you.

20          Again, and given that there's no testimony by

21  Mr. McCurdy in evidence at this point and given that, counsel,

22  you're burning up the clock during which the officers might

23  otherwise be testifying, I again will permit you to renew your

24  application under Rule 41 to the extent that application is

25  based on asserted prejudice because of the inability to

J941mcc3

1    cross-examine a witness regarding his version of events when

2    that person has not testified about his version of events.  I

3    will expect that the jury will accept, as we all do, that

4    statements by counsel are not evidence and that only testimony

5    by witnesses are evidence.

6             MS. GOYKADOSH:  I understand, your Honor.  Thank you.

7             THE COURT:  So at this point I will decline that

8    application, but again, I will invite further application.

9             Counsel, would you like to proceed and to permit the

10   witnesses to continue their testimony, or would you like to

11   continue discussing further issues?

12            MR. SIDDIQI:  We'd like to proceed, your Honor.

13            The only thing, in terms of unringing the bell, I just

14   want to make sure that we address what you had talked about

15   before with saying repeatedly that Mr. McCurdy was not here

16   through no fault of his own.

17            THE COURT:  Counsel, let me first convey some

18   information.  But let me first try to be clear.  I'd like to be

19   responsible to the jury.  So if there are issues that we must

20   take up right now, then I invite conversation about them.  If

21   these are issues that need not be taken up right now so that I

22   can bring the jury back in at the time that I committed to

23   bring them back in, I'd prefer to defer as to them.

24            So this issue only arises if Mr. McCurdy does not

25   appear prior to the completion of the testimony of the

J941mcc3

1    officers.  Counsel for the defendants, you appear to wish to

2    spend a significant amount of time in colloquy with the Court

3    about issues rather than proceeding with the officers'

4    testimony.  Is this something that we need to address now, or

5    would you prefer to take this issue up after the officers have

6    testified?

7            MR. SIDDIQI:  I apologize, your Honor.  We share your

8    preference to continuing with questioning.

9            THE COURT:  Thank you.  I have no preference.  I just

10   want to make sure that I appreciate the strategic decisions

11   being made by counsel.

12           MR. LICHTMACHER:  Extremely brief.

13           THE COURT:  Yes.

14           MR. LICHTMACHER:  In terms of Exhibit 8, the medical

15   records, I'd like to introduce them, the certified records,

16   before I rest.  We're waiting on your order.  Unless I'm

17   allowed to introduce them afterwards, which would be fine too,

18   but, you know, I'd like to know how to proceed on that.

19   Obviously I don't want to hand them to the jury, publish them

20   to the jury before you decide on what redactions to make.

21           THE COURT:  Thank you.  That's fine.

22           All right.  So let me just give you some information

23   that's been conveyed to me from the Marshals Service.  And

24   again, I haven't had these communications directly.  I'm just

25   relating what's been forwarded to me through email traffic.

J941mcc3                       Mitchell - Cross

1          In response to the message that we forwarded to the

2     Marshals Service regarding a message to convey to Mr. McCurdy,

3     I received a message back that says, in essence, that McCurdy

4     is not complying and that the corrections officers are taking

5     him back to Rikers Island.  So I'm seeking confirmation to

6     ensure that the message was conveyed to him.  I expect that it

7     was, given the chronology of the email exchange that's been

8     forwarded to me, but I will seek confirmation of that.

9          With respect to the disputes regarding the redacted

10    Exhibit 8, I agree with counsel for plaintiff that each of the

11    terms that are disputed are relatively straightforward and

12    within the ken of a lay juror without the need for further

13    expert testimony, so I'll permit their introduction with the

14    redactions as currently contemplated.

15              MR. LICHTMACHER:  Thank you, your Honor.

16              THE COURT:  Good.  Thank you.

17              Ms. Nelson, could you please bring in the jury.

18              (Continued on next page)

19

20

21

22

23

24

25

J941mcc3                         Mitchell - Cross

1           (Jury present)

2           THE COURT:  Thank you.  You can be seated.

3           Good.  So Mr. Mitchell, please come forward.

4           Counsel for defendants, please proceed.

5           MR. SIDDIQI:  Your Honor, I believe my application to

6    move Exhibit M into evidence was pending before the break.

7           THE COURT:  Thank you.  I will accept Defendant's

8    Exhibit M into evidence.

9           (Defendant's Exhibit M received in evidence)

10          THE COURT:  You can proceed.

11          MR. SIDDIQI:  Your Honor, can it please be published

12   to the jury.

13          THE COURT:  You may.

14          MS. GOYKADOSH:  I'm sorry, your Honor.  The screen is

15   dark.  I can't --

16          Thank you.  Thank you.

17   BY MR. SIDDIQI:

18   Q.  Officer Mitchell, when was this photograph taken?

19   A.  Immediately after the incident on the -- on February 19,

20   2015.

21   Q.  And is it a fair and accurate representation of what you

22   looked like after the incident?

23   A.  Yes.

24   Q.  And when we're saying "the incident," can you please

25   describe what, if anything, Mr. McCurdy did to you during that

J941mcc3                        Mitchell - Cross

1    incident.

2    A.   After the incident where inmate McCurdy punched me in the

3    face.

4    Q.   Was this photograph taken for any particular reason?

5    A.   It's standard protocol after use of force that officers

6    also are photographed; the parties involved are photographed.

7    Q.   I'm going to zoom in here.

8              Officer Mitchell, do you see anything on this area of

9    your face?

10   A.   Yes.

11   Q.   And what is that?

12   A.   Bruising.

13   Q.   And again, on this portion of the photograph, do you see

14   anything on your face where the finger is pointing?

15   A.   Yes, bruising.

16   Q.   Okay.  And what caused that bruising?

17   A.   The punch to the face.

18   Q.   And what does it say was the date and time of the incident?

19   A.   February 19, 2015, approximately 1445 hours, or 2:45 p.m.

20   Q.   And do you see there it says the date that the photograph

21   was taken?

22   A.   Yes, February 19, 2015.

23   Q.   Do you remember this photograph being taken?

24   A.   Yes.

25   Q.   And one more time for the jury, can you tell us what this

J941mcc3                              Mitchell - Cross

1    is a photograph of.

2    A.  It's a photograph of me after, immediately after the

3    incident.  It's a photograph of my face, the left side of my

4    face, which appeared to be bruising.

5    Q.  And again, this was taken after the incident.

6    A.  Yes.

7    Q.  The same day as the incident.

8    A.  Yes.

9    Q.  Officer Mitchell, at the time that you were engaged in a

10   struggle with the plaintiff, who else was in the cell?

11   A.  Officer Cutler.

12   Q.  Were any other officers in the cell?

13   A.  No.

14   Q.  Was Captain Bell in the cell?

15   A.  No.

16   Q.  Did Captain Bell ever come in the cell during the struggle?

17   A.  No.

18   Q.  Was Captain Bell there when you asked plaintiff to comply

19   with a strip search?

20   A.  No.

21   Q.  Is there a reason why she was not in the area?

22   A.  Because female officers or captains are not allowed to be

23   in the area when a male inmate is strip-searched.

24   Q.  Before you described for the jury the movement within the

25   cell when the plaintiff was resisting.  Can you please describe

J941mcc3                        Mitchell - Cross

1   for the jury the manner in which the plaintiff was resisting.

2   A.  Violently.

3   Q.  Can you please describe what movements he was making.

4   A.  Purposeful movements to basically force my -- forceful

5   movements, purposeful movements to force me off of him.

6   Q.  And was plaintiff successful in forcing you off of him?

7   A.  Eventually, no, he wasn't.

8   Q.  But in the beginning?

9   A.  Yes.

10  Q.  And did that cause you to move around the cell?

11  A.  Yes.

12  Q.  Did that cause you to come into any contact with any

13  furniture in the cell?

14          MR. LICHTMACHER:  Objection.  Leading.

15          THE COURT:  Thank you.

16          Counsel, can you please rephrase the question.

17  Q.  Can you describe what happened to you as a result of being

18  moved around by the plaintiff.

19  A.  Being moved, I began to bump into objects like the wall and

20  the floor, hitting the floor, things like that.

21  Q.  And was your body -- were you holding onto plaintiff when

22  that was happening?

23  A.  Yes.

24          MR. LICHTMACHER:  Objection, your Honor.  Leading.

25          THE COURT:  Thank you.

J941mcc3                    Mitchell - Cross

1              Can I ask you to please rephrase the question,

2     counsel.

3              MR. SIDDIQI:  Yes, your Honor.

4     BY MR. SIDDIQI:

5     Q.  Was your body in contact with plaintiff's body when that

6     was happening?

7     A.  Yes.

8     Q.  How was your body in contact with the plaintiff's body?

9     A.  Basically I had a -- like similar to a bearhug hold

10    control, like on his upper body, his arm and -- his arms and

11    his shoulder area.

12    Q.  And you just testified that you bumped into furniture?

13    A.  Yes.

14    Q.  Were you engaged in that hold that you just described with

15    plaintiff at that time?

16    A.  Yes.

17    Q.  How long was the period of time between the plaintiff

18    punching you and the time that he was eventually placed into

19    handcuffs?

20    A.  I don't recall that exact amount of time.

21              (Continued on next page)

22

23

24

25

J94Qmcc4                    Mitchell - Cross

1   Q.  Now, you said that the plaintiff said to you that he was

2   going to cut you.  Is that correct?

3   A.  Correct.

4   Q.  Did that cause any reaction in you?

5   A.  Yes, it alarmed me.

6   Q.  Why did it alarm you?

7   A.  Because I didn't want to be cut.  It alarmed me because I

8   just had been in an incident in the commissary involving a

9   sharpened weapon so I didn't know if the inmate was in

10  possession of any other contraband.

11  Q.  Officer Mitchell, at any point did Captain Bell direct you

12  to beat the plaintiff?

13  A.  No.

14  Q.  Did Captain Bell ever direct you to use force against the

15  plaintiff?

16  A.  No.

17  Q.  Did you see Officer Cutler use force against the plaintiff?

18  A.  Yes.

19  Q.  Can you please describe that force for the jury.

20  A.  Basically lower body control hold similar to what I had on

21  his upper body.  Had his arms wrapped around his legs so we

22  could bring him down to the ground.

23  Q.  Why did you and Officer Cutler want to bring the plaintiff

24  to the ground?

25  A.  Basically, so we could prevent him from moving around too

J94Qmcc4                          Mitchell - Cross

```
 1   much to secure him a little easier.

 2   Q.  Why did you want to secure him?

 3   A.  Because he had just assaulted me and he just threatened me.

 4   Q.  Did you ever kick the plaintiff?

 5   A.  Never, no.

 6   Q.  Did you ever kick the plaintiff in the face?

 7   A.  No.

 8   Q.  Did you use any force against the plaintiff?

 9   A.  Yes.

10   Q.  Can you please describe that force for the jury?

11   A.  Just the upper body control hold, which I said before the

12   bear hug hold, basically trying to get his arms behind his back

13   and secure him to prevent his movements.

14   Q.  How did you respond when the plaintiff punched you in the

15   face?

16   A.  I immediately threw back a punch.

17   Q.  Was there a purpose for throwing the punch?

18   A.  Basically to gain a distance and prevent him from punching

19   me again and continue the aggression.

20   Q.  Officer Mitchell, what was going through your head when the

21   plaintiff attacked you?

22   A.  Pretty much fear.  I didn't want to be hit again or get --

23   like be further assaulted or any of my coworkers to be further

24   assaulted.

25           MR. SIDDIQI:  If I can just have a moment, your Honor.
```

J94Qmcc4                    Mitchell - Redirect

1           THE COURT:  Thank you.  Please take your time.

2    Q.  Officer Mitchell, as you saw in Defendant's Exhibit L, did

3    you submit a form documenting your facial injury immediately

4    after the incident?

5    A.  Yes.

6           MR. SIDDIQI:  I have no further questions, your Honor.

7    I reserve the right to call this witness for rebuttal.

8           THE COURT:  Thank you.

9           Counsel for plaintiff.

10          MR. LICHTMACHER:  Yes, your Honor.

11          THE COURT:  Thank you.  Please proceed.

12   REDIRECT EXAMINATION

13   BY MR. LICHTMACHER:

14   Q.  Did I hear you correctly, you said Captain Bell wasn't

15   there during the use of force?

16          MR. SIDDIQI:  Objection.  Mischaracterization.

17          THE COURT:  Thank you.

18          You can answer the question.

19   A.  Yes.

20   Q.  Yes, she wasn't there?

21   A.  Yes, you heard me correctly, she wasn't there.

22   Q.  OK.  You gave a deposition.  We talked about it before in

23   this case, where you swore under penalty of perjury, correct?

24   A.  Correct.

25   Q.  Did you give the following answers to the following

J94Qmcc4                         Mitchell - Redirect

 1   questions.

 2              MR. LICHTMACHER:  Does the witness have the deposition

 3   in front of him still, your Honor?

 4   A.  Yes, I do.

 5   Q.  Please turn to page 17, line 5.  Are you ready, sir?

 6   A.  One second.  Yes, I am.

 7   Q.  Did you give the following answers to the following

 8   questions under oath at your deposition.

 9   "Q.  Now, to your knowledge, did Captain Bell, was she -- it's

10   a she, Captain Bell, correct?

11   "A.  Yes.

12   "Q.  Was she involved in use of force that day, February 19,

13   2015?

14   "A.  No.

15   "Q.  Was she present for the use of force?

16   "A.  Yes."

17              You gave those answers to those questions on that day

18   under oath, didn't you, sir?

19   A.  Yes.

20   Q.  And, in fact, now you've changed your mind, haven't you?

21   A.  No, I didn't change my mind.

22   Q.  Well, did you get a copy of the transcript?

23   A.  Yes, I did.

24   Q.  And you changed that answer?

25   A.  No, I didn't change the answer, sir.

1    Q.  So you understand that the two are very contradictory, sir,

2    do you not?

3    A.  I see where the confusion would be, but no, she wasn't in

4    the area.  Like she wasn't -- she wasn't in the cell or with

5    the use of force.  She was in the housing area but not in that

6    area.

7    Q.  So "Was she present for the use of force?

8            "Yes" means to you she wasn't in the immediate area.

9    Is that what it means?

10   A.  Yes.

11   Q.  Now, sir, you indicated in Exhibit L, which the defendants

12   admitted into evidence if you look at it, you indicated that

13   Exhibit L was part of the submission you made for the workers'

14   comp. application.  Is that correct?

15   A.  Yes.

16   Q.  OK.  Now, this particular exhibit, if I understand it, it

17   says "limited release of health information."

18           By the way, is this published to the jury now?  It's

19   not on?  Can we have it on?  Thank you.

20           It's in evidence.  I could do it from there if you

21   can't.  You got it?  Is the jury able to see it now?

22           OK.  Now, this document admitted into evidence as

23   Defendant's Exhibit L is a limited release of health

24   information.  Is that correct, sir?

25   A.  Yes.

1  Q.  And it's part of your workers' comp. application, correct?

2  A.  Yes.

3  Q.  And it's your understanding that it's generated by you to

4  allow workers' comp. to get your medical information.  Is that

5  correct?

6  A.  Yes.

7  Q.  How come you didn't sign it?  Take a look under C.

8  Claimant's signature.  There's no signature there, is there?

9  A.  OK, yes.

10  Q.  And you didn't date it either, did you?

11  A.  No, the date was written up here at the top.

12  Q.  Well, that's the date of the incident, isn't it?  Because

13  you even indicated that you didn't go -- that the other --

14  excuse me -- I think your healthcare was provided on the 20th,

15  the day after the incident, is that correct, or am I wrong

16  about that?

17  A.  The healthcare was provided the same day.

18  Q.  At the hospital also?

19  A.  Correct.

20  Q.  I stand corrected.  OK.

21       The second document that you generated, number two is

22  dated on March 4, correct?  Do you want to see that one again?

23  Let's take a look at it.  That's dated on March 4.  See, this

24  is Plaintiff's number 2.  So now you generated this document on

25  March 4, apparently, which is near your signature.  And you

J94Qmcc4                         Mitchell - Redirect

1    don't have a date on L or a signature to release your medical

2    information.  Is that because you didn't generate this document

3    until well after the incident?

4    A.  No, sir.

5    Q.  Well, in fact, are you aware that medical records can't be

6    released without a signature?

7    A.  Correct.

8    Q.  So this is the document that you are allegedly providing to

9    workers' comp. to get healthcare because you were injured by a

10   punch in the face with no signature and no date on it.  Is that

11   correct?

12   A.  Correct.

13   Q.  Now, we took a lot of photographs that the defendants

14   produced when they directed you -- when they did direct

15   examination of you.  And in those photographs there were

16   several photographs of the inside of the cell, correct?

17   A.  Yes.

18   Q.  And is it fair to say there are no soft spots in that

19   entire cell?

20   A.  Correct.

21   Q.  In fact, everything in that cell is either metal or

22   whatever the floor is made of.  I take it the floor is not made

23   of a soft material?

24   A.  Correct.

25   Q.  And the bed was a metal frame, right?

1   A.  Yes.

2   Q.  And the picture was pretty much the way it looked the date

3   of the incident?

4   A.  Yes.

5   Q.  So if you went facedown to the floor, if you had the front

6   of your body first, you could have banged your head or your eye

7   area in going to the floor, couldn't you?

8   A.  It's possible, yes.

9   Q.  Or on the toilet, correct?

10  A.  It's possible, yes.

11  Q.  And you went down when you were taking McCurdy down,

12  correct?

13  A.  Correct.

14  Q.  Now you talked about pepper spray and OC spray, I think you

15  said, correct?

16  A.  Yes.

17  Q.  Are they the same thing, OC spray and pepper spray?

18  A.  Yes, they are the same thing.

19  Q.  And you said you couldn't use it because you were too close

20  to be effective.  Is that correct?

21  A.  Correct.

22  Q.  Actually, that's not correct, is it, sir?

23          MR. SIDDIQI:  Objection.

24          THE COURT:  Thank you.

25          Can you please rephrase the question?

1        MR. LICHTMACHER:  Sure.

2   Q.  Actually, pepper spray comes out of a can in a small stream

3   that gradually expands.  Isn't that true?

4   A.  No, sir.

5   Q.  Well, isn't it true that occasionally corrections officers

6   and police officers get injured because they're in an area that

7   was sprayed and the spray goes out over a long area and hits

8   more than one person?

9        MR. SIDDIQI:  Objection.

10       THE COURT:  Thank you.

11       You can answer the question.

12  A.  That's correct, but it's disbursed in a cone actually and

13  it has a wider range.

14  Q.  Ahh, a wider range in a cone, but when it first comes out,

15  it comes out of a little tiny hole in the top of the can or the

16  canister, correct?

17  A.  Correct, in a cone shape, yes.

18  Q.  Yeah, but when it first comes out, sir, doesn't it come out

19  as a quick little spray?  Doesn't it come out -- excuse me.

20  Doesn't it come out in a tight little circle when it first

21  comes out?

22  A.  If I went too close, yes.

23  Q.  Well, it flies -- and at that point when it comes out that

24  way, it's actually more powerful than it is at a distance,

25  isn't it, because it's more concentrated.  Isn't that correct,

1    sir?

2            THE COURT:  You can answer the question.

3    A.  Because it's more concentrated, that's the issue with our

4    policy.  Our policy dictates that we be three feet of distance

5    before we utilize spray or we'll be in violation of our policy.

6    Q.  So is kicking somebody on the floor, isn't it?

7            MR. SIDDIQI:  Objection.

8            THE COURT:  Thank you.

9            Can you please rephrase the question, Counsel?

10           MR. LICHTMACHER:  Sure.

11   Q.  Is it a violation of your policy to kick somebody?

12   A.  Yes.

13   Q.  And it's a violation of your policy to punch someone when

14   they're in handcuffs, correct?

15   A.  Correct.

16   Q.  And you describe where McCurdy was and where you were in

17   the photographs, and it didn't look like you were right on top

18   of each other when the incident started, were you?

19   A.  We were.

20   Q.  Well, initially you made circles and X's, and it seemed

21   like there was a little separation between the two of you,

22   wasn't there?

23   A.  That's objective.

24   Q.  Well, I'm asking you.  You were there.  I wasn't there.

25   A.  And I pretty much just said he was a lot closer than you

J94Qmcc4                    Mitchell - Redirect

1   think the pictures made.

2   Q.  Did you ever pull out the spray to threaten him?

3   A.  No.  That's not allowed.

4   Q.  You're not allowed to threaten him.  You're not allowed to

5   pull it out and say, hey, I don't want to spray you?

6   A.  It's the same as menacing.  No, we wouldn't be able to do

7   that.

8   Q.  And you say you were too close to spray him, correct?

9   A.  Correct.

10  Q.  Because if you're too close and you spray him, it would

11  have violated the policy.  Is that the entire reason that you

12  didn't do it?

13          MR. SIDDIQI:  Objection, your Honor.  Asked and

14  answered.

15          THE COURT:  Thank you.

16          You can answer the question.

17  A.  It's not the only reason.  It was, like I said, my

18  movements were in reflex.  They weren't -- like my first

19  reaction was to defend myself and to basically create distance.

20  Q.  Correct me if I'm wrong.  In my earlier examination of you,

21  you indicated in sum and substance that you couldn't see if he

22  was injured, and it seemed to me as if you were indicating

23  because you were having trouble seeing at that point in time.

24  Is that correct?

25  A.  Correct.

J94Qmcc4                    Mitchell - Redirect

1  Q.  And that was because your left eye was in some way injured?

2  A.  Correct.

3  Q.  And the picture in M, that was very shortly taken after the

4  incident?  M in evidence.

5  A.  Yes.

6  Q.  And may I, that's your left eye?

7  A.  Yes.

8  Q.  It doesn't look very teary, does it?

9            THE COURT:  Thank you.  Sustained.

10           Please rephrase the question.

11 Q.  OK.  Do you see anything in that picture that indicates to

12 you you were having trouble seeing out of that eye?

13           MR. SIDDIQI:  Objection.

14           THE COURT:  Thank you.

15           You can answer the question.

16 A.  No, a picture can't basically wouldn't be able to see if I

17 had problems seeing.

18 Q.  Well, does your eye look red in that picture?

19 A.  Not according to the picture, no.

20 Q.  And your eye -- is your eye tearing in that picture?

21 A.  Again, I say that the picture won't be able to capture how

22 I -- my vision.

23 Q.  I'm asking you, was your eye tearing in that photograph?

24 Please answer my question.

25 A.  No, it doesn't appear to be tearing.

1   Q.  It does not, does it, sir?

2   A.  It doesn't appear to be tearing.

3   Q.  Now, you seemed to indicate in your examination by counsel

4   that it's department policy for people involved in the use of

5   force, all parties, to have photographs taken of them, correct?

6   A.  Correct.

7   Q.  And that includes the person who force was used against,

8   correct?

9   A.  Correct.

10  Q.  So, under those circumstances, it would be appropriate to

11  take photos of McCurdy -- excuse me -- of Chance McCurdy the

12  date of the incident, correct?

13  A.  Yes, it would have been appropriate to take photographs of

14  inmate McCurdy.

15          MR. LICHTMACHER:  I want to show this only to the

16  witness.  Well, your Honor, may I approach?

17          THE COURT:  You may.

18          MR. LICHTMACHER:  Approach the witness, not the bench.

19          May the record reflect that I've handed the witness a

20  document marked for identification as Plaintiff's 10.

21  Q.  Now, do you recognize who is depicted in this photo?

22  A.  Yes.

23  Q.  And who is depicted in this photo?

24  A.  It appears to be inmate McCurdy.

25  Q.  And do you know from looking at this document whether or

1    not it was generated on the date of the incident?

2    A.  Yes.

3    Q.  In fact, it's got the insignia of the department of

4    corrections on it, correct?

5    A.  Correct.

6    Q.  And it says AMCK or Anna M. Kross Center, correct?

7    A.  Yes.

8    Q.  It's entitled incident photo, correct?

9    A.  Yes.

10           MR. LICHTMACHER:  Your Honor, I offer this into

11   evidence as Plaintiff's 10.

12           MR. SIDDIQI:  Objection, your Honor.  We ask for a

13   sidebar.

14           THE COURT:  Thank you.  Come on up.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1            (At the side bar)

2            THE COURT:  Thank you.

3            So at this point I would sustain the objection because

4       you haven't laid a foundation for introduction of this

5       photograph.  The witness hasn't stated that he's seen it

6       before.  All he's done is read from it.  So I understand that

7       to be the basis for the objection.

8            Is that correct, counsel for defendants?

9            MR. SIDDIQI:  That's correct, your Honor.  The witness

10      is not competent to testify as to this photograph.  He didn't

11      take the photograph.  He merely has testified that he knows

12      it's the practice that everyone involved is photographed.

13      There's no foundation for him to testify as to this photograph.

14           THE COURT:  Thank you.

15           Counsel.

16           MR. LICHTMACHER:  Your Honor, he's testified that in

17      sum and substance the custom and practice is to take the photos

18      after use of force.  He's testified that the Anna M. Kross, the

19      AMKC, is indicated on the document.  He's testified that it's

20      an incident photo.  He's testified that the department of

21      corrections insignia is on the photo.  He recognizes Chance

22      McCurdy on the photo, and it's dated 2/19/15, which is the date

23      of the incident.

24           Your Honor, there is plenty in there for a substantial

25      foundation to let it in.  Whether or not he's seen it before he

J94Qmcc4                          Mitchell - Redirect

1   can be questioned about, I understand that, but the

2   admissibility of it under these circumstances is that this is a

3   correct foundation.

4                  THE COURT:  Thank you.

5                  Counsel for defendants.

6                  MR. SIDDIQI:  Your Honor, again, for the same reasons

7   stated earlier, just as a procedural matter it seems the

8   coloration on the version the plaintiff is going to show to the

9   jury is significantly different from the one we've been

10  provided.

11                 But with regards to the substance of this, this

12  witness did not take the photograph.  This witness was not

13  present for the photograph being taken.  The only thing this

14  witness has testified to that is he's aware that it's the

15  general policy of DOC to take photographs of everyone involved

16  in use of force.  That's not a sufficient foundation for which

17  to introduce this document into evidence.

18                 THE COURT:  Thank you.

19                 I agree at this point a sufficient foundation hasn't

20  been laid.  If you'd like to ask additional questions, you may.

21  Fundamentally, the witness has said that he can read things

22  from the document and that he recognizes the thing that he's

23  shown on it.  He hasn't testified regarding having ever seen

24  this document before, having any basis for how it was that this

25  document was produced.

1              So at this point I haven't heard a sufficient

2     foundation.  If you'd like to inquire further, you're welcome

3     to do so.

4              MR. LICHTMACHER:  I have to object to your ruling,

5     your Honor.  I think that it's classic foundation pursuant

6     to -- I forgot what the rule is.  Forgive me, that's my

7     mistake.  902 maybe, I don't remember.  But I can't see what

8     additional information can be provided.  I can ask him whether

9     or not that's the way McCurdy looked on that date, you know,

10    but other than that --

11             THE COURT:  Thank you.

12             MR. LICHTMACHER:  -- if he never saw the document.

13    And in terms of it not being -- when the document was provided

14    to us, it looked like that.  It wasn't provided by me.  It was

15    provided by them to me.

16             THE COURT:  Understood.  I invite you to ask the

17    questions that you think might be sufficient to lay a

18    foundation.  I'm ruling based on the information that's been

19    proffered to date, which is that he's generally aware that

20    photos of this type are taken and he read things from the

21    exhibit and agreed that it's stated certain things.  That in

22    and of itself is inadequate to lay a foundation.

23             Again, whether there are additional questions that

24    you'd like to ask is up to you.  I'm not going to tell you what

25    questions to ask to make a proper foundation.

J94Qmcc4                    Mitchell - Redirect

 1              MR. LICHTMACHER:  I wasn't asking a legal advice.  I

 2       was just a little shocked by your ruling.  And note my

 3       objection.

 4              One more thing.  Can I use his document if they're

 5       objecting to the fact that mine doesn't look correct?  They

 6       were provided by them.

 7              MR. SIDDIQI:  I have no problem giving this to

 8       Mr. Lichtmacher if this was ultimately to be admitted into

 9       evidence.

10              THE COURT:  To the extent there is an issue regarding

11       the coloring of the document --

12              MR. LICHTMACHER:  No problem.  Let's switch.

13              THE COURT:  -- I can see.  I'm happy for you to use

14       the other version of the image.  Again, my ruling is based on

15       the questioning to date, and I am not foreclosing further

16       questioning that might be effective to lay a foundation

17       regarding the accuracy of the image that's shown on this

18       exhibit.  Good.

19              MR. SIDDIQI:  Thank you, Judge.

20          (Continued on next page)

21

22

23

24

25

1                         (In open court)

2    BY MR. LICHTMACHER:

3    Q.  Is that the way Chance McCurdy looked on February 19, 2015?

4    A.  Yes.

5    Q.  It's the way he looked on that day, correct?

6    A.  I guess so.  Date on that picture --

7            THE COURT:  That's not the question.

8    Q.  No, you saw him.

9            THE COURT:  I'm sorry.  Counsel, can you please

10   rephrase the question?

11           Let me ask the witness to please listen to the

12   question and respond to it.

13           Please repeat, Counsel.

14   Q.  Pretty clear you saw Chance McCurdy on February 19, 2015,

15   correct?

16           MR. SIDDIQI:  Objection.

17           THE COURT:  Thank you.

18           You can answer that question.

19   A.  Yes.

20   Q.  And you got a good look at him.  You were involved in an

21   incident with him, correct?

22   A.  Yes.

23   Q.  Is that the way he looked on that day?

24           MR. SIDDIQI:  Objection.

25           THE COURT:  Thank you.

1          Counsel, can I ask you to please reframe the question?

2     Q.  When you saw him, did he look the way he looks in this

3     photo?

4          MR. SIDDIQI:  Objection.

5     A.  No.

6          THE COURT:  OK.  Thank you.

7          You can answer the question.

8     A.  No.

9     Q.  In what way is it different?

10    A.  I didn't see him looking like this.  I don't know -- I --

11         THE COURT:  Thank you.

12         I understand the witness has testified that it does

13    not reflect what he saw.

14         You can proceed, Counsel.

15    Q.  Was the hair on his face the same way that day as it is in

16    this photo?

17         MR. SIDDIQI:  Objection.

18         THE COURT:  Thank you.

19         You can answer the question.

20    A.  I didn't get a look at his hair.

21    Q.  Do you know if he had a beard?

22    A.  Yes.

23    Q.  You got a direct look at his face, right?

24    A.  Yes.

25    Q.  In fact, you punched him in his face at some point?

1    A.  Yes.

2    Q.  And you don't know how many times though, correct?

3    A.  Correct.

4    Q.  There seems to be an item underneath Mr. McCurdy.  Do you

5    recognize what that is?

6              MR. SIDDIQI:  Objection, your Honor.

7              THE COURT:  Thank you.

8              Sustained.

9    Q.  Do you know who Captain Saint-Fleur is?

10   A.  Yes.

11   Q.  Who is Captain Saint-Fleur?

12             MR. SIDDIQI:  Objection.

13             THE COURT:  Thank you.

14             You can answer the question.

15   A.  A captain assigned to AMCK.

16   Q.  What are some of the assignments that he does regarding an

17   incident involving the use of force?

18             MR. SIDDIQI:  Objection.

19             THE COURT:  Thank you.

20             Can I ask you to rephrase the question, please,

21   Counsel?

22             MR. LICHTMACHER:  Sure.

23   Q.  Is he the person who takes -- one of the people who take

24   photos after use of force?

25             MR. SIDDIQI:  Objection, your Honor.  Ask for a

J94Qmcc4                         Mitchell - Redirect

1    sidebar.

2              THE COURT:  Thank you.

3              Counsel, I'm going to sustain the objection.  Please

4    proceed.

5              MR. LICHTMACHER:  Can we do a sidebar, your Honor?

6              THE COURT:  Yes.  Please come on up.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J94Qmcc4                       Mitchell - Redirect

1           (At the side bar)

2           THE COURT:  Please proceed.

3           First let me note for the record that the witness has

4    testified that he cannot identify that this is the way that the

5    person appeared on the date, which underscores the conclusion I

6    reached previously, that counsel had not laid a foundation for

7    the introduction of the exhibit.

8           Please proceed, Counsel.

9           MR. LICHTMACHER:  Well, he did identify him as Chance

10   McCurdy immediately.  He did do that.  So obviously he knew

11   enough about the way he looked.

12          THE COURT:  Thank you.

13          Counsel, you can proceed.  There is no basis for the

14   record for any conclusion that this witness saw Mr. McCurdy

15   with that state of injuries in that condition.  He's testified

16   that he didn't.  So we should move on.

17          MS. GOYKADOSH:  Your Honor, can I say one very quick

18   thing?  The reason why we were objecting before is we were just

19   concerned that the questioning is getting very close to the

20   fact that there was a use of force investigation.  Your Honor

21   already ruled that there is to be no testimony or argument

22   about the use of force investigation, at the final pretrial

23   conference.

24          THE COURT:  Thank you.  The parties agreed that there

25   would not be.

1             MR. LICHTMACHER:  Yeah, I'm not going into it, your

2   Honor.

3             MS. GOYKADOSH:  Understood.  I just wanted to clear

4   that up.

5             MR. LICHTMACHER:  It was just the way he qualified

6   that that was the witness was there taking the photo, your

7   Honor.

8             THE COURT:  If that was the witness that you could

9   have called to authenticate it --

10             MR. LICHTMACHER:  Or Chance McCurdy.

11             THE COURT:  Or Chance McCurdy.  I understand you're

12   trying to work around that problem.

13             MR. LICHTMACHER:  I would say so, your Honor.  I

14   thought I did it effectively.  Apparently, you have the last

15   word, so...

16             THE COURT:  Thank you.

17             Anything else we need to talk about here?

18             MS. GOYKADOSH:  No, your Honor.

19             MR. SIDDIQI:  No, your Honor.

20             MR. LICHTMACHER:  There is a document number 15, as

21   long as we're here, which is the clinic records which are kept

22   in the regular course of business and indicate what his

23   injuries are, and has a diagram of his injuries.

24             THE COURT:  Thank you.  What's the question?

25             MR. LICHTMACHER:  The question is in terms of getting

J94Qmcc4                      Mitchell - Redirect

1      this in without my absentee client at the moment.

2                  THE COURT:  Thank you.

3                  MR. LICHTMACHER:  Now, if the Court deems this an

4      impossibility, I won't waste the jury and your time.

5                  THE COURT:  Thank you.  The question presented is how

6      this would be authenticated?

7                  MR. LICHTMACHER:  No, no, I wouldn't presume to ask

8      the Court for legal advice.  I understand that's not

9      acceptable.  What I'm asking is if there's no possible way for

10     me to get it in, I don't want to waste your time or the jury's

11     time.

12                 THE COURT:  Thank you.  The question is how it would

13     be authenticated?

14                 MR. LICHTMACHER:  You're asking me.  OK.

15                 THE COURT:  Yes.

16                 MR. LICHTMACHER:  How it would be authenticated.  I'm

17     sorry, I misunderstood.  Forgive me.

18                 THE COURT:  That's fine.

19                 MR. LICHTMACHER:  It's not a relaxing day, your Honor.

20     So really the issue becomes there's a clinic.  He knows there's

21     a clinic.  You know, there's department of corrections insignia

22     all over it.  There's Chance McCurdy's name.  And it's right

23     after the incident.  It's also provided by defendants.  I would

24     like to offer it into evidence.

25                 THE COURT:  Thank you.  You can ask the witness

J94Qmcc4                      Mitchell - Redirect

1    questions in order to attempt to authenticate it through him.

2    The question will be what his responses are.  So if he

3    testifies that he has no knowledge of the document and has no

4    basis to testify as to its authenticity --

5              MR. LICHTMACHER:  The particular document, you're

6    telling me?

7              THE COURT:  That's correct.

8              MR. LICHTMACHER:  I won't even bother.

9              THE COURT:  Thank you.  It's up to you.  Let's

10   proceed.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J94Qmcc4                    Mitchell - Redirect

1           (In open court)

2           THE COURT:  Thank you, Counsel.  I apologize for the

3  interruption.  Please proceed.

4  BY MR. LICHTMACHER:

5  Q.  Are there cameras in the hallway of the -- where you've

6  been shown a photo of the -- I forgot what you called it,

7  forgive me -- of the tier that Mr. McCurdy was on?  Are there

8  cameras in that hallway?

9           MR. SIDDIQI:  Objection.

10          THE COURT:  Thank you.

11          You can answer the question.

12 A.  Yes.

13 Q.  And, in fact, are those cameras are capable of taking

14 pictures as inmates walk places?  For instance, to the clinic,

15 correct?

16          MR. SIDDIQI:  Objection.  Beyond the scope.

17          THE COURT:  Thank you.

18          You can answer the question.

19 A.  Yes.

20 Q.  In fact, you know several of the officers who work at AMCK

21 by virtue of the fact that you've worked at AMCK for so many

22 years now, correct?

23 A.  Correct.

24          MR. LICHTMACHER:  Your Honor, I want to approach the

25 witness.

J94Qmcc4                    Mitchell - Redirect

 1              THE COURT:  Thank you.  You may.

 2              MR. LICHTMACHER:  This is Plaintiff's 13.

 3   Q.  Before you is a document marked for identification as

 4   Plaintiff's 13.  Do you recognize the area depicted in that

 5   photo?

 6   A.  Looks like the corridor of AMCK.

 7   Q.  And it's the same corridor that you were shown photographs

 8   of earlier by counsel, correct?

 9   A.  No.

10   Q.  It's a different corridor?

11   A.  Yes.

12   Q.  Where is this corridor?

13   A.  Not -- I believe it's right outside -- it's outside of the

14   housing area.

15   Q.  OK.  It's in AMCK, correct?

16   A.  Yes.

17   Q.  And do you recognize any of the people in the photo?

18   A.  No, just inmate McCurdy.

19   Q.  Just inmate McCurdy.  Is that the way he looked on

20   February 19, 2015?

21              MR. SIDDIQI:  Objection.

22              THE COURT:  Thank you.

23              I'm sorry, can you ask the witness, have you seen this

24   photograph before, Mr. Mitchell?

25              THE WITNESS:  I'm not too familiar with this

1    photograph, no.

2              THE COURT:  Thank you.

3    Q.  Have you ever seen this photograph before?

4    A.  I don't believe so, no.

5    Q.  It wasn't shown to you at any point, say, in preparation

6    for trial?

7    A.  No.

8    Q.  Now, at some point in time did you become aware that

9    McCurdy was injured?

10   A.  Yes.

11   Q.  When did you become aware of that?

12   A.  After I came back from the hospital.

13   Q.  After you came back from the hospital, correct?

14   A.  Right.

15   Q.  So, by the 4th when you generated Plaintiff's 2, you were

16   aware that McCurdy had been injured, correct?

17   A.  Correct.

18   Q.  And you didn't date your release for medical records, so we

19   don't really know what date you signed -- you generated that

20   document, do we?

21             MR. SIDDIQI:  Objection.

22             THE COURT:  Thank you.

23             Can you please rephrase the question?

24             MR. LICHTMACHER:  Sure.

25   Q.  There's no date -- there's no signature and a date next to

1    the signature on the document Defendant's L, the one that is

2    your release for medical records, is there?

3    A.  No, there is no date.

4    Q.  There is no date on it.  And, in fact, there's no way to

5    tell if that document wasn't generated until you already knew

6    that McCurdy was hurt, is there?

7              MR. SIDDIQI:  Objection.

8              THE COURT:  Thank you.

9              Can I ask you to rephrase the question, counsel?

10             MR. LICHTMACHER:  Sure.

11   Q.  Other than your testimony, and here's the document again,

12   Exhibit L, document without the signature and without the date

13   at the bottom and the limited release of health information.

14   Without the date on it, we have no way of knowing, other than

15   your testimony, when this document was actually generated, do

16   we?

17             MR. SIDDIQI:  Objection.

18             THE COURT:  Thank you.

19             You can answer the question.

20   A.  No.

21   Q.  And did you ever sign a document for the release of health

22   information to provide it to workers' comp. people?

23             MR. SIDDIQI:  Objection.

24             THE COURT:  Thank you.

25             You can answer the question.

1   A.  I don't recall.

2   Q.  Well, did you get a response from workers' comp.?

3            MR. SIDDIQI:  Objection.

4            THE COURT:  Thank you.

5            You can answer the question.

6   A.  Like I said, it didn't go anywhere.  It could have been

7   because I filled the form out wrong.

8   Q.  Well, did you ever get -- I asked you something different.

9   I didn't ask you whether you obtained workers' comp., at least

10  not now.  I'm asking, did you ever get a response?  Like did

11  they ever send a letter and say, hey, you forgot to sign the

12  form?

13  A.  Yes, they said I was missing -- it was incomplete.  The

14  package was incomplete.

15  Q.  And did they tell you why the package was incomplete?

16  A.  No, I didn't inquire any further.

17  Q.  You didn't inquire any further.  So you didn't then sign

18  the document, date it, and send it to them?

19  A.  No.

20  Q.  So, once again we have no way of knowing -- well,

21  withdrawn.

22            So does that mean at no point in time did you sign the

23  release for your health information to workers' comp.?

24            MR. SIDDIQI:  Objection.

25            THE COURT:  Thank you.

J94Qmcc4                    Mitchell - Redirect

1        You can answer the question.

2  A.  To the best of my knowledge, no.

3  Q.  Was that because you didn't want them to know that you

4  really didn't have an eye injury?

5        MR. SIDDIQI:  Objection.

6        THE COURT:  Thank you.  Sustained.

7  Q.  Was that because you didn't want them to know you really

8  didn't have a facial injury?

9        MR. SIDDIQI:  Objection.

10        THE COURT:  Thank you.  Sustained.

11  Q.  Now, you indicated that the job of corrections was care,

12  custody and control, correct?

13  A.  Correct.

14  Q.  But punishment -- not to be facetious, punishment is not

15  part of your job, correct?

16        MR. SIDDIQI:  Objection.

17        THE COURT:  Thank you.  Sustained.

18  Q.  Well, nowhere are you allowed to make decisions that an

19  inmate needs to have some kind of unsolicited force used

20  against him for any reason, are you?

21        MR. SIDDIQI:  Objection.

22        THE COURT:  Thank you.

23        You can answer the question.

24  A.  Can you repeat the question?

25  Q.  Sure.  Nowhere is it indicated in the policies, you know,

1   that you testified about that you're allowed to use force for a

2   reason other than to defend yourself, are you, or somebody

3   else?

4   A.  Correct.

5   Q.  Now, was McCurdy in possession of contraband that day?

6   A.  The strip search wasn't fully completed, so I'm not sure of

7   that.

8   Q.  Well, you were never informed like, "hey, we got the knife,

9   he's got it"?

10              MR. SIDDIQI:  Objection.

11              THE COURT:  Thank you.  Sustained.

12   Q.  Were informed whether in fact McCurdy did have contraband

13   that day?

14              MR. SIDDIQI:  Objection.

15              THE COURT:  Thank you.

16              You can answer the question.

17   A.  No, I was never informed.

18   Q.  So you were never informed that he had a scalpel, correct,

19   on that day?

20   A.  No, I was not informed.

21   Q.  You were never informed that he had a razor on that day,

22   correct?

23   A.  No, I was not informed.

24   Q.  And you were never informed that he had any weapon of any

25   type on that date, were you?

1    A.  No, I was not informed.

2    Q.  And you didn't see any knife, weapon or contraband on

3    McCurdy's person during the incident with McCurdy on that date,

4    did you?

5    A.  No, I didn't.

6    Q.  So, in fact, he didn't produce anything to cut you with, as

7    you said he threatened to, correct?

8    A.  Correct.

9    Q.  He never showed you any cutting instruments, correct?

10   A.  No, he didn't show me anything.

11   Q.  And, in fact, you have no knowledge that McCurdy was

12   involved in the slashing that occurred by the commissary, do

13   you?

14   A.  He was present inside the commissary.

15   Q.  You have no knowledge that McCurdy was involved in the

16   slashing on that date, do you?

17            MR. SIDDIQI:  Objection.

18            THE COURT:  Thank you.

19            You can answer the question.

20   A.  I also have no knowledge of him not being basically

21   involved in that.

22   Q.  Well, do you assume because there's no knowledge he wasn't

23   involved that he was involved?

24   A.  He was --

25            MR. SIDDIQI:  Objection.

1           THE COURT:  I'm sorry.  Can you rephrase the question?

2           MR. LICHTMACHER:  Sure.

3  Q.  You have no reason as you sit here today to think that

4  McCurdy was the slasher on that day, do you?

5  A.  Can you repeat that question?

6  Q.  Sure.  As you sit here today, do you believe McCurdy was

7  the slasher in the commissary?

8           MR. SIDDIQI:  Objection.

9           THE COURT:  Thank you.

10          You can answer the question.

11 A.  It's very possible.

12 Q.  Well, no weapons found.  You already said that, correct?

13          THE COURT:  Thank you.  Sustained.

14 Q.  So why would you think it's possible that the McCurdy was

15 the slasher?

16          MR. SIDDIQI:  Objection.

17          THE COURT:  Thank you.  Sustained.

18 Q.  How did you form the conclusion that it's possible that he

19 he's the slasher?

20          MR. SIDDIQI:  Objection.

21          THE COURT:  Thank you.  Sustained.

22 Q.  Did you ever hear of McCurdy in any way being disciplined

23 for doing a slashing on that day?

24          MR. SIDDIQI:  Objection.

25          THE COURT:  Thank you.  Sustained.

1   Q.  Is it fair to say there is not a single soft landing area

2   in that cell?

3   A.  Yes.

4           MR. LICHTMACHER:  Give me half a second, your Honor.

5           THE COURT:  Thank you.  That's fine.

6           (Pause)

7   Q.  Can corrections officers write tickets to inmates?

8           MR. SIDDIQI:  Objection.

9           THE COURT:  Thank you.  Sustained.

10  Q.  To your knowledge, did McCurdy get a ticket for

11  participating in a slashing that day?

12          MR. SIDDIQI:  Objection.

13          THE COURT:  Thank you.  Sustained.

14          MR. LICHTMACHER:  No more questions, your Honor.

15          THE COURT:  Thank you.

16          Counsel for defendants

17          MR. SIDDIQI:  Yes, your Honor, short redirect.

18  RECROSS EXAMINATION

19  BY MR. SIDDIQI:

20  Q.  Officer Mitchell, I'd like to show you what's already been

21  entered into evidence as Defendant's Exhibit M.  If it can be

22  published to the jury.  Officer Mitchell, is this what your

23  face normally looks like?

24  A.  No.

25          MR. LICHTMACHER:  Objection, your Honor.

J94Qmcc4                        Mitchell - Recross

1          THE COURT:  I'm sorry, can you please rephrase the

2      question, Counsel?

3   Q.  Officer Mitchell, do you recognize yourself in that

4      photograph?

5   A.  Yes.

6          MR. LICHTMACHER:  Objection, your Honor.  Exceeds the

7      scope of cross.

8          THE COURT:  Thank you.

9          Counsel, I'm going to sustain the objection.

10  Q.  Officer Mitchell, do you see an injury to your phase in

11     this photograph?

12         MR. LICHTMACHER:  Objection, your Honor.

13         THE COURT:  Thank you.  Sustained.

14  Q.  I'd like to also show you what's already been entered into

15     evidence as Plaintiff's Exhibit I, if it can please be shown to

16     the --

17         MR. LICHTMACHER:  Defendant's Exhibit.

18  Q.  Plaintiff's Exhibit 1, I'm sorry.  This is the employee

19     claim.

20         Officer Mitchell, can you read the title of the

21     document there, please?

22  A.  The title Employee Claim.

23  Q.  And is there a notation on the top right of the document?

24  A.  C-3.

25  Q.  And do you see an insignia on the top left of the document?

J94Qmcc4                    Mitchell - Recross

1   A.  Yes.

2   Q.  And on the second page of that document, do you see the

3   date that you signed that document?

4   A.  Yes.

5   Q.  What date is that?

6   A.  2/20/15.

7   Q.  I'd also like to show you what's been entered into evidence

8   as Defendant's Exhibit L and also have it shown to the jury.

9   Do you see this title on the document?

10  A.  Yes.

11  Q.  What's that title?

12  A.  C-3.3.

13  Q.  Is that insignia the same as the one that was on

14  Plaintiff's Exhibit 1?

15  A.  Yes.

16  Q.  Is this part of the set of documents you executed as part

17  of Plaintiff's Exhibit 1?

18           MR. LICHTMACHER:  Objection.  It's been asked and

19  answered.

20           THE COURT:  I'm sorry.  Counsel, you can ask the

21  question, and I'll listen to an answer.  Counsel, please

22  proceed.

23  Q.  Is this part of the same set of documents as Plaintiff's

24  Exhibit 1?

25           THE COURT:  Can I ask you, Counsel, to reframe the

1    question?

2    Q.  Is C-3.3 part of the document C-3?

3    A.  Yes.

4    Q.  Did you execute this document the same time as you executed

5    the employee claim?

6    A.  Yes.

7    Q.  And that was February 20, 2015?

8    A.  Yes.

9    Q.  Officer Mitchell, besides the slashing that occurred on

10   February 19, 2015, have you ever dealt with any other slashing?

11              MR. LICHTMACHER:  Objection, your Honor.

12              THE COURT:  Thank you.  Sustained.

13   Q.  Officer Mitchell, what did the plaintiff say to you

14   immediately before punching you?

15              MR. LICHTMACHER:  Objection.  Asked and answered.

16              THE COURT:  Thank you.

17              I'll permit it.

18   A.  He said he's going to cut one of us.

19              MR. SIDDIQI:  I have no further questions, your Honor.

20              THE COURT:  Thank you.

21              Counsel for plaintiff, any additional questions for

22   this witness?

23              MR. LICHTMACHER:  Just two.

24              THE COURT:  Thank you.  Please proceed.

25

1    REDIRECT EXAMINATION

2    BY MR. LICHTMACHER:

3    Q.  He didn't cut you, did he?

4    A.  No, he didn't cut me.

5    Q.  And he didn't show you a knife, did he?

6    A.  No.

7    Q.  In fact, according to you, he punched you, correct?

8    A.  Correct.

9    Q.  Now, this is Plaintiff's 2, and it's got a clear date on it

10   of March 4.  Not February 19 or February 20.  Isn't that

11   correct?

12            MR. SIDDIQI:  Objection.

13            THE COURT:  Thank you.

14            You can answer the question.

15   A.  Correct.

16            MR. LICHTMACHER:  I have no more questions.

17            THE COURT:  Thank you.

18            Counsel for defendants?

19            MR. SIDDIQI:  Yes, one quick question.

20   RECROSS EXAMINATION

21   BY MR. SIDDIQI:

22   Q.  I'd like to show you Plaintiff's Exhibit 2 again.  Can it

23   please be shown to the jury?

24            Officer Mitchell, do you see at the top of this

25   document it says date of statement?

J94Qmcc4                         Mitchell - Recross

 1  A.  Yes.

 2  Q.  And what's it say is the date of the statement?

 3  A.  2/20/2015.

 4          MR. SIDDIQI:  Thank you.  No further questions.

 5          THE COURT:  Thank you.

 6          Counsel?

 7          MR. LICHTMACHER:  Nothing, your Honor.

 8          THE COURT:  Good.  Thank you.

 9          Thank you very much, Officer Mitchell, for your

10  testimony.  You can step down.

11          (Witness excused)

12          THE COURT:  Counsel for plaintiff, please call your

13  next witness.

14          MR. LICHTMACHER:  Can we have a two-minute

15  intermission?

16          THE COURT:  Thank you.  Yes.  We can take a very short

17  recess.

18          So, ladies and gentlemen of the jury, we're going to

19  take a very short five minute or so break just to let everyone

20  stretch their legs.

21          So during this break, please don't discuss the case

22  amongst yourselves.  Don't do any research about the case, and

23  don't speak to anyone else about the case.  Thank you.  I'll

24  see you back here in a few moments.

25          (Continued on next page)

J94Qmcc4                          Mitchell – Recross

1              (Jury not present)

2              THE COURT:  Thank you.  You can be seated.  Good.

3    Let's take a very short rest break.  Counsel, please be back in

4    no more than five minutes.  I will be back then.  I expect that

5    we will then hear from Captain Bell.  Is that correct, counsel

6    for plaintiff?

7              MR. LICHTMACHER:  I guess so, your Honor.  Yes.

8    That's a yes, your Honor.

9              THE COURT:  Good.  So I'll see you back here in about

10   five minutes.  Thank you very much.

11             (Recess)

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

J941mcc5

```
1              (In open court; jury not present)

2              THE COURT:  Thank you.  You can be seated.

3          So I'm back on the record.  It's been about ten

4    minutes since I left.  Mr. Lichtmacher is not back in the room.

5    My clerk has gone out to look for him, but he is not in the

6    hall.  She has not searched for him elsewhere.  I will give him

7    a couple of additional minutes and then we will get started,

8    bring in the jury, and Mr. Lichtmacher will have the pleasure

9    of coming in with the jury waiting for him.

10             MS. GOYKADOSH:  Your Honor, I'm so sorry.  I know

11   Mr. Lichtmacher is not here and that we might be bringing in

12   the jury before him coming back, but I do have some things that

13   I want to raise, so I'm not sure what to do at this point.

14             THE COURT:  Thank you.  I won't take up any

15   substantive issues until Mr. Lichtmacher is in the courtroom.

16             MS. GOYKADOSH:  Thank you, your Honor.

17             THE COURT:  Can I ask if a male member of the defense

18   team could see if Mr. Lichtmacher is available, if he's in the

19   restroom.

20         Oh, good.  Thank you.  Good.  So Mr. Lichtmacher is

21   joining us.

22         Counsel for defendants, there's a point that you

23   wished to raise before bringing the jury back in?

24             MS. GOYKADOSH:  Yes.  They're all related to

25   Mr. McCurdy's absence.
```

J941mcc5

1     So again, our Rule 41(b) application, another

2   prejudice is that --

3     THE COURT:  Counsel, to be very clear, I'm going to

4   end the trial day at 3:30.

5     MS. GOYKADOSH:  Okay.

6     THE COURT:  So if you want to spend time talking about

7   legal issues rather than letting the witnesses that the

8   plaintiff has be examined, I'm happy to do that.  So I invite

9   you to use the time as you like.

10     Counsel, please proceed.  What would you like to

11   discuss?

12     MS. GOYKADOSH:  Yes.  So with regards to --

13     THE COURT:  And again, to be very clear, that means

14   that if plaintiff hasn't rested at the end of the day because

15   his witnesses have not finished their testimony, then he will

16   rest tomorrow when Mr. McCurdy may reappear.

17     So counsel for defendants, please, again, I invite you

18   to take up this time however you think is best for your

19   strategic purposes.

20     MS. GOYKADOSH:  Thank you, your Honor.  I will sit

21   down now.

22     THE COURT:  Thank you.  It's your choice.  I'm happy

23   to engage in a discussion of whatever issues you like.

24     MS. GOYKADOSH:  I understand.  Thank you.

25     THE COURT:  Thank you.

J941mcc5

1                I understand that the parties wish to proceed with the

2      trial.

3                Ms. Nelson, would you please bring in the jury.

4                I should note briefly for the record that I have

5      received more communications from the Marshals Service who have

6      confirmed, in substance, that Mr. McCurdy did get the

7      communication that we sent back before he decided to be

8      returned to Rikers.  I'll give you a more complete statement

9      regarding the interactions with the Marshals, but I just wanted

10     to confirm that my current information is that he was advised

11     of the substance of the prior communication.

12               The jury can enter.

13               (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

J941mcc5

1          (Jury present)

2          THE COURT:  Thank you.  You can be seated.

3          Counsel for plaintiff, would you please call your next

4    witness.

5          MR. LICHTMACHER:  Well, first, your Honor, I'd like to

6    enter into evidence, offer into evidence Plaintiff's 8, the

7    certified medical records from Elmhurst from the 2/19/15

8    incident.

9          MS. GOYKADOSH:  We object, your Honor.

10         THE COURT:  Thank you.  Please come on up.

11         (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J941mcc5

1              (At the sidebar)

2              THE COURT:  Sorry.  There's an objection?  What's the

3    basis?

4              MS. GOYKADOSH:  The objection is that there's been

5    absolutely no foundation.

6              THE COURT:  Thank you.  That's what the certification

7    is for, is it not?

8              MS. GOYKADOSH:  Well, there needs to be relevance

9    questions asked that say:  Whose medical records are these?

10   Are these plaintiff's?  Who are these medical records going to

11   be introduced through is my question.  There needs to be a

12   witness through whom this evidence is introduced.  Are they

13   just being handed to the jury for the jury just to rifle

14   through?  I do believe that there needs to be a foundation laid

15   with testimony.  I think your Honor said that actually at the

16   final pretrial conference.  We're not disputing the

17   authenticity of these records.  We are saying that there needs

18   to be a proper foundation laid.

19             THE COURT:  Thank you.

20             Why is the certification provided by Elmhurst not

21   proper authentication under Rule 902?  Give me a moment.

22             MS. GOYKADOSH:  Your Honor --

23             THE COURT:  Good.  Please go on.

24             MS. GOYKADOSH:  I'm not making a Rule 902 objection.

25   I'm making a Rule 402 and a Rule 403 objection.  I do not

J941mcc5

1    believe that there has been proper foundation laid through the

2    testimony of a witness that would allow these medical records

3    to just be admitted to the jury.

4              THE COURT:  Thank you.

5              That's because you believe it's not relevant to the

6    claims at trial?

7              MS. GOYKADOSH:  I do believe that it's relevant, but

8    there hasn't been any relevant testimony yet given which would

9    lay the necessary foundation for the introduction of these

10   records.

11             THE COURT:  Thank you.

12             What are you looking for?

13             MS. GOYKADOSH:  Well, there hasn't -- so the officers

14   gave testimony, but there hasn't been any testimony that has

15   been given that would support the conclusions that are in these

16   records.

17             THE COURT:  Thank you.

18             What do you mean by the conclusions that are in these

19   records?  These are self-authenticating business records that

20   fall under 803(6).  It's not apparent what you're referring to.

21             MS. GOYKADOSH:  To give an example, to go to the

22   cortical step-off issue, it says it may suggest evidence of a

23   fracture, but there has been no testimony by anybody about

24   anything that happened with plaintiff's hands that could have

25   suggested a fracture.  That's one example.

J941mcc5

1          THE COURT:  Thank you.

2          So I understand that the objection is not one under

3    803(6); I understand that it's not one under 902.  Instead, I

4    understand that the argument to be that this document cannot be

5    introduced because there is no relevance of medical information

6    regarding the injuries sustained.  It's not apparent to me what

7    the basis is for the argument.  If you'd like to provide

8    additional argument, I'd appreciate that.

9          MS. GOYKADOSH:  I would.  Thank you, your Honor.

10          Just to be clear, 402 is one argument.  403 is my

11    second argument.  And I think it's extremely confusing for the

12    jury to just be handed a stack of medical records.  As your

13    Honor has mentioned, argument by counsel is not evidence.  I do

14    not know who the person is going to be who these medical

15    records are going to be introduced through.  It's confusing.

16          THE COURT:  I'm sorry.  You're confusing several

17    issues.  There will be no person who will introduce them.

18    Instead, counsel is seeking to introduce them as authenticated

19    records by virtue of the certification, so that's what the

20    certification is for.  So can you please pull apart your

21    arguments.

22          So first, I understand that you're not making an

23    argument that these have not been properly certified and that

24    they are not properly authenticated under Rule 902.  You said

25    that you're not making an argument that they are improper

J941mcc5

1   hearsay statements that should be not admitted under 803(6).

2   So what, counsel, is the basis for the objection?

3           MS. GOYKADOSH:  Just one moment, your Honor.

4           (Defense counsel conferring)

5           MS. GOYKADOSH:  Just to step back for a second, if

6   your Honor were to admit these records, it would be extremely

7   problematic, because Officer Mitchell obviously can't testify

8   about them, Captain Bell cannot testify about them, so there

9   would be nobody to talk about what is in these records.  So I

10  think this gets back to our Rule 403 concerns.  It's confusing

11  for the jury.  It's misleading to the jury.  There is just

12  absolutely nobody through whom these records can be properly

13  introduced.  Again, they are certified medical records so I do

14  not have a Rule 902 objection.  I do not have a Rule 803

15  objection.  However, there still needs to be a proper

16  foundation laid through the testimony of a witness, and there

17  is no witness here through whom that foundational testimony can

18  be raised.

19          THE COURT:  What do you mean by foundational testimony

20  in the absence of a 902 objection?

21          MS. GOYKADOSH:  So functionally what I'm saying -- and

22  I think I misspoke earlier, but functionally what I'm saying is

23  that there's no witness who can talk about these records.  The

24  only person who is going to talk about them is going to be

25  Mr. Lichtmacher, and it's not evidence, as your Honor said,

J941mcc5

1    when Mr. Lichtmacher speaks.  So again, I think this is going

2    to be extremely confusing to the jury to have these records

3    just admitted into evidence without any person there.  Witness.

4    I'm sorry.

5              THE COURT:  Thank you.

6              The objection is overruled.

7              MR. LICHTMACHER:  Your Honor, while I'm here, I would

8    like to read a very small portion into the record, if it's

9    being accepted into evidence.

10             THE COURT:  Thank you.  It will be accepted into

11   evidence.  The arguments proffered by counsel for defendants

12   are infirm.  These are records that are being introduced under

13   803(6) and 902.  Perforce, there is not a witness here to

14   testify as to their content.  Otherwise you would not need a

15   hearsay exception and you would not need the

16   self-authentication rule.  So to the extent that the argument

17   by counsel for defendants is, as it has been repeatedly stated,

18   that one must have a witness who can testify to their content

19   and to lay the foundation with respect to them, it is an infirm

20   argument and I overrule the objection.

21             MS. GOYKADOSH:  Just to note, it's a Rule 402 and

22   Rule 403 objection.

23             THE COURT:  Thank you.  Sorry.  To the extent this is

24   a 402 objection -- counsel, you're wasting my time.  What is

25   your argument, that this is not relevant in this case?

J941mcc5

1     MS. GOYKADOSH:  There hasn't been any relevant

2  testimony yet.  I understand your Honor's position and I --

3     THE COURT:  No, counsel.  What is the basis for the

4  argument that evidence about the injuries in an excessive force

5  trial are not relevant?

6     MS. GOYKADOSH:  There hasn't been any testimony by

7  plaintiff.  It's my understanding there won't be any testimony

8  by plaintiff.  I am not going to be able to ask him about

9  anything in those records.

10     THE COURT:  Thank you.

11     So you didn't answer my question about the relevance.

12  That's because it is a futile, wasting-of-my-time argument.

13  It's clearly relevant.

14     With respect to the 403 -- and to the extent that you

15  can recall, counsel, you have a duty of candor to the Court.

16  If you wish to waste my time and all of our time raising

17  arguments that have no foundation, that is your choice.  But I

18  do not appreciate it, nor does the jury.

19     MS. GOYKADOSH:  I apologize to the Court.

20     THE COURT:  Thank you.

21     With respect to the 403 argument, to the extent that I

22  understand it, it is that because no witness has been called to

23  speak to these papers, counsel is concerned that they will not

24  be able to interrogate the speaker.  That is not unduly

25  prejudicial.  Again, counsel on both sides have chosen not to

J941mcc5

1    call the physicians who were involved in the preparation of

2    these records.  That was a strategic choice by you, counsel,

3    and the consequences of it fall upon you.  I don't find it to

4    be unduly prejudicial.

5              MS. GOYKADOSH:  I don't want to waste the Court's

6    time.  I just want to reiterate I believe it's confusing, but

7    that's all I want to say, just to make my record.

8              THE COURT:  Thank you.

9              No more confusing at this point than it has been

10   throughout.

11             Counsel, you've discussed the elements of this that

12   would be confusing.  That generated our decision to redact

13   certain portions of it.  And now you're taking the position

14   that the entirety of it should be excluded because it's

15   confusing.  This is the first time that you've made that

16   argument.  And so counsel, again, if your argument had been to

17   take out the entire thing because it's confusing, that would

18   have come up earlier and we would not have engaged in an

19   exercise to redact specific elements of it, and you would have

20   raised that in your letter to the Court requesting not

21   redactions to this record but its exclusion in its entirety.

22   So again, counsel, please, I appreciate that you've raised this

23   objection.  I overrule it, and I'm going to accept it into

24   evidence.

25             MS. GOYKADOSH:  Thank you, your Honor.

J941mcc5

1          MR. LICHTMACHER:  And I don't know if you heard me.  I

2     would like to read just a few very small sections of this into

3     the record.

4          THE COURT:  Thank you.  Once it comes into evidence,

5     you can read from it.

6          MR. SIDDIQI:  And your Honor, I am very, very sorry to

7     keep taking time on this.  I am asking a functional question.

8     At this point in time how is this exhibit going to be used?

9     Mr. Lichtmacher will be allowed to read portions into evidence

10    and we will be allowed to read other portions into evidence?

11         THE COURT:  Yes.

12         MR. SIDDIQI:  Okay.

13         THE COURT:  It's all in evidence, and once it's in

14    evidence, people can read it.

15         MR. SIDDIQI:  Read it to the jury without a witness on

16    the stand.

17         THE COURT:  Correct.

18         MR. SIDDIQI:  Thank you, your Honor.

19         (Continued on next page)

20

21

22

23

24

25

J941mcc5

1          (In open court)

2          THE COURT:  I'm sorry for the interruption.

3          I'm accepting Plaintiff's Exhibit 8 into evidence.

4          (Plaintiff's Exhibit 8 received in evidence)

5          THE COURT:  Counsel, you can proceed.

6          MR. LICHTMACHER:  Very briefly, I'm going to read a

7     few small excerpts from this.  This is from the medical

8     records, Plaintiff's 8.

9          This is page 739.  "Chief Complaints.  Patient

10    referred from Rikers for status post assault.  Patient

11    complained of head, neck, back, face, positive loss of

12    consciousness.  Patient also complained of bilateral rib pain."

13         This is from page 742.  Says:  "This is a 25-year-old

14    male with no reported medical history brought in from Rikers

15    presenting after alleged assault by prison guards in which he

16    reports loss of consciousness for approximately five minutes.

17    States he was hit in the head, neck, ribs, and right arm and

18    leg.  His pain is most significant in head, neck, and right

19    arm.  He denies new numbness, weakness, or tingling, though he

20    had chronic neuropathy of right arm."

21         And then moving along, couple more sections.

22         "Lacerations, no palpable bony deformities of skull or

23    facial bones."

24         And, "Pain with palpation of right superior to orbital

25    bones."

J941mcc5                        Bell - Direct

1          "Diagnosis."  This is page 744.  "Body side right

2   indication decreased range of motion, right.  Transport method:

3   Stretcher."

4          "Arm pain.  Transport method:  Stretcher."

5          And performed by -- "Scheduled exam to be performed by

6   radiology."

7          Next indication is, "Head pain.  Dorsal."

8          This is page 746.  "Chest Diagnosis.  PA and lateral.

9   Indication:  Blunt trauma.  Transport method:  Stretcher."

10         And these will be available to the jury so they can

11  review the whole thing.

12         THE COURT:  Thank you.

13         MS. GOYKADOSH:  Your Honor, now that this exhibit has

14  been introduced into evidence, may I read some portions as

15  well.

16         THE COURT:  You may during your case in chief,

17  counsel, which has not happened yet.

18         MS. GOYKADOSH:  Thank you, your Honor.

19         MR. LICHTMACHER:  Does the Court want to take custody

20  of this?

21         THE COURT:  Thank you.  Please do hand it forward.

22         MR. LICHTMACHER:  What's that?

23         THE COURT:  Please do hand it forward.

24         MR. LICHTMACHER:  Thank you.

25         THE COURT:  Good.  Thank you.

J941mcc5                           Bell - Direct

1          Counsel for plaintiff, would you please call your next

2     witness.

3          MR. LICHTMACHER:  Yes.  Plaintiff calls Cheryl Bell.

4          THE COURT:  Thank you.

5          Captain Bell, would you please come forward.

6          (Witness sworn)

7          THE COURT:  Thank you very much.  Please be seated.

8          Please bring the chair close to the microphone, if you

9     can.

10          Would you please state your full name and spell your

11     last name for the record.  Perhaps spell the entirety of your

12     name for the record.

13          THE WITNESS:  Cheryl Bell.  C-H-E-R-Y-L, last name

14     B-E-L-L.

15          THE COURT:  Thank you.

16          Counsel, you can proceed.

17          MR. LICHTMACHER:  Thank you, your Honor.

18     CHERYL BELL,

19          called as a witness by the Plaintiff,

20          having been duly sworn, testified as follows:

21     DIRECT EXAMINATION

22     BY MR. LICHTMACHER:

23     Q.  Captain Bell, were you employed on February 19th of 2015?

24     A.  I was.

25     Q.  By who?

J941mcc5                          Bell - Direct

1    A.  New York City Department of Corrections.

2    Q.  And were you stationed in any specific building?

3    A.  AMKC.

4    Q.  In what?

5    A.  I was in AMKC.

6    Q.  And that's on Rikers Island, correct?

7    A.  Yes.

8    Q.  How long have you been with the Department of Corrections?

9    A.  20 years.

10   Q.  20 years?  How long were you at AMKC?

11   A.  I was at AMKC as an officer.  When I got promoted, I came

12   back to AMKC.

13   Q.  When was that?

14   A.  2007.

15   Q.  That's your promotion date or when you started at AMKC?

16   A.  That's my promotion date.

17   Q.  Okay.  And have you been at AMKC fairly regularly since

18   that date?

19   A.  Right now I am assigned to the emergency service unit so I

20   am not currently in AMKC.

21   Q.  When was the last time you were assigned to AMKC?

22   A.  Four years ago; three years ago, maybe.

23   Q.  So you were there, as you said, during February 2015,

24   correct?

25   A.  I was.

J941mcc5                         Bell - Direct

1   Q.  How many officers, approximately, are -- in 2015, I'm

2   talking about.  Approximately how many officers, correction

3   officers, were there on one shift at AMKC?  Let's talk about

4   the day shift.

5   A.  7 to 3 tour?

6   Q.  Talking about 7 to 3.

7   A.  The 7 to 3 tour can have anywhere from 300 officers, 200

8   officers.

9   Q.  200 to 300?

10  A.  Yeah.

11  Q.  And how many captains?  Again, we're talking about February

12  2015.

13  A.  AMKC is a huge facility, so you can have maybe 10 or 15

14  captains, 20 captains, maybe.

15  Q.  How many of the captains in February 2015 on the 7 to 3

16  tour were females?

17  A.  I have no idea.

18  Q.  Were they mostly females, mostly males?

19  A.  I have no idea.

20  Q.  Would you say they're evenly distributed between men and

21  women?

22          MS. GOYKADOSH:  Objection.

23          THE COURT:  Thank you.

24          You can answer the question.

25  A.  I have no idea.

1   Q.  At any point in time did you notice that every captain at

2   AMKC in February of 2015 was a female?

3           MS. GOYKADOSH:  Objection.

4           THE COURT:  Thank you.

5           You can answer the question.

6   A.  Repeat your question?

7   Q.  At any point in time in February of 2015 on the 7 to 3

8   tour, did you notice that all the captains were females?

9   A.  We never have all female captains.

10  Q.  Okay.  So there are usually a mix of men and women as

11  captains, correct?

12  A.  Usually, yes.

13  Q.  And it goes up to -- if I understood you correctly, goes up

14  to 20 captains in a building, correct?

15  A.  It depends on the day and the tour.

16  Q.  What's the control room?

17  A.  Of what?

18  Q.  AMKC.  Does it have a control room?

19  A.  You have a bunch of different control rooms in AMKC.

20  Q.  And there are captains that work in those control rooms?

21  A.  The main control room, there's a captain that works there.

22  Q.  And any other control rooms the captains work?

23  A.  No.

24  Q.  The captains in the control room, does that captain respond

25  to a use of force incident?

J941mcc5                        Bell - Direct

1   A.  No.

2   Q.  Okay.  Now under certain circumstances -- well, your

3   promotion to captain, does that involve a civil service test?

4   A.  Yes.

5   Q.  Now when you get promoted -- by the way, does corrections

6   have a rank of sergeant?

7   A.  No.

8   Q.  Rank of lieutenant?

9   A.  No.

10  Q.  So your rank is the rank above CO, correct?

11  A.  Yes.

12  Q.  And as a captain, you are able to supervise COs, is that

13  correct?

14  A.  Yes.

15  Q.  In fact, are you aware of the last order rule?

16  A.  Yes.

17  Q.  What is the last order rule?

18  A.  Officers have to follow their last order.

19  Q.  And the last order would come from a superior officer,

20  correct?

21  A.  Yes.

22  Q.  And so a captain or above, is that correct?

23  A.  Yes.

24  Q.  Now in use of force incidents, are captains usually on the

25  scene to supervise?

J941mcc5                          Bell - Direct

1    A.  Yes.

2    Q.  And that's a requirement, correct?

3    A.  It doesn't always happen that way.

4    Q.  I imagine there are emergency situations where it just

5    comes up all of a sudden and no one's able to appear as a

6    captain; would that be a fair statement?

7    A.  Yes.

8    Q.  But after a stabbing, after a serious incident or a

9    slashing, there would be captains on the scene in case the

10   violence continued, correct?

11   A.  Yes.

12   Q.  And was that in the scope of one of the things that you

13   would be able to do in February of 2015 when you worked the 7

14   to 3 tour?

15   A.  Yes.

16   Q.  In fact, captains supervise searches frequently, correct?

17   A.  Every day.

18   Q.  Every day.  Okay.  But captains, female captains are not

19   supposed to supervise male strip searches, are they?

20   A.  No.

21   Q.  And in fact, there would have to be male captains present

22   if in fact an appropriate strip search was to be conducted of a

23   male inmate, correct?

24   A.  Yes.

25   Q.  And in fact, if not, the rules were being violated,

J941mcc5                          Bell - Direct

1   correct?

2   A.  Repeat your question?

3   Q.  If a female captain supervises a strip search of a male, a

4   rule would be violated, correct?

5   A.  Yes.

6   Q.  Now is there a method of calling for backup if an inmate is

7   resisting a search?

8   A.  Calling for backup?

9   Q.  Yeah.

10  A.  What's the situation?

11  Q.  Well, let's say there's an inmate who refuses to be strip

12  searched and is cursing, or allegedly cursing at the officer

13  trying to strip search him.  Would it be appropriate at that

14  point for a CO to in some way ask for backup?

15          MS. GOYKADOSH:  Objection.

16          THE COURT:  Thank you.  Sustained.

17  Q.  Now is it fair to say that a captain can stop a CO from

18  using force if she deems it inappropriate?

19  A.  If there's a situation and the officer calls for the

20  supervisor, the supervisor can go over to the situation and try

21  to use IPC skills to stop the situation.

22  Q.  Well --

23          THE COURT:  I'm sorry.  What's an IPC skill?

24          THE WITNESS:  It means interpersonal communication.

25          THE COURT:  Thank you.

1          Please proceed.

2   Q.  Now can a supervisor, captain, can she stop a correction

3   officer, say, hey, you're using too much force, if you find

4   that that's in fact the case?

5   A.  If the use of force is already in progress, the supervisor,

6   he or she, just try to supervise the situation.

7   Q.  By supervise the situation, in some instances it would call

8   for asking for the force to cease and desist, correct?

9   A.  If the use of force is already in progress?

10  Q.  Well, if there's no reason to use force at that point and

11  the captain is there, can the captain order the officer to stop

12  using force?

13  A.  If there's a situation going on and --

14  Q.  Captain, please, yes or no.  In my circumstance that I

15  described, can a captain order a CO to stop using force?

16  A.  Ask your question again.  I didn't hear it.

17  Q.  Sure.

18          MR. LICHTMACHER:  Can we have a readback.

19          THE COURT:  Please re-inquire, counsel.

20  Q.  Okay.  If a captain witnesses force being used which is no

21  longer necessary, can she order the CO using the force to cease

22  and desist?  Yes or no, please.

23          MS. GOYKADOSH:  Objection.

24          THE COURT:  Thank you.  Sustained.

25  Q.  Are there times when a captain can order a CO to stop using

J941mcc5                              Bell - Direct

1   force?

2              MS. GOYKADOSH:  Objection.

3              THE COURT:  You can answer the question.

4   A.  Yes.

5   Q.  And is one of those times when the force is unnecessary?

6   A.  I wouldn't say it was unnecessary.  If the situation is

7   getting out of hand, the captain can say, oh, if the inmate is

8   restrained, okay, that's it.

9   Q.  Captain, I didn't describe the situation.  If the

10  situation, the use of force is unnecessary, can the captain

11  order the CO to stop using force?

12             MS. GOYKADOSH:  Objection.

13             THE COURT:  Thank you.

14             You can answer the question.

15  A.  Again, if the captain deems the situation out of hand, they

16  can stop the officer, yes.

17  Q.  Thank you.

18             Now isn't it true that you're required to stop a

19  correction officer from using unnecessary force?

20  A.  Repeat your question?

21  Q.  Isn't it true that you are required, if you witness it, to

22  stop a correction officer from using unnecessary force?

23  A.  Yes.

24  Q.  And but a CO, correction officer -- can I use the term CO?

25  Is that understood?

J941mcc5                        Bell - Direct

1   A.   Sure.

2   Q.   Sure.  Is the CO able to order a captain, hey, stop using

3   force?

4   A.   They don't order a captain, but they can tell a captain,

5   stop.

6   Q.   And in fact, COs generally cannot give orders to captains,

7   correct?

8   A.   No.

9   Q.   Now are captains able to write up COs for bad behavior

10  while they're on duty?

11            MS. GOYKADOSH:  Objection.

12            THE COURT:  Thank you.  Sustained.

13  Q.   Are there occasions where captains write up COs because

14  they've done something inappropriate?

15            MS. GOYKADOSH:  Objection.

16            THE COURT:  Thank you.  Sustained.

17  Q.   Can COs -- excuse me.  Can captains have COs disciplined?

18            MS. GOYKADOSH:  Objection.

19            THE COURT:  Thank you.  Sustained.

20            Can we focus on the incident at issue in the case.

21            MR. LICHTMACHER:  We actually -- okay.

22  Q.   Now do you remember an incident from -- withdrawn.

23            Were you involved in an incident on February 19, 2015,

24  involving Mr. McCurdy?

25  A.   No.

J941mcc5                          Bell - Direct

1    Q.  Well, you gave a deposition in this case, didn't you?

2    A.  Yes.

3    Q.  And that deposition was on May 30, 2018, is that correct?

4    A.  Yes.

5            MR. LICHTMACHER:  May I approach the witness, your

6    Honor.

7            THE COURT:  You may.

8            MR. LICHTMACHER:  Handing the witness the deposition

9    transcript.

10   Q.  Is that your deposition transcript?

11   A.  It is.

12   Q.  Okay.  Now on May 30, 2018, when you gave that deposition,

13   did you raise your right hand and swear to tell the truth?

14   A.  I did.

15   Q.  And did you in fact tell the truth?

16   A.  I did.

17   Q.  And in fact, you were given a copy of that deposition after

18   you testified at some point and asked if any changes were

19   necessary, correct?

20   A.  At some point I was given this deposition, yes.

21   Q.  Okay.  And did you make any changes to the deposition?

22   A.  No.

23   Q.  So you deemed the testimony you gave under penalty of

24   perjury to be correct, is that correct?

25   A.  Yes.

J941mcc5                         Bell - Direct

1   Q.  Turning to page 4, line 24.  Tell me when you're ready,

2   Captain.

3   A.  I'm ready.

4   Q.  "Q.  Were you involved in an incident on February 19, 2015,

5   involving Mr. McCurdy?

6            "A.  I don't remember the date.

7            "Q.  I think your attorney will stipulate that was the

8   date of the incident that we're here about."

9            And the corporation counsel who was present at the

10  time said:  "Correct."

11           MS. GOYKADOSH:  Your Honor, I'm not sure what

12  Mr. Lichtmacher is reading to, but I don't know what's proper

13  impeachment in here, so I just -- I didn't get --

14           THE COURT:  I'm sorry.  Is this not a party?

15           MR. LICHTMACHER:  What?

16           MS. GOYKADOSH:  I just don't know what's being --

17           THE COURT:  I'm sorry.  Please come forward.

18           (Continued on next page)

19

20

21

22

23

24

25

J941mcc5                          Bell - Direct

1                    (At the sidebar)

2                    THE COURT:  Thank you.

3                    Go ahead, counsel.  I understand there's an objection?

4                    MS. GOYKADOSH:  My issue is only that I just wanted to

5          know where Mr. Lichtmacher will be reading until, just so I can

6          know where he will be reading till.  That's all I want to know.

7                    THE COURT:  Thank you.

8                    So the comment about impeachment was irrelevant, is

9          that correct?

10                    MS. GOYKADOSH:  I just want to make sure that if he's

11          impeaching the witness, it is proper impeachment.  If it's an

12          inconsistent statement.

13                    THE COURT:  Thank you.

14                    Is she not a party?

15                    MS. GOYKADOSH:  She is a party.

16                    THE COURT:  Thank you.

17                    So can he only use her deposition for impeachment

18          purposes?

19                    MS. GOYKADOSH:  Her deposition can be used for any

20          purpose under Rule 32.

21                    THE COURT:  Thank you.

22                    MS. GOYKADOSH:  However, the way that the questions

23          were framed were such that it implied that they were being used

24          for impeachment.  So all I want to know is where

25          Mr. Lichtmacher is reading till.

J941mcc5                          Bell - Direct

1              MR. LICHTMACHER:  Page 5, line 11.  And it is

2      impeachment, your Honor.

3              THE COURT:  Thank you.

4              Please proceed.  As counsel has described, the

5      deposition for a party can be used for any purpose.

6              MR. LICHTMACHER:  May I start from the beginning of

7      the reading?  It's not long.

8              THE COURT:  Yes, you may.

9              And again, counsel, how you wish to use our time for

10     the afternoon is up to you.

11             Let's proceed, counsel.

12             MS. GOYKADOSH:  Thank you, your Honor.

13             MR. LICHTMACHER:  Thank you.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

J941mcc5                       Bell - Direct

1              (In open court)

2              THE COURT:  Thank you, counsel.  You can proceed.  I

3      apologize for the interruption.

4              MR. LICHTMACHER:  Excuse me, your Honor.  I'm going to

5      go back to the beginning of that.  It's short.

6      BY MR. LICHTMACHER:

7      Q.  So did you give these answers to these questions on May 30,

8      2018 -- page 4, line 24:

9              "Q.  Were you involved in an incident on February 19,

10     2015, involving Mr. McCurdy?

11             "A.  I don't remember the date.

12             "Q.  I think your attorney will stipulate that was the

13     date of the incident that we're here about."

14             The attorney:  "Correct."

15             "A.  I can't remember what the incident was, so I

16     can't tell you anything about the incident because I don't

17     remember it."

18             You gave that testimony on that day, correct?

19     A.  I did.

20     Q.  So on that day you didn't remember it, but today, you

21     remember that you weren't involved in the incident, is that

22     correct?

23     A.  I was not involved in the incident.

24     Q.  Well, on that day you did say something slightly different,

25     didn't you?

J941mcc5                          Bell - Direct

1    A.  I told you I didn't remember the incident so I couldn't

2    comment on it.

3    Q.  But now you know that you weren't involved in it.  They are

4    different, aren't they?

5    A.  I was not involved in the incident.

6    Q.  Well, is there a difference to you between "I don't

7    remember it" and "I wasn't involved in it"?  Do you think those

8    are the same thing?

9              MS. GOYKADOSH:  Objection.

10             THE COURT:  Thank you.  Sustained.

11   Q.  Now what did you rely on to determine that you weren't

12   involved in the incident?

13   A.  I remembered the incident.  Once the incident -- once the

14   incident date -- date was brought to me, then I remembered the

15   incident.

16   Q.  Well, I asked you in the questions I read you if you were

17   involved in an incident on February 19, 2015, and you said

18   specifically at your deposition I just read, "I don't remember

19   it."  Didn't you?

20   A.  And my answer didn't change.  I didn't remember it at that

21   time.

22   Q.  Oh.  So you didn't remember it because you didn't know the

23   date, but now you know.  Then you were told the date; you still

24   didn't remember it.

25             MS. GOYKADOSH:  Objection.

J941mcc5                          Bell - Direct

```
 1              THE COURT:  Thank you.

 2              Can you please rephrase the question, counsel.

 3              MR. LICHTMACHER:  Sure.

 4   Q.  You were told the date that day, and after you were told

 5   the date, you still didn't remember the incident, is that

 6   correct?

 7   A.  Once the date -- once I realized what the date was, then I

 8   remembered what the incident was, sir.

 9   Q.  Well, did you realize what the date was when I told it to

10   you on May 30, 2018?

11              MS. GOYKADOSH:  Objection.

12              THE COURT:  Thank you.

13              You can answer the question.

14   A.  When you asked the question and I answered it and told you

15   I didn't remember it, that was -- at that moment, I did not

16   remember what the incident was.

17   Q.  How was it you came to remember what the incident was?

18   A.  Once the date -- again, once the date was told to me, then

19   I remembered what the incident was.

20   Q.  So the date must have been told to you again after I told

21   it to you, and then you remembered that you weren't there, is

22   that right?

23   A.  You asked me if I was involved.  I was not involved in the

24   incident.

25   Q.  You witnessed the incident?
```

J941mcc5                        Bell - Direct

1    A.  No.

2    Q.  Do you have any idea why Officer Mitchell places you there

3    during the use of force?

4            MS. GOYKADOSH:  Objection.

5            THE COURT:  Thank you.

6            Can you rephrase the question, please, counsel.

7            MR. LICHTMACHER:  Sure.

8    Q.  You were here when Officer Mitchell was impeached with the

9    statement that you were there during the use of force.  You

10   were here for that, correct?

11   A.  I was.

12   Q.  And so he was incorrect, I take it, Officer Mitchell.

13   A.  I was in the area of the use of force.  I was not involved

14   in the use of force.

15   Q.  Well, he testified in the deposition that you were there

16   for the use of force.

17           MS. GOYKADOSH:  Objection.

18           THE COURT:  Thank you.  Sustained.

19   Q.  So you were in the area, but you weren't involved in the

20   use of force; is that your testimony?

21   A.  Yes.

22   Q.  Do you know why Chance McCurdy has named you as a defendant

23   in this incident?

24           MS. GOYKADOSH:  Objection.

25           THE COURT:  Thank you.  Sustained.

J941mcc5                          Bell - Direct

1  Q.  Chance McCurdy named you as a defendant in this incident,

2  correct?

3  A.  Yes.

4  Q.  And you knew Chance McCurdy before this incident, correct?

5  A.  I did.

6  Q.  In fact, did you have any type of relationship with

7  Mr. McCurdy?

8  A.  No.

9  Q.  Okay.  You knew him for a while from where?

10 A.  He's an inmate in AMKC.

11 Q.  And you knew him as being an inmate in AMKC, correct?

12 Correct?

13 A.  Yes, sir.

14 Q.  And did you interact with him at any occasions?

15 A.  I did.

16 Q.  And on those occasions were they contentious?

17         Your interactions with him, did they cause any

18 hostility between the two of you?

19 A.  No.

20 Q.  So you don't know why he named you, correct?

21 A.  I have no idea.

22 Q.  And how far from the area where the force was used were

23 you?

24 A.  I was in the front of the tier.

25 Q.  How far away is that from where the incident happened?

J941mcc5                         Bell - Direct

1    Well, withdrawn.

2              Do you know where the incident happened?

3    A.  The incident happened in the back of the tier.  I was in

4    the front of the tier.

5    Q.  Okay.  When did you learn where the incident happened?

6              THE COURT:  I'm sorry.  Can I just ask:  What is a

7    tier?

8              THE WITNESS:  A tier is the hallway of the housing

9    area where the inmates live.

10             THE COURT:  And how far is the front of the tier from

11   the back of the tier?

12             THE WITNESS:  The tier would be from, let's say, here

13   to that back chair.  It could be that long.

14             THE COURT:  I'm sorry.  From the witness stand to the

15   back of the courtroom?

16             THE WITNESS:  From here, the back of this wall, to

17   where that last black chair is.  That could be --

18             THE COURT:  Thank you.  From the back of the

19   courtroom, where the --

20             THE WITNESS:  Where that black chair is to maybe here.

21             THE COURT:  To the back of the well before the

22   gallery.

23             THE WITNESS:  Mm-hmm.

24             THE COURT:  Thank you.

25   BY MR. LICHTMACHER:

J941mcc5                         Bell - Direct

1   Q.  Would you say that's about 120 feet?

2   A.  I have no idea what it is.

3   Q.  Did you ever play baseball or softball?

4   A.  Never.

5   Q.  Never played?  Okay.  Do you watch baseball?

6   A.  I don't watch sports.

7   Q.  You don't watch sports.  Okay.  So you won't know if that

8   was like from home plate to second base.  You wouldn't know.

9               MS. GOYKADOSH:  Objection.

10              THE COURT:  Thank you.  Sustained.

11  Q.  Okay.  So now did you hear the incident happening?

12  A.  I heard a commotion.

13  Q.  And when you heard the commotion, did you react in any way?

14  A.  I did.

15  Q.  How did you react?

16  A.  I told the officers on the tier to secure the inmates.

17  Q.  And you remember that now, as you sit here today?

18  A.  I just answered your question.  Yes.

19  Q.  All right.  So you didn't supply that answer when I asked

20  you about the incident at your deposition, did you?

21              MS. GOYKADOSH:  Objection.

22              THE COURT:  Thank you.  Sustained.

23              Counsel, if you have a specific inquiry, please

24  proceed.

25              MR. LICHTMACHER:  Sure.

J941mcc5                         Bell - Direct

1    Q.  Now you became aware that force was used, correct?

2    A.  I did.

3    Q.  Otherwise no use of force report would be generated,

4    correct?

5              MS. GOYKADOSH:  Objection.

6              THE COURT:  Thank you.  Sustained.

7    Q.  Did you generate a use of force report in this incident?

8    A.  No.

9    Q.  You didn't generate any use of force report.

10   A.  I didn't generate a use of force report, no.

11   Q.  Of any kind, like saying that you weren't involved or

12   anything like that?

13   A.  I generated a use of force witness.

14   Q.  Ah.  Okay.  And what was that?  What was the content of

15   that, in sum and substance?

16   A.  The use of force witness is generated by -- by everybody

17   that's in the area, so whether you're involved in the use of

18   force or not, you have to generate a use of force witness or a

19   use of force report.

20   Q.  Now did you understand that Chance McCurdy was taken for --

21   well, withdrawn.

22             Do you regularly work on that tier that Chance McCurdy

23   was housed in?

24   A.  No.

25   Q.  Did you work on that same floor?

J941mcc5                    Bell - Direct

1   A.  I don't know what you mean by floor.

2   Q.  Okay.  What floor is that tier located on, where the

3   incident transpired?

4   A.  It's all one level of the jail.  It's --

5   Q.  Okay.  It's all one level.  How far away -- well, did you

6   have a regular post at that time?

7   A.  I didn't hear you.

8   Q.  Did you have a regular post at that time?

9   A.  Yes.

10  Q.  And where was the post?

11  A.  I was a security captain of AMKC.

12  Q.  Okay.  So did that involve your traveling to where Chance

13  McCurdy was housed?

14  A.  I traveled the whole building, yes.

15  Q.  Okay.  So you walked the building during your tour of duty,

16  is that correct?

17  A.  Yes.

18  Q.  All right.  And so there would be times when you'd go where

19  Chance McCurdy was, correct?

20  A.  It depends on where he was, but yes.

21  Q.  Did you become aware of him going for medical treatment

22  that day?

23  A.  Later I learned that he went for medical treatment.

24  Q.  Did you follow him to the hospital?

25  A.  That's not authorized, sir.

J941mcc5                    Bell - Direct

1   Q.  Okay.  I asked if you did it.  Did you follow him to the

2   hospital?

3   A.  That's not authorized.

4   Q.  I didn't ask you that.  I asked you if you did it.

5   A.  No.

6   Q.  You didn't go to the hospital with him?

7   A.  We're not allowed to do that, no.

8   Q.  Now if a captain participates in a use of force and it's

9   deemed unnecessary, can problems arise for that captain?

10            MS. GOYKADOSH:  Objection.

11            THE COURT:  Thank you.  Sustained.

12            MR. LICHTMACHER:  Can I approach, your Honor.

13            THE COURT:  Thank you.  You may.

14            MR. LICHTMACHER:  No, I mean, I want a sidebar.

15   Excuse me.

16            THE COURT:  Yes, you may.

17            MR. LICHTMACHER:  I misspoke.

18            THE COURT:  Come on up.

19            (Continued on next page)

20

21

22

23

24

25

J941mcc5                          Bell - Direct

1            (At the sidebar)

2            THE COURT:   Thank you.

3            First, there's an objection.  I sustained it.  I

4      understood the basis for the objection to be that you're

5      positing a hypothetical to the witness and asking her to

6      respond to it.  Much the same way that there was a prior

7      objection with respect to using Officer Mitchell as an

8      unnoticed expert, I understood that the basis for the objection

9      posited here was the posing of hypotheticals to Captain Bell.

10           Counsel for defendants, what was the basis for the

11     objection?  That was the reason upon which I sustained the

12     objection.

13           MS. GOYKADOSH:   That was my objection as well, your

14     Honor.

15           THE COURT:   Thank you.

16           Counsel for plaintiff?

17           MR. LICHTMACHER:   Now I indicated in the papers to the

18     Court that I would approach before I attempted to do this.

19     Captain Bell has an enormous history of getting in trouble for

20     using force, excessive force, and for not supervising or

21     correcting people who use force.  We believe -- and I wanted to

22     have Chance McCurdy here to do it, but I'll try to put in part

23     of his deposition, if I can -- that the reason for her being

24     disingenuous about her being there -- he's indicated at his

25     deposition she punched him several times -- is that she had

J941mcc5                    Bell - Direct

been in so much trouble, she had been force monitored, she had

lost 35 days' comp time on one occasion, 30 days' vacation pay

one occasion, 10 days' vacation pay on another occasion.  She

was in a lot of trouble.  And they were all very close -- those

incidents were very close to this incident.  Early in her

career, she had been force monitored.

          Now I would like to introduce evidence that she has a

reason to lie because so many times she'd been caught using

excessive force, and to connect it that she was there, I will

offer parts of Mr. McCurdy's deposition transcript, as he

appears to be unavailable.  Of course not unavailable;

unwilling to appear in court.  I won't go into detail.  I'll

just ask if she was found to have used excessive force and

penalized that amount of time.  And that's all I want to go

into.

          But one other thing I should mention.  If I'm allowed

to inquire, she was found to have hit a guy repeatedly in the

head with a radio on one occasion.  This is a woman with an

enormous record for violence.

          And there's more, but these are the things I think I

can get in.  I have documents to support them.

          THE COURT:  Thank you.

          What's the basis for the contention that the jury

should infer from this history that she has a motivation to lie

here?

1          MR. LICHTMACHER:  Because she'll get in additional

2     trouble, and that's why I asked about -- and you didn't allow

3     the question -- if captains, you know, use excessive force, can

4     they be disciplined, and the discipline actually escalates over

5     time when they've been found numerous times.  I'd like you to

6     allow me to revisit that issue and ask if captains can be

7     disciplined, because this goes directly to motive to lie,

8     because she'd been disciplined so much that this brings it to

9     the point where she could be terminated, and that's why we

10    believe that she lied about her involvement in the incident.

11          THE COURT:  Thank you.

12          Counsel for defendants?

13          MS. GOYKADOSH:  Your Honor, I don't want to waste a

14    lot of time.  I don't believe plaintiff's counsel is raising

15    any new arguments that he hasn't raised before and that have

16    not been rejected.

17          Again, first of all, there's been a

18    mischaracterization calling her disciplinary history enormous.

19    There are three substantiated incidents on her disciplinary

20    history.  That's certainly not enormous for somebody with a

21    20-year career.

22          Number two, there's also been -- I don't have a

23    document in front of me, but I don't believe that what has

24    happened in this case is progressive discipline.  I believe

25    that the second incident, she actually received less days lost

J941mcc5                      Bell - Direct

1   than the first incident.  So I don't think that comports with

2   what Mr. Lichtmacher was saying.

3           And these incidents -- again, my belief; I don't have

4   a document in front of -- me, were in 2011 and 2013, so while

5   they are about two years before the incident, it's not like it

6   was 10 days, 15 days.

7           I don't believe there's any reason to introduce these.

8   It seems to be something that would be precluded under

9   Rule 404(b), and there are also 403 concerns, so it should not

10  be allowed in.

11           MR. LICHTMACHER:  If I may.  I'm sorry.

12           THE COURT:  Yes.

13           MR. LICHTMACHER:  The disciplines were inflicted

14  substantially after the events and they were very near to this

15  event, and I have the documents for that.  So these incidents

16  happened in 2011, one in 2013, one in 2014 on a 5/15/13.

17  Sorry.  That was the -- no.  I got the wrong number there.  It

18  was an incident from 5/15/13.  My mistake.  But the penalties

19  each time and the pleas out are later dates.  They're signed on

20  later dates; they're generated on later dates.  So she was

21  being disciplined for these acts.

22           So I'd like to do a very simple inquiry that these

23  escalate and she was disciplined for, haven't you been --

24           THE COURT:  I'm sorry.  Can you raise your voice.

25           MR. LICHTMACHER:  I'm trying to find the middle

J941mcc5                         Bell - Direct

1    ground.

2              Okay.  Can you be disciplined for being found to have

3    used excessive force?  Haven't you been so disciplined?  And

4    can you be disciplined for failure to supervise excessive use

5    of force?  And haven't you been so disciplined?  And did you

6    lose this amount of time and these amount of dates?  And even

7    though the incidents were from those dates, this one was

8    inflicted much later, closer to the time of this incident?

9    That's all I want to ask, your Honor, and I think it's

10   appropriate, and I think it goes not to show propensity but to

11   show that she has motive to lie.

12             Oh, and obviously I want to ask -- I don't know if I

13   just said it -- if the discipline can escalate where she's in

14   danger of termination.

15             THE COURT:  Thank you.

16             MS. GOYKADOSH:  Your Honor, again, we submitted a

17   letter about this.  Under civil service law, you can't just be

18   terminated.  There needs to be a hearing; there are steps that

19   need to be taken.  Is this going to be asked from this witness?

20   Again, this is a mini trial issue.

21             No. 1, her discipline is absolutely not relevant.

22             No. 2, it's confusing under Rule 403.

23             No. 3, it seems to be a 404(b) issue.

24             I know Mr. Lichtmacher said he's not introducing it

25   for propensity, but I think he's trying to circumvent that just

J941mcc5                        Bell - Direct

1  by saying that.  I don't think this evidence should be

2  introduced.

3            THE COURT:  Thank you.  Let me just say a few words.

4            First, we may need to take a short break to resolve

5  this.  I'll probably excuse the jury momentarily.

6            MR. LICHTMACHER:  Sorry, your Honor.

7            THE COURT:  That's fine.

8            Second, while they're out, we'll discuss this in more

9  depth.

10            I just want to provide a few comments before I excuse

11  them for you to consider the issues.

12            Counsel has provided a justification for why this

13  evidence should come in in spite of Rule 404(b) -- namely,

14  motive, and in a sense, motivation to lie.  So under the

15  inclusionary rule used by the Second Circuit, I believe that

16  404(b) is not a bar.  I, as a result, expect to engage in some

17  conversation with you after I excuse the jury for a short

18  recess regarding whether and to what extent any I'll call it

19  propensity implications of this evidence might be cured through

20  an instruction that they're not to accept this evidence as

21  evidence of propensity.  I think that plaintiff has made a

22  reasonable argument that the possibility of sanction or

23  something similar might provide her with a motivation to lie

24  here, and as a result, I think it's reasonable grounds for

25  cross-examination.  I'd expect to limit the extent to which he

J941mcc5                        Bell - Direct

1    can bring in specific evidence regarding the prior actions in

2    order to avoid the trial within a trial.

3            But I think in order to work out a limiting

4    instruction further, I'm going to let the jury go.

5            MR. LICHTMACHER:  Thank you, your Honor.

6            (In open court)

7            THE COURT:  So ladies and gentlemen, I'd like to take

8    a short break, if you don't mind, probably about 10 minutes for

9    this recess.  During this break, as always, please don't

10   discuss the case amongst yourselves, don't communicate about it

11   with anyone else, and don't do any research about the case.

12           See you back here in just a few minutes.  Thank you.

13           (Jury not present)

14           THE COURT:  Thank you.  You can be seated.

15           Good.  So counsel, to follow up on this line of

16   conversation before we step down for a very short recess --

17   very short, let me emphasize that -- the series of questions

18   that counsel has described, with the exception of the extent of

19   the discipline received on each occasion, appears to me to be

20   within reasonable grounds for cross-examination.  I will permit

21   it with respect to the question regarding whether sanctions are

22   available, whether prior sanctions have been imposed, whether

23   she had a motivation as a result to prevaricate here.  Because

24   of the 404(b) concerns, I would have to impose a limiting

25   instruction to the jury with respect to the use of this

1    evidence, and I request that the parties provide me with one.

2    I do not expect to spend much more time beyond that first set

3    of high-level questions, however, but I think that counsel for

4    plaintiff has made a reasonable argument regarding why it is

5    that that's a proper basis for cross-examination, and I

6    hesitate to restrain him, understanding that there are

7    alternative means to deal with the potential prejudice or

8    misuse of this information -- namely, through a limiting

9    instruction -- regarding how it may be read.

10         So counsel, I will happily prepare a short limiting

11   instruction of that sort.  My preference would be that you

12   would prepare one.  But I agree ultimately with plaintiff that

13   some very limited inquiry on this line is appropriate.  But

14   again, it should be very limited as I've just outlined, which

15   is essentially, I'll call it, concurrent with what plaintiff

16   was suggesting with the exception of the statement regarding

17   the consequences of the discipline, unless counsel for

18   defendants would prefer that that information come in.

19         MS. GOYKADOSH:  I have a question, your Honor.

20         THE COURT:  Yes.

21         MS. GOYKADOSH:  So just to be clear, we're not getting

22   into any of the underlying facts.  We're just asking if there

23   are sanctions available, if there were sanctions imposed, and

24   if that somehow created a motivation to lie.  Nothing about any

25   radios, any kicks, any of the facts underlying --

J941mcc5                        Bell - Direct

1             THE COURT:  Correct.  Correct.

2             MS. GOYKADOSH:  Okay.  Thank you, your Honor.

3             MR. LICHTMACHER:  So I may not inquire -- may I be

4      seated, your Honor.

5             THE COURT:  Yes.

6             MR. LICHTMACHER:  Thank you.  I appreciate that.

7             I may not inquire to the amount of time that she

8      missed vacation days and comp time that was taken away, just

9      the fact that vacation days and comp time was taken away,

10     correct?

11            THE COURT:  Thank you.  That's my inclination, barring

12     objection by defendants, simply because I am concerned that the

13     incremental prejudice associated with that additional

14     information may outweigh the probative value of the line of

15     inquiry.  If counsel for defendants takes the position that

16     that information is actually significant or important in order

17     to suggest the scale of the nature of the consequences here,

18     perhaps I'll hear argument from them to that effect now.

19            MS. GOYKADOSH:  No, your Honor.  We agree that that

20     information should not come in.

21            But I just want to ask one more question.  Plaintiff's

22     counsel is not going to be allowed to introduce any documents,

23     right?  It's just these questions.

24            THE COURT:  Correct.

25            MS. GOYKADOSH:  Thank you.

J941mcc5                          Bell - Direct

1          THE COURT:  Yes, I don't expect that he'll be proving

2     this through extrinsic evidence.

3          MR. LICHTMACHER:  Except, your Honor, I want to put

4     the documents in front of the witness, not to the jury, for

5     impeachment purposes, to ask her if it refreshes her

6     recollection.

7          THE COURT:  Thank you.

8          We can address that if recollection needs to be

9     refreshed or if impeachment needs to take place.  Otherwise,

10    there's no need to do so.

11         Let's just take one very short moment to address the

12    issue raised by counsel, I'll call it by implication just

13    now -- namely, whether the plaintiff is unavailable and

14    therefore permitting the use of his deposition at trial.  That

15    I understand to have been the suggestion.  Of course, the

16    witness arguably was available.  He just chose not to come.

17         So counsel for defendants, what's your view regarding

18    that issue, and in particular, what's your view regarding the

19    law regarding availability and the assessment of whether or not

20    a deposition can be used under these circumstances?  Counsel?

21         MS. GOYKADOSH:  Your Honor, I agree with the Court

22    that I don't think he's unavailable.  I know that Rule 32 says

23    that an adverse party can use a deposition for any purpose.  I

24    don't know if the party themselves can.  I just need to read

25    the rule again, if I can have a moment.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J941mcc5                          Bell - Direct

1              THE COURT:  Thank you.  Good.

2         Thank you.

3              So counsel, let me just make sure that you're looking

4    to the right section.  I agree that Rule 32(a)(3) speaks to

5    depositions of a party, which has the adverse party limitation.

6    I understand that counsel for plaintiff would be relying on

7    32(a)(4).

8              MS. GOYKADOSH:  Yes, your Honor.  So he's not

9    available.  I mean, he's not dead.  He's not more than a

10   hundred miles away from this courthouse.  He cannot not intend

11   to testify because of any age, illness, infirmity or

12   imprisonment.  He can testify even though he's imprisoned.  And

13   there's no issue with the subpoena here.  So -- and then the

14   next one --

15             MR. LICHTMACHER:  Your Honor, we don't disagree.  I've

16   been down this road, unfortunately, before.  I want to save the

17   Court some time, because I know you're concerned with wasting

18   time.

19             THE COURT:  Thank you very much, Mr. Lichtmacher.  I

20   understand this is not an issue.

21             MR. LICHTMACHER:  Except --

22             THE COURT:  Yes.

23             MR. LICHTMACHER:  -- if they introduce testimony from

24   his deposition, there is nothing in the rule from precluding me

25   from putting in rebuttal testimony about the same issues from

J941mcc5                          Bell - Direct

1   the same deposition.

2              THE COURT:  Thank you.  Perhaps, or also, you might

3   make an argument regarding the rule of completeness.  I don't

4   know to what extent defendants will wish to put on a case here.

5              Good.  I'm going to step down now briefly.  Let's take

6   a very short break so that we can bring the jury back in

7   promptly.

8              Counsel, please let me know if you'd like to propose a

9   particular instruction.  I will otherwise propose one.  But I

10  prefer to hear from the parties regarding your proposal.  If

11  you can develop that within the next short window of time, I

12  would appreciate it.

13             MS. GOYKADOSH:  We will do so.

14             THE COURT:  I'm stepping down now.  Thank you.

15             MS. GOYKADOSH:  Thank you, your Honor.

16             (Recess)

17

18

19

20

21

22

23

24

25

J94Qmcc6

1           (Jury not present)

2           THE COURT:  Counsel, are you ready to proceed?  If so,

3   Ms. Nelson, would you please bring in the jury.

4           Captain Bell, please come forward.

5           MR. SIDDIQI:  Your Honor, are we taking up that

6   language now or later?

7           THE COURT:  Oh, please, tell me what you propose.

8           MR. SIDDIQI:  We agree on the first sentence, so I'll

9   read that first.

10          THE COURT:  You can hand it forward.  I'd appreciate

11  that.

12          MR. SIDDIQI:  My handwriting is probably not legible.

13          THE COURT:  That's fine.  Please feel free to read it.

14          MR. SIDDIQI:  "I am about to allow plaintiff to

15  introduce evidence regarding prior acts of defendant Bell.  I

16  am instructing you that you are not to draw any conclusion from

17  this evidence that because defendant Bell engaged in certain

18  conduct in the past that this predisposed her to engage in the

19  same conduct later."

20          THE COURT:  Thank you.  I understand the parties

21  agreed on the first sentence there?

22          MR. SIDDIQI:  The first -- I'm sorry, these two

23  sentences are agreed on.

24          THE COURT:  Thank you very much.

25          MR. SIDDIQI:  The sentence I am about to read is not

J94Qmcc6

1   agreed on.

2            THE COURT:  Thank you.

3            MR. SIDDIQI:  "I further instruct you not to use this

4   evidence in coming to any judgment regarding defendant Bell's

5   character."

6            THE COURT:  Thank you.  You can hand it forward.

7            MR. LICHTMACHER:  For the record, your Honor, we do

8   object to that last sentence because the motive to lie implies

9   lying, and lying does go to character.

10           (Pause)

11           THE COURT:  Thank you.  So the parties' proposed

12   instruction says nothing about the use for which the

13   prospective jurors may use the evidence.

14           Counsel for plaintiff, I understand you intend to

15   introduce it for the purpose of showing defendant Bell's

16   circumstances that may be relevant to defendant Bell's

17   credibility?

18           MR. LICHTMACHER:  Yes.  And that, as I said all along,

19   not to be redundant, she had a motive to lie, and take herself

20   out of the situation.  And I will go into that on my

21   cross-examination.

22           Your Honor, I left tabs in the medical records.  They

23   can be pulled out.  I'm sorry that would be inappropriate to

24   show the jury.  It's just Post-Its.

25           THE COURT:  Thank you.  We will have those removed.

J94Qmcc6

1            So I propose to modify your proposed instruction as

2      follows:  It would read as follows:  "The evidence you have

3      heard regarding other disciplinary actions against Captain

4      Bell" -- actually, I will say "regarding disciplinary actions

5      regarding Captain Bell," pardon me.

6            It would read as follows:  "The evidence you've heard

7      regarding prior disciplinary actions against Captain Bell was

8      offered for a limited purpose only.  Specifically, it was

9      offered as proof of circumstances that may be relevant to an

10     evaluation of defendant Bell's credibility and motivation to

11     lie regarding the incident.  It can be used by you to evaluate

12     the defendant's motivation to lie; that is, whether she had a

13     motivation to provide incorrect statements regarding her

14     involvement in the incident at issue.

15            "However, defendant Bell is not on trial for

16     committing or being involved in these other matters.  You may

17     not consider the evidence of these other matters as substitute

18     for proof that defendant Bell committed the acts or omissions

19     alleged in this case.  You may not consider this evidence as

20     proof that defendant Bell has a bad character or any propensity

21     to commit the acts alleged here, nor may you used this evidence

22     to conclude that because defendant Bell was accused of some

23     other act or may have been involved in some other matter or

24     disciplinary proceeding that she must also have committed the

25     acts alleged in this case.  You may only use this evidence, if

J94Qmcc6

1      at all, for the specific purpose I've instructed you here."

2              Counsel?

3              MR. LICHTMACHER:  That's fine with the plaintiff, your

4      Honor.

5              THE COURT:  Counsel for defendants?

6              MR. SIDDIQI:  That's fine with us, your Honor.

7              THE COURT:  Good.  Thank you.

8              MR. SIDDIQI:  And, your Honor, I apologize for taking

9      up more time.  Plaintiff's counsel and I were speaking before,

10     and I think I'm unclear as to the leeway the Court is

11     providing.  Is plaintiff allowed to inquire only as to the fact

12     of previous discipline or also ask about the category of that

13     discipline?  In other words, was it a force discipline?  Was it

14     a failure to supervise discipline?

15             THE COURT:  Thank you.  I'm allowing what, again I'll

16     use a term that may be relatively imprecise, so I apologize,

17     him to inquire regarding what I'll call pedigree; namely,

18     excessive force, failure to supervise, because they're germane

19     to the issue here.

20             MR. LICHTMACHER:  So I can inquire?

21             THE COURT:  You may.

22             MR. SIDDIQI:  Thank you for the clarification, your

23     Honor.

24             THE COURT:  But without specific detail regarding the

25     underlying facts.

J94Qmcc6

```
1         MR. LICHTMACHER:  I shouldn't have missed this, but
2    are you giving the instruction before or after?
3         THE COURT:  Thank you.  I will provide it both in
4    closing instructions, and I will provide a present tense
5    version of it as you are about to introduce the evidence.  So
6    you should alert me that it's time for the limiting
7    instruction.
8         MR. LICHTMACHER:  It's time.
9         THE COURT:  Fine.  Thank you.
10         MR. LICHTMACHER:  There will be a couple of foundation
11    questions.
12         THE COURT:  Fine.
13         MR. LICHTMACHER:  And then it will be in, so I will
14    alert you right after those.
15         THE COURT:  Good.  Thank you very much.
16         Ms. Nelson, would you please bring in the jury.
17         (Continued on next page)
18
19
20
21
22
23
24
25
```

J94Qmcc6

1          (Jury present)

2          THE COURT:  Thank you.  You can be seated.

3          Counsel for plaintiff, you can proceed.

4    BY MR. LICHTMACHER:

5    Q.  Isn't it true, Captain, that captains can be disciplined

6    for using excessive force?

7    A.  Yes.

8    Q.  Isn't it also true, Captain, that captains can be

9    disciplined for failure to supervise properly the use of

10   excessive force?

11   A.  Yes.

12   Q.  And these disciplines can involve serious repercussions to

13   a captain's career.  Is that correct?

14          MS. GOYKADOSH:  Objection.

15          THE COURT:  Thank you.

16          You can answer the question.

17   A.  Yes.

18   Q.  And, in fact, the repercussions can get quite serious if

19   the captain was found to have used excessive force or failed to

20   supervise on numerous occasions, correct?

21   A.  Yes.

22          MR. LICHTMACHER:  Your Honor, at this point limiting

23   instruction.

24          THE COURT:  Thank you.

25          So, ladies and gentlemen, you are about to hear

J94Qmcc6

1    evidence regarding prior disciplinary actions against Captain

2    Bell.  This evidence will be introduced for a limited purpose

3    only.  Specifically, it will be offered as proof of

4    circumstances that may be relevant to an evaluation of

5    defendant Bell's credibility and motivation to lie regarding

6    the incident.  It can be used by you to evaluate defendant

7    Bell's motivation to lie; that is, whether she has a motivation

8    to and had a motivation to provide incorrect statements

9    regarding her involvement in the incident at issue.

10           However, defendant Bell is not on trial for committing

11   or being involved in these other matters.  You may not consider

12   the evidence of these other matters as substitute for proof

13   that defendant Bell committed the acts or omissions alleged in

14   this case.  You may not consider this evidence as proof that

15   defendant Bell has a bad character or any propensity to commit

16   the acts alleged here, and nor may you use this evidence to

17   conclude that because defendant Bell was accused of some other

18   act or may have been involved in a prior disciplinary

19   proceeding that she must also have committed the acts alleged

20   in this case.  You may use this evidence, if at all, for the

21   specific purpose I have instructed you here.

22           Counsel for plaintiff, you can proceed.

23           MR. LICHTMACHER:  Yes, sir.

24   BY MR. LICHTMACHER:

25   Q.  Now, you've been disciplined for using excessive force on

J94Qmcc6

1    more than one occasion, haven't you, Captain?

2    A.  Yes.

3    Q.  In fact, you were disciplined for the use of excessive

4    force for an incident that transpired on January 7, 2011,

5    correct?

6    A.  Yes.

7    Q.  And you were disciplined for another use of excessive force

8    on January 16, 2013, correct?

9    A.  Yes.

10   Q.  And you were disciplined again on May 15, 2013 for failure

11   to supervise the use of excessive force, weren't you?

12   A.  The charge was failure to supervise.

13   Q.  Yes.  The charge was use of force failure to supervise.

14   Would you like to see the document?

15   A.  It was failure to supervise.

16           MR. LICHTMACHER:  May I approach the witness?

17           THE COURT:  Thank you.  Yes you may.

18   BY MR. LICHTMACHER:

19   Q.  Now, first of all, is there anything that would refresh

20   your recollection?

21   A.  I know what the charges are.  They were failure to

22   supervise.  It was failure to supervise.

23   Q.  Well, with looking at your employee performance service

24   report, your history of discipline, would that assist you in

25   determining what the charges were that you were found guilty

J94Qmcc6

1    of?

2    A.  No.

3    Q.  It would not.  OK.

4         MR. LICHTMACHER:  Your Honor, under these

5    circumstances, I ask to enter the document Plaintiff's 3.

6         MS. GOYKADOSH:  Objection, your Honor.

7         THE COURT:  Thank you.  Counsel, can you please show

8    the witness the document and ask her whether it refreshes her

9    recollection.

10        MR. LICHTMACHER:  Sure.  I'm approaching the witness

11   and handing her the document that's been marked as plaintiff's

12   3.  The bottom right there, Captain Bell.

13        THE COURT:  Thank you.  Thank you, counsel.  You can

14   inquire.

15   Q.  Has looking at this document refreshed your recollection as

16   to what appears on your disciplinary history?

17   A.  Yes.

18   Q.  And, in fact, you were disciplined on that occasion for

19   failure to supervise use of force, correct?

20   A.  I was charged with failure to supervise the use of --

21        THE COURT:  I'm sorry.  I'm sorry.  Let me just ask

22   the witness, would you please listen to the question and

23   respond to it?

24   Q.  In fact, you were disciplined on that occasion for failure

25   to supervise the use of force, correct?

J94Qmcc6

```
 1   A.  Yes.

 2   Q.  OK.  Now, Captain Bell, isn't it true that you have a

 3   motive to lie about this incident because you're afraid of

 4   future discipline?

 5   A.  That's a negative.  No.

 6   Q.  And isn't it true that the discipline can escalate if

 7   you're found to repeatedly use excessive force?

 8   A.  If I was involved in another use of force, yes.

 9   Q.  And, in fact, if you're involved in another failure to

10   supervise use of force, the discipline could escalate, correct?

11   A.  Each discipline is different.

12   Q.  Well, isn't it true that a series of incidents puts you in

13   greater danger in terms of the possible disciplinary action

14   that can be taken against you?

15   A.  It can be.

16             MS. GOYKADOSH:  Objection.

17             THE COURT:  Thank you.  I accept the answer.

18   Q.  OK.  So asking you one last time, Captain, didn't you have

19   a motive to say that you weren't involved in issues of force

20   because you had had all those incidents in a relatively short

21   time before this?

22   A.  That's a negative.  I was never involved in issues of

23   force.

24   Q.  And you have no idea why initially Corrections Officer

25   Mitchell places you on the scene at the use of force as he was
```

J94Qmcc6                        Bell - Cross

1    shown to have said in his deposition?

2            MS. GOYKADOSH:  Objection.

3            THE COURT:  Thank you.

4            You can answer the question.

5    A.  I was not involved in issues of force, sir.

6    Q.  You have no idea why Corrections Officer Mitchell had

7    testified at his deposition that you were present for the use

8    of force?  Could you please answer my question?

9            MS. GOYKADOSH:  Objection.

10           THE COURT:  Thank you.  Sustained.

11           MR. LICHTMACHER:  No more questions, your Honor.

12           THE COURT:  Thank you.

13           Counsel for defendants.

14   CROSS-EXAMINATION

15           MS. GOYKADOSH:  May I inquire, your Honor?

16           THE COURT:  You may.

17   Q.  Good afternoon, Captain Bell.

18   A.  Good afternoon.

19   Q.  Are you currently employed?

20   A.  I am.

21   Q.  By whom are you employed?

22   A.  The New York City Department of Corrections.

23   Q.  And how long have you been a member of the department of

24   corrections?

25   A.  20 years.

J94Qmcc6                        Bell - Cross

1   Q.  Where are you presently assigned?

2   A.  The emergency service unit.

3   Q.  What's your assignment at the emergency services unit?

4   A.  I'm the admin captain.

5   Q.  Can you tell the jury what some of your duties and

6   responsibilities as the admin captain at the emergency services

7   unit are?

8              MR. LICHTMACHER:  Objection, your Honor.  Relevance.

9              THE COURT:  Thank you.

10             You can answer the question.

11  A.  I'm in charge of the officers' assignments, making sure the

12  officers are where they are, their schedules.

13  Q.  And was your rank captain on February 19, 2015?

14  A.  It was.

15  Q.  You were working that day?

16  A.  I was.

17  Q.  What tour were you scheduled to work?

18  A.  7:00 to 3:00.

19  Q.  Were you wearing a uniform on February 19, 2015?

20  A.  I was.

21  Q.  Can you tell the jury, please, what your uniform consisted

22  of?

23  A.  My uniform -- my shirt is white, my pants are blue, my

24  boots are black, and I have a duty belt.

25  Q.  What equipment was on your duty belt?

J94Qmcc6                     Bell - Cross

1   A.  My handcuff case, I have chemical agents, I have a radio

2   holder, and I have a glove pouch.

3   Q.  Do you have any deadly weapons?

4   A.  No.

5   Q.  Why not?

6   A.  We're not allowed to carry deadly weapons inside of the

7   facilities.

8   Q.  Why?

9   A.  Because inmates could take it away and use it against us or

10   each other.

11   Q.  Could you please explain to the jury what some of your

12   duties as a captain on February 19, 2015 were.

13   A.  On that day, I was the security captain of AMKC.

14   Q.  And what does a security captain do?

15   A.  So the security captain is in charge of the SRGs in the

16   building.  We are in charge of the security of that facility.

17   So we need to know where all the gangs are, all the SRG, all

18   the -- basically we need to know what's going on in the

19   facilities.

20   Q.  Can you please tell the jury what the words SRG stand for?

21   A.  Security risk group.

22   Q.  What's a security risk group?

23   A.  They're the gangs.

24   Q.  And how big is AMKC?

25   A.  AMKC can hold up to 2,000 inmates.

J94Qmcc6                        Bell - Cross

1    Q.  Were you working in a specific area in AMKC on February 19,

2    2015?

3    A.  I was.

4    Q.  Which area was that?

5    A.  Quad level 14.

6    Q.  What is quad level 14?

7    A.  Quad level 14 is a housing area that Blood inmates live.

8    Q.  How many inmates live in that housing area?

9    A.  31.

10   Q.  Was Chance McCurdy one of those inmates?

11   A.  He was.

12   Q.  Is there a reason why he was housed in that housing area?

13   A.  Yes.

14   Q.  Why is that?

15   A.  Because he's a Blood member, and he can't live in any other

16   housing area.  He has to live in a housing area where Bloods

17   are.

18   Q.  What are the Bloods?

19   A.  The Bloods is a violent street gang.

20   Q.  What does it mean to be a member of the Bloods?

21            MR. LICHTMACHER:  Objection, your Honor.

22            THE COURT:  Thank you.

23            Can you please rephrase the question, Counsel?

24   BY MS. GOYKADOSH:

25   Q.  If someone is a member of the Bloods, what does that mean?

J94Qmcc6                         Bell - Cross

1   A.  It means that you're a part of a gang.

2   Q.  And did you know that plaintiff was a member of the Bloods?

3   A.  I did.

4   Q.  How did you know that?

5   A.  He is assessed in our database as a Blood.

6   Q.  Why did specifically know that he is a member of the

7   Bloods?

8   A.  Because I'm the security captain.

9   Q.  Do you also know what plaintiff was convicted of?

10  A.  Yes.

11  Q.  What is that?

12  A.  Rape.

13  Q.  And how did you know that's what plaintiff was convicted

14  of?

15  A.  It's in our database.

16  Q.  In your experience, is someone who is a sex offender

17  treated differently by the other inmates?

18              MR. LICHTMACHER:  Objection, your Honor.

19              THE COURT:  Thank you.  Sustained.

20              Counsel, can you rephrase?

21  BY MS. GOYKADOSH:

22  Q.  Is someone who is a sex offender a person who you would

23  rely upon in a jail setting?

24  A.  Never.

25              MR. LICHTMACHER:  Objection, your Honor.

J94Qmcc6                        Bell – Cross

1              THE COURT:  Thank you.

2              Counsel, can you rephrase, please?

3    Q.  Is an inmate who's a sex offender someone who would command

4    respect from other inmates based on your understanding?

5              MR. LICHTMACHER:  Objection, your Honor.

6              THE COURT:  Counsel, can I just see you briefly?

7              MS. GOYKADOSH:  Yes.

8              (Continued on next page)

J94Qmcc6                        Bell - Cross

 1            (At the side bar)

 2            THE COURT:  Thank you.

 3            So just a few comments before I hear more from

 4       counsel.  I understand that the questions that you have go to

 5       rebut what you had anticipated would be the plaintiff's

 6       narrative here and therefore your outline for questions to ask

 7       this witness.

 8            At this point it's not clear to me that plaintiff will

 9       ever testify in a way that was anticipated.  So I invited the

10       parties up to talk about this line of questioning in the event

11       that plaintiff McCurdy does not ultimately testify.  So that is

12       the basic question.

13            Counsel for plaintiff, what was the basis for your --

14       that's the basis for my question.

15            Counsel for plaintiff, what was the basis for your

16       objection?

17            MR. LICHTMACHER:  Well, the objections that I've been

18       making really they go to things that, first of all, may be

19       outside of her scope.  Partly, they're asking for hearsay to

20       reach into other people's minds, what they think of him, if

21       they would respect him.  You know, even though she said, you

22       know, in your experience what have you found, it relies on

23       hearsay to do it.

24            The other thing is it is character impeachment.

25       Without him being here, and it seemed like a cross-examination

1    on things that he was expected to testify about, which he's not

2    here to testify about as you stated a minute ago, so...

3            THE COURT:  Thank you.

4            Counsel for defendants, let me just comment on the

5    specific objections raised.  I don't understand you to be

6    eliciting a hearsay.  At least that's not the import of it.

7    Instead, you're asking for a statement regarding her

8    understanding of the circumstances that have informed her

9    behavior at the time.  You're not soliciting information about

10   the fact of the matter.  To the extent that that's the issue

11   raised by counsel for plaintiff, you may be able to rephrase

12   the questions accordingly.

13           I have the other question, which is basically whether

14   this is a narrative that adds much for the jury's perspective

15   if the counter-narrative never comes in which appears to be

16   the, unfortunately, probable outcome at this stage.  So that's

17   my basic question.  Is this something that we need to explore

18   in depth beyond what's already come out?

19           Counsel, what's your view?

20           MS. GOYKADOSH:  I understand the Court's concern, and

21   I share the same view that we should be efficient, and I do not

22   believe that if Mr. McCurdy is not testifying there is a strong

23   need to go here, go down this road.  However, we do reserve our

24   right, if by some chance Mr. McCurdy does show up, to ask these

25   questions for rebuttal at that point.  So that's our view.

J94Qmcc6                        Bell - Cross

1                THE COURT:  Absolutely.

2                MS. GOYKADOSH:  Thank you, your Honor.

3                MR. LICHTMACHER:  And I couldn't object to that.

4                THE COURT:  Good.

5                MS. GOYKADOSH:  Thank you, your Honor.

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J94Qmcc6                        Bell - Cross

 1              (In open court)

 2              MS. GOYKADOSH:  May I proceed, your Honor?

 3              THE COURT:  Thank you.  Yes, proceed.

 4              MS. GOYKADOSH:  Thank you, your Honor.

 5    BY MS. GOYKADOSH:

 6    Q.  Did there come a point on February 19, 2015 when an

 7    institutional search was being conducted?

 8    A.  Yes.

 9    Q.  At approximately -- do you know why an institutional search

10    was being conducted?

11    A.  There was a slashing in the facility.

12    Q.  Do you know what weapon was used in the slashing?

13    A.  Scalpel.

14    Q.  Why is it important to conduct a search after a slashing?

15    A.  Because we need to recover the weapon, we need to find out

16    what the situation is, and we need to secure the inmates that

17    are involved.

18    Q.  Can you please explain to the jury what happens during an

19    institutional search?

20    A.  Institutional search, the officers are briefed before we go

21    into the housing area.  We let them know why we're going into

22    the housing area.  Once we enter the housing area, the male

23    inmates -- I'm sorry -- the male officers strip-search the male

24    inmates.  And the female officers and captains conduct searches

25    of the common areas.

J94Qmcc6                        Bell - Cross

1    Q.  Would a female captain be present if a male inmate is being

2    strip-searched?

3              MR. LICHTMACHER:  Objection.

4              THE COURT:  Thank you.

5              Can you please rephrase the question?

6    Q.  Are there any female captains present when a male inmate is

7    being strip-searched?

8              MR. LICHTMACHER:  Objection.  Same objection.

9              THE COURT:  You can answer the question.

10   A.  No, ma'am.

11   Q.  On February 19, 2015, did you hear anything when the

12   institutional search was being conducted?

13   A.  Yes, I heard a commotion coming from the back of the tier.

14   Q.  Can you describe to the jury what you mean by commotion?

15   A.  I heard the officers saying "stop resisting, stop

16   resisting."

17   Q.  And where were you when you heard the commotion?

18   A.  I was in the front of the tier.

19   Q.  Are you familiar with the tier?

20   A.  I am.

21   Q.  How familiar are you with the tier?

22   A.  Very familiar.

23              MS. GOYKADOSH:  At this point I would like to show the

24   witness only a photo of the tier.

25   Q.  Captain Bell, do you see what's on the screen in front of

J94Qmcc6                          Bell - Cross

1   you?

2   A.  I do.

3   Q.  Is this photo a fair and accurate representation of the

4   tier in the housing area?

5   A.  Yes.

6           MS. GOYKADOSH:  Your Honor, at this point, I would

7   like to show this photo to the jury for demonstrative purposes.

8           THE COURT:  Thank you.

9           Counsel?

10          MR. LICHTMACHER:  No objection.

11          THE COURT:  Thank you.  What's the exhibit reference,

12  Counsel.

13          MS. GOYKADOSH:  It's Exhibit C, your Honor.

14          THE COURT:  Thank you.  Please proceed.

15  Q.  Captain Bell, do you see this photo?

16  A.  I do.

17  Q.  Where was plaintiff's cell?

18  A.  Back here somewhere.

19  Q.  So you --

20  A.  In this area.

21  Q.  So you drew a circle a little bit past the 14.  Is that

22  right?

23  A.  Yes.

24          MS. GOYKADOSH:  Thank you.

25          At this point your Honor, I'd like to show the witness

J94Qmcc6                          Bell - Cross

1    another exhibit, please.

2                 THE COURT:  Thank you.

3    Q.  Captain Bell, do you see what's on the screen in front of

4    you?

5    A.  I do.

6    Q.  And what is this?

7    A.  This is the B gate.

8    Q.  Are you familiar with the area depicted in this photo?

9    A.  I am.

10   Q.  Is this photo a fair and accurate representation of the B

11   gate as you describe it?

12   A.  Yes.

13                MS. GOYKADOSH:  Your Honor, at this point I would like

14   to show this exhibit, which is Defendant's Exhibit E, to the

15   jury for demonstrative purposes.

16                MR. LICHTMACHER:  No objection.

17                THE COURT:  Thank you.  Please proceed.

18   Q.  Captain Bell, can you please point out to the jury where on

19   this photo you were on February 19, 2015?

20   A.  (Indicating)

21   Q.  So is that close by to the post?

22   A.  Yes.

23   Q.  And was plaintiff -- where was plaintiff's cell in relation

24   to that?

25   A.  (Indicating)

J94Qmcc6                        Bell - Cross

1    Q.  How far of a distance would you describe that to be?

2    A.  It would be from, again, here to that black chair

3    (indicating).

4    Q.  That's what you previously described from the witness stand

5    to the chair in the back of the well?

6    A.  Yes, ma'am.

7    Q.  Thank you.  What are the lighting conditions inside of the

8    tier?

9    A.  They're not very good.  They're horrible.

10   Q.  Are they similar to what's depicted in this photograph?

11   A.  Yes.

12   Q.  Thank you.  Why were you in the front of the tier?

13   A.  Because the male inmates were getting strip-searched.

14   Q.  Was there any other reason why you were in the front of the

15   tier?

16   A.  I had to supervise the female officers that was searching

17   the common areas.

18   Q.  When you heard this commotion, what did you do?

19   A.  I told -- I yelled to the officers, "secure your inmates.

20   Secure your inmates."

21   Q.  What does it mean to secure an inmate?

22   A.  It means that you either have to put the inmate back into

23   his cell or you have to get them away from the situation that's

24   going on.

25   Q.  Why is that important to do?

J94Qmcc6                    Bell - Cross

1    A.  Because you don't want them to get involved in what's going

2    on and potentially get hurt.

3    Q.  Did you do anything else?

4    A.  Once I told the other officers to secure the inmates, I

5    observed Officer Emmanuel walking towards me.

6    Q.  How long after you heard the commotion did you observe

7    Officer Emmanuel walking towards you?

8    A.  Seconds.

9    Q.  Was Officer Emmanuel with anyone?

10   A.  Yes.

11   Q.  Who was he with?

12   A.  He had inmate McCurdy.

13   Q.  And what did you do when you saw Officer Emmanuel with

14   Mr. McCurdy?

15   A.  I instructed Officers Barr and Roberts to -- I told

16   Emmanuel to relinquish the inmate to those two officers.

17   Q.  And why did you do that?

18   A.  Because Emmanuel was involved in the use of force, and he's

19   not allowed to interact with him now.

20   Q.  And what did you tell the two officers that plaintiff was

21   handed off to?

22   A.  "Take him to the intake."

23   Q.  Why did you instruct them to take him to the intake?

24   A.  All inmates who are involved in any type of incident, use

25   of force or otherwise, are taken to the intake so they can get

J94Qmcc6                        Bell - Cross

1   medical attention from there.

2   Q.  Did you at any point notice other inmates resisting the

3   search?

4   A.  No.

5   Q.  Did you notice any other inmates fighting with corrections

6   officers?

7   A.  No.

8   Q.  At any point, did you direct Officer Mitchell to punch

9   plaintiff?

10  A.  No.

11  Q.  At any point, did you direct Officer Mitchell to kick

12  plaintiff?

13  A.  No.

14  Q.  At any point, did you direct Officer Mitchell to stomp on

15  plaintiff?

16  A.  No.

17  Q.  Did you ever see Officer Mitchell kick plaintiff?

18  A.  I wasn't in the area, no.

19  Q.  Did you ever see him punch plaintiff?

20  A.  No.

21  Q.  Did you have any interaction with plaintiff on February 19,

22  2015?

23  A.  No.

24        MS. GOYKADOSH:  Your Honor, may I have a moment to

25  confer with my co-counsel, please?

J94Qmcc6                        Bell - Cross

1              THE COURT:  Yes, please take your time, counsel.

2              (Pause)

3              MS. GOYKADOSH:  Two very brief questions, your Honor,

4      if I may.

5              THE COURT:  That's fine.  Please proceed.

6              MS. GOYKADOSH:  Thank you.

7      BY MS. GOYKADOSH:

8      Q.  Why were the female corrections officers searching the

9      common areas?

10     A.  Because they're not allowed to be present when male inmates

11     are being strip-searched.

12     Q.  Was there any other reason why they were searching the

13     common areas?

14     A.  We were looking for a weapon because there was a slashing,

15     so we had to search.

16     Q.  Thank you.  And plaintiff's counsel suggested that you

17     might have some relationship with plaintiff.  Would you ever

18     have a relationship with the plaintiff in this case?

19             MR. LICHTMACHER:  Objection to "would."

20             THE COURT:  Thank you.

21             Counsel, can you please rephrase the question?

22     Q.  Did you ever have a relationship with the plaintiff?

23     A.  No, ma'am.

24             MS. GOYKADOSH:  Thank you.

25             Your Honor, I have no further questions, but I do

J94Qmcc6                    Bell - Redirect

1    reserve the right to call this witness for rebuttal if

2    necessary.

3              THE COURT:  Thank you.

4              Counsel for plaintiff, any further questions for this

5    witness?

6              MR. LICHTMACHER:  Yes.  Just a few.

7    REDIRECT EXAMINATION

8    BY MR. LICHTMACHER:

9    Q.  So, let me understand this, you saw McCurdy directly after

10   the incident?

11   A.  I saw the inmate walking down the tier, yes.

12   Q.  OK.  Which view did you see of him?

13   A.  I didn't hear you.

14   Q.  Well, how did you know it was McCurdy?

15   A.  I know who the inmate is.

16   Q.  OK.  So you saw him.  You saw his face?

17   A.  I saw the inmate walking towards me, yes.

18   Q.  Walking towards you.  I'm going to hand this witness one,

19   two, three, four exhibits marked for identification as 11

20   through 14 not yet in evidence, your Honor.

21             Please take a moment and look at these four Exhibits

22   11, 12, 13 and 14.  Do you know the people in those exhibits?

23   A.  I know some of the officers, yes.

24   Q.  And which officers -- not yet.  In which exhibit do you

25   know an officer?

J94Qmcc6                          Bell - Redirect

1   A.  All of them.

2   Q.  All of them.  And which officers do you know?

3   A.  Roberts and Barr.

4   Q.  And do you know who the inmate is?  I take it that's an

5   inmate with them, correct?

6   A.  Yes.

7   Q.  What inmate is that?

8   A.  McCurdy.

9   Q.  Is that the way he looked when you saw him?

10  A.  I didn't see him this way.

11  Q.  Well, you said he was walking towards you, correct?

12  A.  I saw him walking down the tier, yes.

13  Q.  You said you saw him walking towards you, correct?

14  A.  I saw him walking down the tier, yes.

15  Q.  Did you or did you not just testify under oath that you saw

16  him walking towards you?  If you'd like, we can have a

17  read-back.

18          MS. GOYKADOSH:  Objection.

19          THE COURT:  Thank you.  Can you just rephrase the

20  question, please, Counsel?

21  Q.  Sure.  You testified a few moments ago that you saw him

22  walking towards you, correct?

23  A.  Officer Emmanuel, he was walking down the tier, yes.

24  Q.  I'm sorry.  I didn't hear what you said.

25  A.  He was walking down the tier with Officer Emmanuel after

1   the incident, yes.

2   Q.  Toward you, correct?

3   A.  Yes.

4   Q.  So you got to see what he looked like at that point,

5   correct?

6   A.  I saw him walking down the tier.  I did not see him like

7   this.

8   Q.  When you say you didn't see him like this, what do you

9   mean?

10          MS. GOYKADOSH:  Objection.

11          THE COURT:  I'm sorry.  Counsel, can you please

12   rephrase the question?

13          MR. LICHTMACHER:  Sure.

14   Q.  What do you mean by you didn't "see him like this"?

15          MS. GOYKADOSH:  Objection.

16          THE COURT:  I'm sorry.  Can you please rephrase the

17   question.  I understand the question relates to the documents

18   in front of the witness.

19          MR. LICHTMACHER:  Sure.

20   Q.  You saw him, according to you, walking towards you, and you

21   knew the officers with him and you knew it was him.  Is that

22   all correct?

23   A.  Yes.

24   Q.  And in all those documents, did you know -- did they look

25   like him to you?

1          MS. GOYKADOSH:  Objection.

2          THE COURT:  Thank you.

3          Can you please rephrase the question?

4          MR. LICHTMACHER:  Sure.

5     Q.  Is it true that Mr. McCurdy is in all four of those

6     documents?

7     A.  Yes.

8     Q.  Is it also true -- well, you just testified a few moments

9     ago that you know officers in all of those documents, correct?

10    A.  Yes.

11    Q.  And you saw him -- how long after you heard the commotion

12    did you see him walking towards you?

13    A.  It was seconds after the commotion.

14          MR. LICHTMACHER:  Your Honor, I move these into

15    evidence.  This is Plaintiff's 11, 12, 13 and 14.  And if you

16    need a sidebar, I'd love to have one.

17          MS. GOYKADOSH:  Objection, your Honor.

18          THE COURT:  I'd be happy to discuss with counsel at

19    sidebar if you'd like.  Please come forward.

20          (Continued on next page)

21

22

23

24

25

J94Qmcc6                        Bell - Redirect

1              (At the side bar)

2              THE COURT:  Thank you.  Go ahead.  There's an

3     objection, counsel?

4              MS. GOYKADOSH:  I believe for the same reasons why

5     these photos could not be admitted through Corrections Officer

6     Mitchell, they cannot be admitted through Captain Bell as well.

7     She's testified that she did not see him like that.  This is --

8     as Corrections Officer Mitchell testified, this hallway is not

9     the same tier where she was at.  There's absolutely no

10    testimony that he was walking towards her just like that, the

11    same way it's depicted in the photos.  She did testify that he

12    was walking towards her, but she did not say anything about him

13    looking like that.  In fact, she actually said the opposite of

14    that, so...

15             THE COURT:  Thank you.

16             So, Counsel, just to be clear, my recollection of the

17    testimony is that the witness has testified that she did not

18    see the plaintiff like that.  We heard from the testimony of

19    Officer Mitchell previously that that is not the hallway in the

20    tier, it does not appear to be the hallway in the tier, and the

21    witness has testified that he saw her -- sorry -- that she saw

22    him walking toward her in the hallway in the tier.

23             MR. LICHTMACHER:  Seconds -- I didn't mean to cut you

24    off, but seconds after the incident.

25             THE COURT:  Thank you.

1          Can I have a proffer of this?  Is this a picture of

2     the hallway and the tier?

3          MR. LICHTMACHER:  Well, this is what it's purported to

4     be.

5          MS. GOYKADOSH:  Your Honor, if I --

6          THE COURT:  She said she knows the officers who were

7     escorting him.

8          MS. GOYKADOSH:  Just to make things a little quicker.

9     Just my own limited experience with DOC, this is not the tier.

10    The tier is a separate hallway just for the housing area.  This

11    is a hallway outside of the tier, so it's not the same place.

12         THE COURT:  Thank you.  It's apparent that that is not

13    the same hallway she testified about seeing.  There are no

14    cells, and the illumination is substantially different.

15         MR. LICHTMACHER:  The same person and the same people

16    with him, your Honor, and she saw him seconds after the

17    incident, and I doubt they would have taken him -- and look at

18    the time 2:39:20.  The incident is alleged to have gone down at

19    approximately 2:30.  This is directly after the incident, she

20    saw him walking towards him.  I think she's already

21    authenticated this.

22         THE COURT:  Thank you.  I'm sustaining the objection.

23    The testimony is that she saw him walking towards her in a

24    hallway that is not the hallway depicted in these images.  The

25    fact that she -- she also testified that she did not see him

like this, referring to the way in which he is represented in

the photos.  As a result, I don't believe that she can lay an

adequate foundation for the introduction of these exhibits, and

so the objection is sustained.

MS. GOYKADOSH:  Thank you, your Honor.

MR. LICHTMACHER:  I would like to try a little more to

lay a foundation that will please the Court, your Honor, and I

think I can.

THE COURT:  Thank you.  If you'd like, you should feel

free.  I would like to ask for a proffer because at this point

we've heard objective testimony by the witness that she did not

see him like that.

MS. GOYKADOSH:  Yeah, well, that's kind of impeachable

because how he did he get like that probably seconds after she

alleges she saw him?  With the huge knot on his head and he

looks terrible.  Let me ask how far down the hallway -- how far

it was from the original incident?  How far that is from the

clinic?  Does she know this particular hallway?  Do officers

just, you know, dally with prisoners after they're -- when

they're on their way to the clinic or do they bring them

directly there?  If I ask it that way, that might be an

adequate foundation, your Honor.

THE COURT:  Thank you.  I don't mind if you ask

questions about the mobility of the defendant following the

incident, but she's already testified she hasn't seen these

1   images or she did not see him like that after the incident.

2   Further inquiry regarding these pictures from her therefore

3   seems to be a waste of time.

4           MR. LICHTMACHER:  If I may, your Honor, under the

5   criteria that you just laid out, any defendant who beats the

6   heck out of somebody can see a picture with a bloody face --

7   and I'm not trying to trump the Court, I mean that, but any

8   defendant who sees a defendant's picture with a bloody face and

9   says, "Gee, I didn't see him like that," can't commit.  So let

10  me try to connect it temporally, connect it in terms of

11  distance and what the officers' obligations were afterward and

12  where they were going, and then possibly there will be enough

13  to connect it into evidence.

14          MS. GOYKADOSH:  Your Honor, we would object to this

15  potential line of questioning under Rule 403.  I believe it

16  wastes the jury's time.

17          MR. LICHTMACHER:  I haven't wasted much of the jury's

18  time, your Honor.  In fairness, I'm trying to be to the point.

19          THE COURT:  Thank you.  I will allow a few more

20  questions.

21          Counsel, at this point I don't see how this is going

22  to be rehabilitated.  Fundamentally, I understand the basic

23  concern.  However, that's easily solved by work by counsel to

24  ensure that the witness is capable of authenticating the

25  relevant documents here.  We have a particular issue why

J94Qmcc6                    Bell - Redirect

1    plaintiff has made himself unavailable, but there are other

2    vehicles to authenticate exhibits.

3            MR. LICHTMACHER:  All right.

4            THE COURT:  Good.  So let's proceed.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J94Qmcc6                          Bell - Redirect

1              (In open court)

2     BY MR. LICHTMACHER:

3     Q.  So when Mr. McCurdy was walking towards you, did you see

4     any injuries on him?

5     A.  No, sir.  The situation was chaotic.

6     Q.  Well, that's not what I asked you.  He was walking towards

7     you.  You were able to see his face, I presume, when he was

8     walking towards you, correct?

9              MS. GOYKADOSH:  Objection.

10    A.  The situation was chaotic, sir.

11             THE COURT:  Can you rephrase the question, please,

12    Counsel?

13             MR. LICHTMACHER:  Sure.

14    Q.  You indicated already that Mr. McCurdy was walking towards

15    you, and you also indicated that you were able to see that it

16    was him.  Am I correct so far?

17    A.  Yes.

18    Q.  So I guess you saw his face, correct?

19             MS. GOYKADOSH:  Objection.

20             THE COURT:  Thank you.  Can you please rephrase the

21    question?

22             MR. LICHTMACHER:  Sure.

23    Q.  When he was walking towards you, was anybody standing in

24    front of him hiding you from or blocking you from being able to

25    see that it was him?

1          MS. GOYKADOSH:  Objection.

2          THE COURT:  Thank you.

3          You can answer the question.

4   A.   There were officers all over the tier, so it was a chaotic

5   situation.  It wasn't just him and officers on the tier.

6   Q.   OK.  When officers were there, and when he was walking

7   towards you, at any point were you able to see his face?

8   A.   I was --

9          MS. GOYKADOSH:  Objection.

10          THE COURT:  Thank you.

11          You can answer the question.

12   A.   I wasn't concentrating on his face.  We were trying to get

13   him out of the area because the situation was chaotic.

14   Q.   By the way, was the scalpel ever found on Mr. McCurdy that

15   day?

16          MS. GOYKADOSH:  Objection.

17          THE COURT:  Thank you.

18          You can answer the question.

19   A.   I have no knowledge of that.

20   Q.   But you were captain of security there?

21          MS. GOYKADOSH:  Objection.

22          THE COURT:  Thank you.

23          Can you please rephrase the question, Counsel?

24          MR. LICHTMACHER:  Sure.

25   Q.   I think you indicated you were captain of security at that

1    time, correct?

2    A.  Of AMKC, yes.

3    Q.  And as captain of security, it would be important to know

4    what weapons would have been recovered in the facility,

5    correct?

6              MS. GOYKADOSH:  Objection.

7              THE COURT:  Thank you.

8              You can answer the question.

9    A.  We recovered a scalpel that day, yes.

10   Q.  And did you recover it from Mr. McCurdy?

11   A.  No.

12   Q.  You did not, OK.  When was the scalpel recovered, if you

13   remember?

14             MS. GOYKADOSH:  Objection.

15             THE COURT:  Thank you.  Sustained.

16   Q.  Now, so as you sit here today, you understand that

17   Mr. McCurdy was not the person with the scalpel at the time the

18   search went on, correct?

19             MS. GOYKADOSH:  Objection.

20             THE COURT:  Thank you.  Sustained.

21   Q.  What, if anything, leads you to believe that Mr. McCurdy

22   was the guy with the scalpel if it wasn't recovered from him?

23             MS. GOYKADOSH:  Objection.

24             THE COURT:  Thank you.  Sustained.

25   Q.  What, if any, weapons were recovered from Mr. McCurdy that

J94Qmcc6                         Bell - Redirect

1    day?

2                 MS. GOYKADOSH:  Objection.

3                 THE COURT:  Thank you.  You can answer the question.

4    A.  None that day.

5    Q.  Now, as head of security, when you hear a commotion, do you

6    have an obligation to investigate what's happening?

7                 MS. GOYKADOSH:  Objection.

8                 THE COURT:  Thank you.  Sustained.

9    Q.  What is your obligation as head of security when you hear a

10   commotion in the building?

11                MS. GOYKADOSH:  Objection.

12                THE COURT:  Thank you.  Sustained.  I understand it's

13   beyond the scope.  You may proceed.

14   Q.  What, if anything, did you do that day when you heard the

15   commotion?

16                MS. GOYKADOSH:  Objection.

17                THE COURT:  Thank you.  You can answer the question.

18   A.  I instructed the officers to secure their inmates.

19   Q.  And where, if anywhere, did you go after you gave that

20   instruction?

21   A.  I didn't go anywhere.

22   Q.  You stood right where you were?

23   A.  Yes.

24   Q.  You stayed right there?

25   A.  I stayed on the tier, yes.

J94Qmcc6                         Bell - Redirect

```
 1   Q.  And were you inquiring as to what was happening?
 2              MS. GOYKADOSH:  Objection.
 3              THE COURT:  Thank you.
 4              You can answer the question.
 5   A.  No.
 6   Q.  As head of security -- withdraw that.  You were wearing
 7   boots that day, you indicated, I take it, correct?
 8              MS. GOYKADOSH:  Objection.
 9              THE COURT:  Thank you.
10              Can you rephrase the question, please, Counsel?
11   Q.  What, if anything, were you wearing on your feet that day?
12   A.  Boots.
13   Q.  At any point in time did you become aware that Mr. McCurdy
14   became injured that day?
15              MS. GOYKADOSH:  Objection.
16              THE COURT:  Thank you.
17              You can answer the question.
18   A.  We learned later that he went to the clinic.
19   Q.  Now, when you saw him walking, I think you said -- I don't
20   want to misquote you -- you handed him off to two other
21   officers, correct?
22   A.  Yes.
23   Q.  What other two officers did you hand him off to?
24   A.  Barr and Roberts.
25   Q.  For what purpose?
```

J94Qmcc6                    Bell - Redirect

1    A.   Officer Emmanuel was involved in the use of force with him,

2    he's not allowed to escort him to the intake.

3    Q.   Why was Mr. McCurdy being escorted to the intake?

4    A.   He was involved in an incident.

5    Q.   When you're involved in an incident, are you also brought

6    to a clinic?

7    A.   From the intake, yes.

8    Q.   So the clinic and the intake are somehow synonymous?

9            MS. GOYKADOSH:   Objection.

10           THE COURT:   Thank you.

11           Can you rephrase the question?

12           MR. LICHTMACHER:   Sure.

13   Q.   What, if any, relationship does intake have with the

14   clinic?

15           MS. GOYKADOSH:   Objection.

16           THE COURT:   Thank you.

17           You can answer the question.

18   A.   An inmate that's involved in an incident goes to the intake

19   first, and then they are escorted to the clinic for medical

20   attention.

21   Q.   And if the inmate is not injured after he goes to intake,

22   is he still escorted for medical attention?

23   A.   Yes.

24   Q.   OK.  And if the inmate is not injured, is he still escorted

25   to an outside hospital?

J94Qmcc6                        Bell - Redirect

1   A.  If the inmate is not injured?

2   Q.  Yeah.

3   A.  I have no medical -- I can't answer that.  That's up to the

4   medical staff.

5   Q.  So then is it fair to say -- what I'm hearing from you is

6   if the medical staff decides he's injured, they send him to an

7   outside hospital.  Is that correct?  Is that your

8   understanding?

9           MS. GOYKADOSH:  Objection.

10          THE COURT:  Thank you.  Sustained.

11  Q.  What's the criteria for an inmate to go to an outside

12  hospital?

13          MS. GOYKADOSH:  Objection.  Beyond the scope.

14          THE COURT:  Thank you.  Arguably asked and answered.

15          Counsel, I will permit a response.

16          You can answer the question.

17  A.  I'm not medical.

18          THE COURT:  Thank you.

19  Q.  Is it your understanding that he has to be injured in order

20  to be taken to an outside hospital?

21          MS. GOYKADOSH:  Objection.

22          THE COURT:  Thank you.  Sustained.

23  Q.  Inmates at Rikers, can they just ask to go to the hospital

24  and they get brought there?

25          MS. GOYKADOSH:  Objection.

1              THE COURT:  Thank you.

2              You can answer the question.

3    A.  Inmates are afforded sick call every day.

4    Q.  I asked you something a little different, but thank you for

5    that.

6              So you're an inmate at Rikers.  Can you say, "I need

7    to go to the hospital, bring me to the hospital."  On his word

8    alone, does he get brought to the hospital?

9    A.  Not on his word alone, no.

10   Q.  In fact, there has to be some kind of medical evidence of

11   an illness, correct?

12             MS. GOYKADOSH:  Objection.

13             THE COURT:  Thank you.

14             You can answer the question if you know the answer.

15   A.  I have no idea.

16             MR. LICHTMACHER:  No more questions.

17             THE COURT:  Thank you.

18             Counsel for defendants.

19             MS. GOYKADOSH:  Nothing further, your Honor.

20             However, we do have a -- nothing further for this

21   witness, your Honor.

22             THE COURT:  Good.

23             Thank you very much, Captain Bell, for your testimony.

24   You can step down.

25             THE WITNESS:  Thank you.

1              (Witness excused)

2              MR. LICHTMACHER:  I'm sorry, but I need a sidebar.

3              THE COURT:  That's fine.  So why don't we take another

4      very short break.

5              Ladies and gentlemen, please bear with us.  We'll take

6      about a ten minute break.  Then I will ask you to come back in.

7      I've committed to get you out of here by 3:30 and I will today.

8              During the recess of this break, don't discuss the

9      case among yourselves.  Don't do any research about the case.

10     Don't discuss the case with anyone else.  I'll see you back

11     here shortly.  Thank you.

12             (Recess)

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

J94Qmcc6                        Bell - Redirect

1           (Jury not present)

2           THE COURT:  Just to note that the witness testified

3    that she did not see plaintiff's face.

4           Let's talk about what we're doing now.  Counsel for

5    plaintiff, do you have any additional evidence that you are in

6    a position to offer at this time?

7           MR. LICHTMACHER:  My position to offer was well posed,

8    your Honor.

9           THE COURT:  I'm sorry?

10          MR. LICHTMACHER:  That was well posed, your Honor,

11   position to offer.

12          Do I have additional evidence?  Yes.  Am I in a

13   position to pose it?  No.  That's why I'm going to make an

14   application.

15          THE COURT:  Thank you.

16          MR. LICHTMACHER:  My application is that you give me

17   until tomorrow morning to attempt to procure the plaintiff's

18   attendance at trial, which I'm -- to be totally honest, I am

19   not optimistic about, nor do I know how useful he'd be without

20   having heard the testimony.  But I'd like to have the

21   opportunity if he can show up tomorrow morning.  If he doesn't

22   show up, I'll obviously, you know, rest at that time.

23          THE COURT:  Thank you.

24          MS. GOYKADOSH:  Your Honor, may I be heard on that

25   issue?

J94Qmcc6                      Bell - Redirect

1          THE COURT:  Yes, please.

2          MS. GOYKADOSH:  We would oppose plaintiff's

3    application.  Mr. McCurdy was brought here today.  He did

4    refuse to come and testify.  It's unclear why one additional

5    day might make a difference.  However, it is one additional day

6    that these officers are forced to go through this trial.  We

7    believe that if Mr. McCurdy did want to come here and

8    participate in his own trial, he certainly had an opportunity

9    to do so.

10         We think that the Court went through great efforts to

11   make sure that Mr. McCurdy was here today, and yet he refused

12   to come.  A message was conveyed to him through his own counsel

13   about the possibility of what could happen, and he chose to

14   take that risk.  So he should now have to suffer the

15   consequences of his own actions.

16         THE COURT:  Thank you.  Give me just a moment, if I

17   can.

18         I would like to give the parties a little bit more

19   information about what I know regarding Mr. McCurdy's conduct.

20   Again, this is not complete or comprehensive.  I am summarizing

21   briefly information that was conveyed to me directly through my

22   clerk through the marshals, but let me give you a brief summary

23   of what I understand to have happened.

24         So what I understand to have happened is that the

25   deputy marshal arrived to produce Mr. McCurdy; that he spoke

with Mr. McCurdy and explained that he, per USMS and BOP

policy, he has jewelry, sunglasses, cone, rings, etc.

Apparently, the plaintiff raised his voice and cursed at staff

and stated that he refused to go to court; that he would like

to go back to Rikers.

        Mr. McCurdy asked to use the rest room.  He was

released from the holding cell and allowed to go to a cell in

the rest room.  Afterwards McCurdy apparently told BOP staff

that he was not going back to the holding cell, and then he

started to threaten staff saying he was going to fight them

because he was not going back into the holding cell or into

court.

        The deputy, as I understand it, together with the

supervisor -- I should say the deputy tried to explain to

Mr. McCurdy regarding the information that we discussed

earlier, and I believe the content of our agreed-upon

communication.  Apparently, McCurdy kept threatening to fight

the staff.  The transport team was able to restrain him without

incident and he was escorted from the facility.

        So that's the information that I have.  It does not

augur well for his appearance here tomorrow morning.  I want to

make sure that you have basically all the information that I

have.  I just summarized an email that I received earlier.

        So all of that said, we've got work to do.  I am

inclined to grant the plaintiff's request and to give him the

J94Qmcc6                        Bell - Redirect

1    opportunity to have Mr. McCurdy produced by tomorrow before he

2    rests.  I'm not optimistic given the information that I have.

3    I recognize it is something of an imposition on the defendants,

4    but at the same time plaintiff has been attempting to pursue

5    this lawsuit for some period of time, and I want to give him

6    another opportunity to appear here.

7              Again, I'm not sanguine about the prospects of that,

8    but I think that it would be reasonable to provide him that

9    opportunity.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J941mcc7

```
 1          THE COURT:  So my inclination is to grant plaintiff's
 2   request and to take up at 9 a.m. tomorrow what we will do if
 3   he's not here at that time.
 4          MR. LICHTMACHER:  Your Honor?
 5          THE COURT:  Yes.
 6          MR. LICHTMACHER:  I would like to make a further
 7   application.
 8          THE COURT:  Yes.
 9          MR. LICHTMACHER:  As I'm going to attempt to -- I
10   doubt I can jump through all these hoops.  I doubt I can get it
11   done.  But if we could convene at 9:30, might give me some
12   extra time to at least have the possibility.
13          As your Honor has mentioned, we've been pursuing this
14   for years.  Finally got our day in court.  And my plaintiff
15   undoubtedly is responsible.  Perhaps, however, with him able to
16   leave his jewelry in Rikers, he'll be more cooperative about
17   coming in.
18          THE COURT:  Thank you.  It's very hard to tell.
19          MR. LICHTMACHER:  I'm not optimistic; I won't lie to
20   you.
21          THE COURT:  Thank you.
22          MR. LICHTMACHER:  I am not optimistic.  But, you know,
23   under the circumstances -- and actually, defendants had to be
24   here anyway, until tomorrow, because we're ending at 3:30, and
25   it would have continued through then.  I don't think there's
```

J941mcc7

1    any prejudice.

2            THE COURT:  Good.  Thank you.

3            So I'm going to deny the request to start at 9:30

4    rather than at 9.  I've committed to the jurors to begin every

5    day at 9:15, and I don't believe that there's a substantial

6    difference between the information that we'll have at 9:15 as

7    opposed to 9:30.

8            MS. GOYKADOSH:  Your Honor, I just have a question

9    with regards to timing.

10           THE COURT:  Yes.

11           MS. GOYKADOSH:  Just logistically speaking.

12           THE COURT:  Please.

13           MS. GOYKADOSH:  Today, my understanding is Mr. McCurdy

14   didn't arrive until past 9.  I don't know if that has to do

15   with the busing from GRVC.  I don't know why he wasn't here

16   until after 9 today, and I'm just curious how that's going to

17   impact tomorrow.  If indeed he is on his way but the bus or the

18   means of transportation does not arrive here until whatever

19   time, are we going to just wait until he gets here and then see

20   what happens?  I just want to know what we're going to do.

21           THE COURT:  Thank you.

22           I can't provide a complete answer to that question.

23   And unfortunately I think it will very much vary based on the

24   circumstances.  At this point my expectation is that if

25   Mr. McCurdy is not here and prepared to testify at 9:15 when

J941mcc7

```
1    the jury is ready to hear testimony, then the plaintiff will be
2    required to rest, lacking additional evidence, as I understand
3    it.  As a consequence of plaintiff's failure to appear today,
4    to the extent that he fails to appear tomorrow because he
5    failed to accept the transfer to MCC and to come to court
6    today, that remains the consequence of his decision today.
7            Now I only leave some leeway here because if the
8    information is that Mr. McCurdy will be here, you know,
9    relatively early in the morning, then as you can see, I'm
10   trying to express some flexibility about what we would do.  I
11   don't want to deprive him of the opportunity to put on a case.
12   If we know that he's on the way and it's just a question of
13   waiting for a couple of hours, I think that would be more than
14   appropriate.  It would be the fair and equitable approach.
15           So my expectation is at this point that if he is not
16   here at 9:15 that we will, unfortunately, as a result of his
17   choice, be left with the plaintiff's case as it is.  If that's
18   not the case, then we'll have to deal with the facts as they
19   are at the time.
20           So I hope that's helpful guidance.  Unfortunately I
21   can't anticipate what the circumstances will be and therefore I
22   can't tell you exactly how I expect to respond in all
23   circumstances.
24           Counsel for plaintiff, do I take from you that you
25   have no evidence at this point beyond the testimony of
```

J941mcc7

1    Mr. McCurdy?  Because if so, I would release the jurors for the

2    day now.  We would need to then take some time to engage in a

3    conversation about what I should tell the jury in the event

4    that he fails to appear.  I agree that we need to craft a

5    statement that's appropriate, given my prior statements to them

6    regarding how they should view his absence.  We began a

7    conversation on that earlier, and I would like to complete that

8    conversation and develop language that is informed by the

9    parties' arguments about what I should best tell the jury in

10   that circumstance.

11           So that's what I'd like to ask the parties to engage

12   in now, but because I'm respectful of the jury's time, I'd just

13   like to ask, is there anything else that we need the jury for

14   today?  The gating question for that, Mr. Lichtmacher, is

15   whether there is any evidence beyond Mr. McCurdy's testimony

16   that the plaintiff seeks to introduce here.

17           MR. LICHTMACHER:  Well, there are documents that we

18   can introduce, but the Court has made that readily apparent,

19   when we wanted to do that -- and I would keep my objection

20   to -- 11, 12, 13, and 14.  That's all been properly

21   authenticated, your Honor, but I understand the Court's ruling.

22   I would seek to enter them again with Mr. McCurdy to come in,

23   as I would seek to enter Document No. 15 if he were to come in,

24   and I understand I can't do it without him --

25           THE COURT:  Thank you.

J941mcc7

 1           MR. LICHTMACHER:  -- under these circumstances.  So

 2     the statement was correct but incomplete.

 3           THE COURT:  Good.  Thank you.

 4           Fine.  I've already made a record regarding my reason

 5     not to admit those records.  Among other things, the witness

 6     testified that she did not see him looking in the way that he

 7     was depicted in the photograph, therefore could not state that

 8     they're accurate photographs, the images of him at the time of

 9     the incident.

10           So with that, what I propose to do, counsel, is to

11     bring in the jury, I'll relieve them for the day, then we'll

12     talk about what we'll do in the event that Mr. McCurdy is not

13     produced tomorrow in terms of what I should tell them, in terms

14     of how they will consider the evidence, assuming that the case

15     is put to them following any motions that may be brought by the

16     defense.

17           MR. SIDDIQI:  Your Honor?

18           THE COURT:  Yes.

19           MR. SIDDIQI:  Very quickly, I have an application I'd

20     like to make after the jury leaves for the day.

21           I would just like to express for the record that our

22     preference is that the jury is instructed with regards to

23     Mr. McCurdy's absence today before they're dismissed and, if

24     they are not instructed today, that any instruction would refer

25     to Mr. McCurdy's absence today.  Because the Court in the

J941mcc7

1    morning told them that it was through no fault of his own.

2    That was no longer true as the day progressed.

3              THE COURT:  Thank you.

4              That's denied.  We'll have the opportunity to develop

5    a statement to read to the jury.  I would like to be respectful

6    of the jurors' time.  It's 3:15 now.  If we take the time to

7    develop such a statement before I excuse the jury for the day,

8    I expect that we will not meet the schedule that I've committed

9    to.  As a result, I'm going to deny the request to make any

10   statement to the jury prior to their departure today.  That's

11   because I want to make sure that we have an opportunity to

12   develop an appropriate statement, and I do not want to hold up

13   the jury while we do so.  I think that the marginal benefit of

14   making a statement to the jury today as opposed to tomorrow

15   morning is very small, and as a result, I believe it's

16   appropriate for us to take the time to develop a statement

17   rather than asking to make a statement in prompt order without

18   having the opportunity to develop it or to disrespect the time

19   of our volunteer citizens who are here doing their civic duty.

20             So for those reasons, I'm denying that request.

21             MR. SIDDIQI:  Thank you for letting us make our

22   record, your Honor.

23             THE COURT:  Thank you.  Good.

24             So counsel, if you'd like to make a further record,

25   please do.  What's the incremental prejudice associated with

J941mcc7

1    waiting to develop an appropriate statement and to deliver it

2    to the jury in the morning?

3            MR. SIDDIQI:  No, your Honor.  I have no further

4    record to make.  I thank the Court for its indulgence so far.

5            THE COURT:  Thank you.  Good.

6            Ms. Nelson, would you please bring in the jury.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                    (Jury present)

 2                    THE COURT:  Thank you.

 3                    Counsel, you can be seated.

 4                    So ladies and gentlemen of the jury, I've told you

 5       earlier that sometimes these breaks will actually help the case

 6       move along more efficiently.  Here, what I'm going to tell you

 7       is that you've heard the last of the evidence that you're going

 8       to hear today.  So I'm going to excuse you for the day now.

 9       Please be back tomorrow morning at 9 a.m.  All of you were very

10       prompt yesterday.  We will try to start as close to 9:15 as

11       possible; my hope is no later than 9:15.

12                    So during this recess, as before, please don't discuss

13       the case with each other, don't communicate about the case with

14       anyone else by any means, and don't do any research about the

15       case or anyone or anything to do with it.

16                    I'll see you all tomorrow morning.  So thank you very

17       much.

18                    (Continued on next page)

19

20

21

22

23

24

25

J941mcc7

1           (Jury not present)

2           THE COURT:  Thank you.  Counsel, you can be seated.

3       So let's work on the question of what instruction I

4   should give the jury regarding Mr. McCurdy's absence in these

5   circumstances.  To date, as the parties know, I've instructed

6   the jury I believe thrice that they should not hold

7   Mr. McCurdy's absence against him, that it was as a result of

8   circumstances that were no fault of his own.  I made that

9   comment, if my recollection serves, twice during the course of

10  jury selection and then again once during the beginning of our

11  trial day today.

12      So counsel, of course that's no longer true.  Now

13  Mr. McCurdy is absent not through no fault of his own but

14  because of his fault, and I recognize a legitimate concern that

15  the subsequent part of that instruction -- namely, that the

16  jury is not to take his absence against him -- could be

17  confusing to the jury, perhaps mislead them, to the extent that

18  it leads them to believe that they should not take the absence

19  of any testimony or evidence from him against him, which I do

20  not believe would be the appropriate message.

21      So what I'd like to do is engage in a discussion

22  regarding the appropriate commentary to the jury on this issue.

23  I'd like to hear proposals from each of the parties.

24      Counsel, what are your concrete proposals regarding

25  statements that I might appropriately make under these

J941mcc7

circumstances?

First, let me hear from counsel for defendants.

MR. SIDDIQI:  Can we have a moment to confer, your
Honor.

THE COURT:  Yes.

MS. GOYKADOSH:  Thank you, your Honor.

THE COURT:  And counsel, if you'd like, I could step
down for 10 minutes to let the parties develop your respective
positions.  I'd be happy to do that.  I have one comment, which
is that I have a criminal sentencing in this room at 4 p.m., so
we'll need to move some of you before then.

MR. SIDDIQI:  Your Honor, I don't think we need more
than five minutes, but we do appreciate the opportunity.

THE COURT:  That's fine.  I'll step down for 10
minutes.  Please develop proposals, both defendants and
plaintiff, and then I will come back and we'll discuss your
concrete proposals.  To the extent that you have the
opportunity to do so, I would encourage you to discuss your
alternatives with your adversary.

MS. GOYKADOSH:  Thank you, your Honor.

May Captain Bell and Officer Mitchell leave for the
day?

THE COURT:  Yes.  You're both excused.  Thank you.
Assuming you wish to be excused.  You're welcome, of course, to
be here throughout the course of whatever of the proceedings

J941mcc7

1     you wish.

2                   I'll step down, and I'll see you momentarily.

3                   ALL COUNSEL:  Thank you, your Honor.

4                   (Recess)

5                   (In open court)

6                   THE COURT:  Thank you.  Please be seated.

7                   So counsel, we're back on the record after a recess to

8     permit the parties an opportunity to consider alternative

9     statements that the Court can make to the jury in order to

10    address the concerns articulated by defendants, and that I

11    elaborated on before the break.

12                  Counsel, have you made any progress in that regard?

13                  MR. SIDDIQI:  Your Honor, there is no agreement.  We

14    have our version -- I have it written legibly for the Court --

15    but we don't have an agreement between parties.

16                  THE COURT:  That's fine.  If you would, please hand

17    forward your proposal.

18                  Counsel for plaintiff, to the extent you have a

19    proposal, would you also please hand it forward.  I'll read it

20    into the record just for the sake of all.

21                  MR. LICHTMACHER:  My proposal -- I'll do it orally --

22    is that nothing be said to them.  And I base it on 12-CV-6911.

23    Judge Abrams, that's what she did in *Soto*.  I had the wonderful

24    fortune of having my client not show up in that matter.  And

25    that was an extremely serious injury matter.  Not that it

J941mcc7

 1  matters.  But the way Judge Abrams chose to handle it was to

 2  say nothing about it.  And I think the inference is so bad from

 3  him not being here, I think it's piling on to read anything

 4  else about it.  And especially under these circumstances,

 5  because let's remember, there was, according to him, a problem

 6  with him showing up that he thought he would lose his jewelry.

 7  So it's not like he had absolutely no reason.  Now was it

 8  necessarily a rational, you know, sympathetic reason?  Maybe

 9  not.  But nevertheless, it is a reason in his mind, and for

10  that reason, he should get some deference, because the

11  inference is going to be horrible, and the prejudice to him and

12  his trial by him not being here is obviously enormous, as

13  evidenced by the fact that I can't get in so many exhibits,

14  your Honor.

15          THE COURT:  Thank you.

16          MS. GOYKADOSH:  Your Honor --

17          THE COURT:  Sorry.  Let me just comment briefly.

18          The circumstances here I think are complicated by my

19  prior instructions to the jury.  They were I believe correct

20  and proper under the circumstances.  But I am concerned that

21  the jury may be confused by my instruction that they are to

22  draw no adverse inference against him as a result of his

23  failure to appear.  Why am I so concerned?  Principally

24  because, while plaintiff has no obligation to appear to

25  testify, the jury must evaluate his case based on the evidence

1    or lack of evidence, and I'm afraid that they may confuse the

2    instruction that they are not to take his absence against him

3    here to be a refutation of the basic constraint that he must

4    prove his case based on the evidence or lack of evidence and

5    that the jury must evaluate it based on the lack of evidence.

6    In other words, to put it even more simply, I am afraid that

7    they will understand me to have said that his lack of evidence

8    here is excused because I've told them that they cannot hold

9    his absence here against him in any way.  That fundamental

10   concern leads me to conclude that some statement is necessary.

11   I understand that to be the motivating force behind defendants'

12   concern.  I want to frame it in a way that is as neutral as

13   possible, but I fundamentally agree with the defendants that

14   that prior set of instructions could lead a reasonable juror to

15   infer that they are not supposed to hold against the plaintiff

16   the lack of evidence -- namely, the lack of his testimony --

17   and that is something that the defendants rightfully request I

18   correct.

19            Let me just read into the record what the defendants'

20   proposed instruction is, then I will comment further or perhaps

21   propose an alternative.

22            "I have previously instructed you that plaintiff was

23   not present by no fault of his own.  Since I gave you those

24   instructions, the factual circumstances regarding plaintiff's

25   absence have changed.  I'm informing you that yesterday (and

J941mcc7

 1    today) plaintiff had the opportunity to appear for trial but

 2    refused to appear.  Therefore, you may draw any inference or

 3    conclusion that stems from the plaintiff's refusal to appear

 4    for his trial."

 5            If you'd give me a moment, I'd like to see if I can

 6    take a few moments to develop an alternative to this.

 7            Thank you.  So let me read you a brief proposed

 8    alternative instruction.  It would read as follows:

 9            "During jury selection and at the outset of trial

10    yesterday, I instructed you that plaintiff was not present at

11    trial through no fault of his own and that you were not to hold

12    that fact against him in any way, nor were you to speculate

13    regarding the reasons for plaintiff's absence.  I'm now

14    modifying that instruction as follows:

15            "Plaintiff has chosen not to appear to provide

16    testimony in this case.  A plaintiff in a civil trial is under

17    no obligation to provide testimony in support of his case.  He

18    may instead choose to prove it through other evidence.

19    However, you should evaluate the claims asserted by plaintiff

20    in light of the evidence or lack of evidence presented at

21    trial."

22            Thank you.  I'm going to modify that briefly.

23            MR. LICHTMACHER:  Your Honor, if I may.

24            THE COURT:  Thank you.  Give me one moment.

25            MR. LICHTMACHER:  Sure.

J941mcc7

1          THE COURT:  The last sentence would read instead:

2    "However, you may consider both the evidence as well as any

3    perceived lack of evidence presented by plaintiff in evaluating

4    the merits of his claim."

5          So just to read the substance of it again without the

6    introductory remarks, it would read:

7          "Plaintiff has chosen not to appear to provide

8    testimony in this case.  A plaintiff in a civil trial is under

9    no obligation to provide testimony in support of his case.  He

10   may instead choose to prove it through other evidence.

11   However, you may consider both the evidence as well as any

12   perceived lack of evidence presented by plaintiff in evaluating

13   the merits of his claims."

14         In other words, I'm trying to clarify the basic issue

15   that I've identified earlier without saying that he refused to

16   appear or suggesting that they can draw an adverse inference

17   from the fact that he refused to appear here.  And I want to

18   make sure that it's clear to them that they can consider the

19   lack of evidence in evaluating the claims.  I just give you

20   that alternative.  I invite argument regarding either that

21   proposal, the defendant's original proposed instruction, or

22   what I understand to be plaintiff's initial position -- namely,

23   that we provide no commentary at all.

24         Counsel for plaintiff.

25         MR. LICHTMACHER:  I think it's too strong, your Honor,

J941mcc7

and even though in the beginning -- it's got to be clear in the

beginning.  The first two days he had a legitimate excuse for

not showing up, and it's got to be made clear about that.  The

third day he had a perceived excuse, which may be borderline,

you know, may or may not be believed, but nevertheless, it was

more in his corner.  It may or may not be believed, but

nevertheless, he sensed a detriment to himself by coming to

court, because he did, because of the property.  So he did

sense that, and I don't think that should be left out.

THE COURT:  Thank you.

Should I also include that he cursed at the Marshals

and threatened them?

MR. LICHTMACHER:  I know you're being facetious.

THE COURT:  I am being facetious, but the point is

that once I get into the circumstances underlying his choice

not to appear here, it raises a question regarding me providing

some kind of normative evaluation of the rationale for his

choice not to appear.  The language that I've selected instead

was selected in order to be very neutral.  It simply says,

"Plaintiff has chosen not to appear to provide testimony in

this case," without saying whether or not he had a good reason

to do so, whether or not he did so in a diplomatic way, whether

or not he did so in a way that might lend credence to the

officer's version of the events and the story.

So the question that I would have is, to the extent

J941mcc7

1  that I were to provide additional facts related to his

2  justification for his failure to appear, how it would be that I

3  would cull them in a way that would be anything other than me

4  importing normative views regarding the nature of his choice,

5  something that I'm hesitant to do on the basis of the

6  information that I have presented to me.  I raised that example

7  in a way that was facetious, as you described, but to

8  illustrate the challenge presented to the extent that the

9  request is that I provide the jury with an explanation of

10  Mr. McCurdy's conduct, as part of this instruction.

11          MR. LICHTMACHER:  Well, in that case, if you're

12  reluctant to do that, your Honor, distinguish the first two

13  days where he was willing to come to court, it was beyond his

14  control, and was only the third day, you know, I mean -- what

15  is today, the second or third day?  I'm tired.  We're at two

16  days of trial.  I'm sorry.  It's the second day.  The first

17  day -- I'm exhausted.

18          You know, the first day was beyond his control.  How

19  about if we say the first day was beyond control, he was

20  faultless, and the second day was not?  Because it would be

21  somewhat misleading to think like the whole time he didn't want

22  to come.

23          THE COURT:  Thank you.

24          Give me one moment, please.

25          MR. LICHTMACHER:  Thank you, your Honor.

1          THE COURT:  I could modify it as follows.  I will not

2    repeat the initial two sentences of the instruction, but the

3    following sentences would read as follows:

4          "I'm now modifying that instruction as follows:

5          "That instruction was accurate at the time that I

6    provided it to you.  However, yesterday, during the course of

7    trial, plaintiff affirmatively chose not to appear to provide

8    testimony in this case.  A plaintiff in a civil trial is under

9    no obligation to provide testimony in support of his case -- he

10   may instead choose to prove it through other evidence.

11   However, you may consider both the evidence as well as any

12   perceived lack of evidence presented by plaintiff in evaluating

13   the merits of his claims."

14         Counsel, does that address the request?

15         MR. LICHTMACHER:  It's an improvement, your Honor, but

16   frankly, I think that if there could be some language in there

17   that says like -- it's not like he wasn't threatened to be

18   harmed if he came to court.  In his warped view of the world,

19   which it may be the way he views things, you know, he was going

20   to lose his jewelry if he showed up to court.  So is that a

21   bogus excuse?  Only he knows for sure.  But nevertheless, it is

22   something tangible.  And the jury could be given a little piece

23   of that; if not that specifically, just the idea that there may

24   have been a mitigating circumstance, at least in his mind, you

25   know, subjectively, if not objectively.  That might be the way

J941mcc7

1   to put it.  Subjectively, he perceived himself through possibly

2   internal harm if he showed up to court.  Objectively -- and I'm

3   sure you don't want to say it.  Objectively, most of us would

4   not agree with that assessment of the situation.  Something

5   like that would be --

6           I'm sorry.  I didn't mean to interrupt, Omar.

7           MR. SIDDIQI:  No, that's fine.

8           MR. LICHTMACHER:  -- would be palatable for

9   plaintiffs.

10          MR. SIDDIQI:  I have comments.  I don't remember any

11  communications that the Court has provided to us that there was

12  any motive for plaintiff not providing his jewelry, that he

13  thought he was going to lose it, simply that he did not want to

14  comply with the rules to check in his jewelry.  I don't

15  remember hearing anything with regards to him having a fear

16  that he would lose it or it would be stolen.

17          THE COURT:  Thank you.  There was no specific

18  statement regarding the state of mind of the plaintiff when he

19  chose to act as he did.

20          MR. LICHTMACHER:  Your Honor, that is implicit in that

21  statement, though.

22          THE COURT:  Thank you.  It may be.

23          Counsel for defendants, please proceed.

24          MR. SIDDIQI:  Your Honor, the only other comment I

25  would have is that I believe that the initial comments that

J941mcc7

1    your Honor made to the jury implied that there was some sort of

2    an encumbrance to plaintiff.  I believe that a jury could

3    fairly draw the conclusion that plaintiff may have been ill or

4    very well may have been incarcerated, and I just want to make

5    clear in the statement that we're going to make now that there

6    was no -- at the current time there is no such encumbrance on

7    plaintiff and that there is nothing preventing him in any way

8    from coming to trial.  My only concern is to rebut any

9    presumption of an encumbrance that was indicated by the special

10   instructions given by the Court.

11        MR. LICHTMACHER:  That kind of wipes out what I'm

12   trying to get in there, your Honor, if the Court accepts that.

13   I mean, it may be a bad excuse, but it's not no excuse.  It's

14   not as if, you know, he just said, well, I don't feel like

15   going to court today, you know, and his perception may be

16   warped, but nevertheless, it's his perception.

17        MR. SIDDIQI:  Your Honor, just to add to that, it's

18   our position that if any portion of the facts that have been

19   given to the Court underlying plaintiff's refusal comes in,

20   then all of those facts should come in, that they should not be

21   selectively culled.

22        THE COURT:  Thank you.

23        MR. LICHTMACHER:  It's a lot more prejudicial,

24   threatening to beat up a correction officer, than it is to

25   explain why he didn't want to come to court.  That's after the

J941mcc7

1    fact.

2              THE COURT:  Thank you.

3         I am concerned about editing the facts that led to

4    plaintiff's decision here not to appear.  It may be, as counsel

5    for plaintiff has suggested, that the logic behind his conduct

6    is implicit in the conduct itself.  But I hesitate to infer

7    that his conduct was motivated by those instincts and nor to

8    justify that conduct.  It's not completely clear from the

9    information that has been provided to me that his conduct was

10   justifiable to the extent that he threatened security officers

11   and exhorted them with verbal abuse.

12        I'd be happy to include a statement that he

13   affirmatively chose not to appear to provide testimony for

14   reasons which are known to him, or something along those lines,

15   or as to which the Court will not speculate.  But I'm unwilling

16   to provide, I'll call it justification for plaintiff's conduct

17   because I am not the plaintiff and don't believe that I have

18   adequate information from which I can infer that rationale.  As

19   a result, my strong inclination is to provide the jury with a

20   very neutral statement regarding the fact that he chose not to

21   appear to provide testimony here and then to let them know they

22   can evaluate the lack of evidence in assessing his claims.

23        So I'm going to deny the plaintiff's request to

24   include I'll call it a normative explanation for the

25   plaintiff's decision-making which led to his choice not to

J941mcc7

1    appear here for the reasons that I've just described.

2            As I said, counsel for plaintiff and defendants, I'd

3    be happy to insert some statement regarding his rationale --

4    namely, for reasons about which the Court cannot speculate --

5    but beyond that, I'm hesitant to speculate regarding the

6    rationale for his conduct, and I'm not sure that that addition

7    would be beneficial.

8            Counsel for plaintiff, would such an addition be

9    beneficial?

10           MR. LICHTMACHER:  It might be.  It might be.  I mean,

11   it would -- it's better than no explanation at all, your Honor.

12           THE COURT:  Thank you.  Good.

13           Counsel for --

14           MR. LICHTMACHER:  I'm not trying to be facetious

15   either.  You know, I mean, when you understand that this is not

16   the most mainstream person on the planet, I get that, you know,

17   and I know the Court gets it, and the defendants get it.  You

18   know, however, there is a subjective aspect --

19           Do you mind if I remain seated, your Honor?

20           THE COURT:  That's fine.  I know you have some health

21   concerns.

22           MR. LICHTMACHER:  Thank you.

23           There is an aspect to this which may not fully justify

24   it, but, you know, it should be given even an iota of

25   deference.  You know, I mean -- and the other thing is his lack

J941mcc7

1   of trust for correction officers.  Who's to say it doesn't

2   emanate from this incident?  You know, I know you're not going

3   to tell the jury that, and I'm not asking you to, but, you

4   know, who knows.  Looking at it objectively, from his life

5   experiences, he may think anyone he leaves this jewelry with is

6   going to steal it.  Now is his perspective correct?  I doubt

7   it, in the case of BOP.  I admit that.  But nevertheless it's

8   him making the irrational decision, not one of us.

9            THE COURT:  Thank you.  Good.  Understood.

10           Counsel for defendants, any additional comments

11   regarding the language that I have just proposed?

12           MS. GOYKADOSH:  So will the Court be including the

13   language "for reasons that the Court will not speculate"?

14           THE COURT:  "As to which the Court cannot speculate."

15           MS. GOYKADOSH:  "As to which the Court cannot

16   speculate"?  We have no problem with that, your Honor.

17           THE COURT:  Thank you.  So let me read to you the

18   entirety of the proposed comment then.  It would read as

19   follows:

20           "During jury selection and at the outset of trial

21   yesterday, I instructed you that plaintiff was not present at

22   trial through no fault of his own and that you were not to hold

23   that fact against him in any way, nor were you to speculate

24   regarding the reasons for plaintiff's absence.  I'm now

25   modifying that instruction as follows:

J941mcc7

1          "That instruction was accurate at the time that I

2     provided it to you.  However, yesterday, during the course of

3     trial, plaintiff affirmatively chose not to appear to provide

4     testimony in this case for reasons as to which the Court cannot

5     speculate.  The plaintiff in a civil trial is under no

6     obligation to provide testimony in support of his case.  He may

7     instead choose to prove it through other evidence.  However,

8     you may consider both the evidence as well as any perceived

9     lack of evidence presented by plaintiff in evaluating the

10    merits of his claims."

11         Counsel, any further comments regarding that proposed

12    text?  First, counsel for plaintiff.

13         MR. LICHTMACHER:  Well, you know my objections, your

14    Honor.  It's preferable to what we started with, and, you know,

15    I understand the Court is trying to be fair.  I'm not

16    commenting on the Court or inferring there's any lack of

17    fairness from the Court.  Sincerely, I would just hope that

18    somebody would try to, you know, take in my subjective, warped

19    view of the world as it is, you know, and he should be given

20    even an iota of deference for that, even if it's wrong.

21         THE COURT:  Thank you.

22         I can reassure you that that is happening in my mind.

23    I'm hesitant to present it to the jury, however.

24         Counsel for defendants, any additional comments on the

25    proposed instruction?

J941mcc7

1         MR. SIDDIQI:  Your Honor, just if he doesn't show up

2    tomorrow, that it would also include tomorrow in the time

3    recitation.

4         MR. LICHTMACHER:  I don't know if it's legally

5    possible to get him tomorrow, your Honor.  I already started

6    making attempts, but I don't know if it's legally possible.

7         THE COURT:  Thank you.

8         Counsel, I'm not sure where I would add that.  Where

9    would you have me add it?  I know that you have only heard me

10   read it and don't have the physical text in front of you.  Can

11   you tell me what you propose for me to modify, however.

12        MR. SIDDIQI:  Your Honor, I believe it's either right

13   before or right after the clause that says "affirmatively

14   chosen."  I think this would be somewhere over there where you

15   say "over the course of events yesterday."

16        THE COURT:  Thank you.  I had said, "However,

17   yesterday, during the course of trial, plaintiff affirmatively

18   chose."

19        MR. SIDDIQI:  So I would say, "Yesterday, over the

20   course of trial, and today, has affirmatively chosen."

21        MR. LICHTMACHER:  We don't know if he's choosing

22   tomorrow.

23        THE COURT:  Thank you.

24        I decline to make that change.  Plaintiff specifically

25   did not present here in order to give testimony.  I think

J941mcc7

1    that's accurate.

2              Good.  Anything else from counsel for defendants?

3              MS. GOYKADOSH:  On this issue or --

4              THE COURT:  Yes, on this issue, and then we can

5    proceed to any other issues you want to discuss.

6              MS. GOYKADOSH:  No, your Honor.

7              THE COURT:  Good.  Thank you.

8              So thank you very much, counsel, for helping us work

9    through this issue.

10             Counsel for defendants, any other issues that you'd

11   like to discuss at this time?

12             MS. GOYKADOSH:  Yes, your Honor.  Two very brief

13   issues.

14             First of all, if plaintiff does show up tomorrow, in

15   the cross-examination, I do intend to ask him about his refusal

16   to appear today, and I just wanted to run that by the Court so

17   that I can plan accordingly.

18             THE COURT:  Thank you.  Let's take that up if and to

19   the extent it becomes an issue.  I'm not sure that that's a

20   fruitful use of our time to discuss that --

21             MS. GOYKADOSH:  Thank you, your Honor.

22             THE COURT:  -- given the facts that we have now.

23   Still, I'd be happy to hear from you tomorrow regarding the

24   purpose to which such line of questioning would be put.

25             MS. GOYKADOSH:  Thank you, your Honor.

J941mcc7

1              And then the second question is just, we are

2    proceeding with the assumption that we should be prepared to

3    sum up tomorrow, and I just wanted to confirm with the Court if

4    that assumption is the correct one.

5              THE COURT:  Yes.

6              MS. GOYKADOSH:  Thank you, your Honor.

7              THE COURT:  I'm sorry.  Let me just make a brief

8    comment regarding the question about summing up.  This is very

9    straightforward.  I have some notes about opening statements,

10   but let me just say the most important thing about closing

11   arguments.

12             Remember, closing arguments permit the parties to draw

13   inferences from the evidence that has been admitted, not to

14   comment on evidence that was omitted.  So to be very clear, I

15   will not permit arguments regarding information, evidence that

16   was expected to be put before the jury that was not, and so I

17   just want to be very clear that closing arguments should be

18   focused on the claims as they have been proven or not proven by

19   the evidence in the case.  Counsel should not attempt to

20   testify through the closing arguments.  You should expect that

21   I will police any such an effort very carefully.

22             MS. GOYKADOSH:  Your Honor?

23             THE COURT:  Yes.

24             MS. GOYKADOSH:  Just to avoid any misunderstanding by

25   me, does that mean that I can say to the jury that plaintiff

J941mcc7

1    didn't appear and that they can infer from that what they may?

2    I believe that would not violate the Court's current

3    instruction.

4              THE COURT:  Yes.  You would certainly be permitted to

5    say that plaintiff did not appear and did not present any of

6    the evidence that you heard during the opening statements.

7              MS. GOYKADOSH:  Thank you.

8              THE COURT:  Remember the judge's instructions that

9    statements by counsel are not facts in evidence.  You are to

10   decide this based on the evidence.  All of those things would

11   be within bounds.

12             MS. GOYKADOSH:  Thank you, your Honor.

13             THE COURT:  Good.  Thank you.

14             Anything else that we should take up now?  Counsel for

15   defendants?

16             MR. SIDDIQI:  Your Honor, I just would quickly like

17   to, for the record, renew our application to have this action

18   dismissed pursuant to Rule 41(b) based on plaintiff's refusal

19   to appear.

20             THE COURT:  Thank you.  Good.

21             Counsel for plaintiff, any argument with respect to

22   that further application?

23             MR. LICHTMACHER:  Yeah, that as you cited repeatedly,

24   plaintiff does not have to show up in a civil case in order to

25   present his case.  So the case has been presented.  Hopefully

J941mcc7

1  it will be presented in more detail tomorrow, but I doubt it,

2  for the reasons we discussed ad nauseam.

3          I would like to know who the defense are going to put

4  on tomorrow.

5          THE COURT:  Thank you.

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J94Qmcc8

1          THE COURT:  Thank you.  Let me just rule on this

2    motion first, and then we will hear from defendants whether and

3    to what extent they expect to put on a case in the event that

4    Mr. McCurdy fails again to appear here.

5          Now, counsel for defendants have made an application

6    that I dismiss this case because plaintiff has failed to appear

7    to testify.  I'm denying that motion.  Rule 41(b) permits

8    involuntary dismissal, amongst other things, if the plaintiff

9    fails to prosecute or to comply with these rules or a court

10   order.

11         In this instance, while the plaintiff himself has

12   chosen not to appear to support his claims, the plaintiff

13   through counsel is still prosecuting the case.  They have

14   called two witnesses.  They have introduced documents, and they

15   are proceeding to litigate the case.  There is a strong

16   preference in the Circuit to decide cases on their merits, and

17   at this point plaintiff, or at least plaintiff through his

18   authorized representative, is actively seeking to pursue his

19   claims.

20         So while it may be that ultimately in the absence of

21   plaintiff's direct testimony those claims may be found by the

22   trier of fact to lack merit, it's not a sufficient

23   justification for me to dismiss the case for failure to

24   prosecute.  Presence of counsel and his efforts here throughout

25   the course of trial the last two days suggest that plaintiff's

J94Qmcc8

1    authorized representative is undertaking substantial efforts to

2    prosecute his client's claims.  So I deny the application for

3    that reason.

4            Counsel for plaintiff, anything else that we should

5    talk about?

6            MR. LICHTMACHER:  Nothing further.  Just who the

7    witnesses are for tomorrow.

8            THE COURT:  Thank you.

9            Counsel for defendants, let's discuss this question

10   in, I'll call it, two states:  First, in the event that

11   Mr. McCurdy chooses again not to appear tomorrow, do you

12   anticipate that you will be calling additional witnesses?

13           MR. SIDDIQI:  No, your Honor.  We would adopt the

14   testimony of the two witnesses, and our only portion of our

15   case in chief would be to read portions of the medical record

16   into the record.

17           THE COURT:  Thank you.  Good.

18           Counsel for defendants, in the event that Mr. McCurdy

19   does choose to testify and appears here at the outset of the

20   trial day or close enough to it that it will not result in a

21   substantial misuse of the Court's and the jury's time, do you

22   anticipate that there be additional witnesses who you'll be

23   calling as part of your case in chief?  In other words,

24   plaintiff would not be resting, so it may be premature for you

25   to comment, but please let me know to the extent you can

J94Qmcc8

 1   provide any feedback.

 2         MR. SIDDIQI:  Your Honor, at this point I can only see

 3   us calling rebuttal witnesses from Officer Mitchell and Captain

 4   Bell.

 5         THE COURT:  Thank you very much.

 6         So, Counsel, you should be prepared to sum up in the

 7   event we don't have additional information regarding

 8   Mr. McCurdy such that plaintiff is in a position where he must

 9   rest.  Then I expect that I would provide the jurors with that

10   instruction shortly before or immediately after plaintiff

11   rests.  Defendant would then begin its case in chief, and then

12   we would hear whether there are any applications.  And to the

13   extent there are no applications, we would submit the case to

14   the jury as to the defendants.  Good.  So thank you very much.

15         Counsel, let me just ask, Mr. Lichtmacher in

16   particular, I'd like to ask you to please clear your table so

17   that the people who will be coming forth in the incoming matter

18   can use that space.  Counsel for plaintiff, if you wish, I will

19   be locking the courtroom after the next proceeding.  I don't

20   know whether you've left your things here in the past.  If you

21   wish, you can simply move them to the side, but I need to ask

22   that the back table be completely clear.

23         MR. LICHTMACHER:  Absolutely, your Honor.

24         THE COURT:  Good.  So thank you all very much.

25         I will see you all here tomorrow morning at 9:00 a.m.

J94Qmcc8

Good luck, Mr. Lichtmacher, in getting your client here.

        This proceeding is in recess.  I'll see you in the morning.

        (Trial continued on September 5, 2019 at 9:00 a.m.)